FILED

1  ISRAEL NOEL MCHENZIE T-58501(PRO SE-PETITIONER) 08 JUL 25 PM 1:11

2  C.S.P. CORCORAN 3B03 #203-L P.O. BOX 3466 STRICT COURT

3  CORCORAN. CA. 93212-3466

4

5

6  UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

7  COUNTY OF SANTA-CLARA

8

9  IN re                              Case No.C08-0551 PJH(PR)

10 ISRAEL NOEL MCHENZIE              REQUEST FOR APPOINTMENT

11 On Habeas Corpus                  OF COUNSEL AND
                                     DECLARATION OF INDIGENCY

12

13

14

15      I, ISRAEL NOEL MCHENZIE DECLARE THAT I AM THE

16 PETITIONER TO THE ABOVE REFERENCED MATTER. THAT I AM

17 INCARCERATED AT CORCORAN STATE PRISON, AND THAT I AM INDIGENT

18 AND UNABLE TO AFFORD COUNSEL. MY TOTAL ASSETS ARE $ 0

19 AND MY INCOME IS $ 0 PER MONTH. I, HEREBY REQUEST

20 THAT COUNSEL BE APPOINTED IN THIS MATTER. SO THAT MY

21 INTERESTS MAY BE PROTECTED BY THE PROFESSIONAL

22 ASSISTANCE REQUIRED.

23      I DECLARE UNDER PENALTY OF PERJURY THAT THE

24 FOREGOING IS TRUE AND CORRECT AND THIS DECLARATION

25 WAS EXECUTED ON _____ AT CORCORAN CALIFORNIA

26

27

28                          Israel N McKenzie

                            PETITIONER

ISRAEL NOEL MCHENZIE

    PETITIONER    IN PRO - PER

  V.)

DERRAL G. ADAMS

    RESPONDANT

 

)EVIDENTIARY HEARING

_____ ) REQUESTED

ISRAEL NOEL MCHENZIE IN PROPRIA - PERSONA AS FOLLOWS:

## I. PARTIES

1.) I, ISRAEL NOEL MCHENZIE, PETITIONER HEREIN, IS CONFINED AT CORCORAN STATE PRISON, IN CORCORAN CA. ON DEC. 13TH, 2004 PETITIONER WAS CONVICTED IN SANTA - CLARA CO. OF ONE COUNT §(459)(a) AND ONE COUNT §(496)(a) AND WAS SENTENCED TO 25 TO LIFE ON BOTH COUNTS THE §(496) WAS STAYED, AND AN ADDITIONAL 5 YEAR ENHANCEMENT WAS ALSO HANDED DOWN FOR A TOTAL OF 30 TO LIFE;

2.) DERRAL G. ADAMS IS THE WARDEN OF CORCORAN STATE PRISON IN CORCORAN, CA.

## II. JURISDICTION

UNDER 28 U.S.C. §2241(d) VENUE IS APPROPRIATE IN BOTH THE DISTRICT IN WHICH THE PRISONER IS IN CUSTODY, AND THE DISTRICT IN WHICH HE WAS CONVICTED AND SENTENCED. PETITIONER IS IN CUSTODY PURSUANT TO JUDGMENT OF A SANTA - CLARA CO. STATE COURT, AND SEEKS RELIEF ON THE GROUND THAT HIS IMPRISONMENT AND SENTENCE ARE IN VIOLATION OF HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION.

3.)            ## III. EXHAUSTION

ON MAY 3RD 2006, COURT OF APPEAL AFFIRMED THE CONVICTION AND SENTENCE, ON JULY 19TH 2006 CALIFORNIA SUPREME COURT DENIED REVIEW. ON MARCH 20TH, 2007 THE SUPERIOR COURT ISSUED A WRITTEN OPINION DENYING A PETITION FOR WRIT OF HABEAS - CORPUS, EXHIBITS M (IN ORIGINAL PETITION.) THE CALIFORNIA COURT OF APPEAL AND CALIFORNIA SUPREME COURT ALSO DENIED A PETITION FOR WRIT OF HABEAS - CORPUS, (EXHIBIT O ORIGINAL PETITION.) PETITIONER THEN FILED A PETITION FOR WRIT OF HABEAS - CORPUS IN THIS COURT. ON FEBRUARY 12, 2008 THIS COURT ISSUED AN ORDER TO SHOW CAUSE. IN THAT ORDER THE COURT STATED THAT ONE OF PETITIONERS CLAIMS, A CLAIM THAT THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO STRIKE PRIOR CONVICTIONS WAS *NOT COGNIZABLE ON HABEAS - CORPUS*. THIS COURT DETERMINED THAT PETITIONER'S OTHER CLAIMS WERE COGNIZABLE.

HABEAS - CORPUS RULE 8(a) Id WHEN DISCUSSING THIS RULE, *THE SUPREME COURT HAS HELD THAT THE FEDERAL JUDICIARY MUST RESOLVE ANY FACTUAL DISPUTES MATERIAL TO A CLAIM APPROPRIATELY RAISED IN A HABEAS - CORPUS PETITION AND THAT RESOLUTION OF SUCH FACTUAL DISPUTES* ~~RELATES TO A CLAIM~~ *REQUIRES AN EVIDENTIARY HEARING IN MOST CASES;* See eg FORD V. WAINWRIGHT 477 U.S. 399,106 S. ct. 2595,91 LEd 2d 355(19,86)

# EVIDENTIARY HEARING

WHEN DECIDING WHETHER TO HOLD AN EVIDENTIARY *HEARING* THE COURT MUST FIRST CONSIDER THE SEMINAL CASE OF *TOWNSEND V. SAIN* 372 U.S. 293. 83 S. Ct. 745. 9 L Ed 2d 770 (1963). IN *TOWNSEND* THE SUPREME COURT REVERSED *THE DISTRICT COURTS* DISMISSAL OF HABEAS-CORPUS APLICATION BECAUSE *THE LOWER COURT IMPROPERLY REFUSED TO HOLD AN EVIDENTIARY HEARING.* THE COURT IDENTIFIED A STRONG FEDERAL POLICY FAVORING HEARINGS, BECAUSE PUNISHMENT OBTAINED IN VIOLATION OF THE CONSTITUTION "IS INTOLERABLE AND THE OPPORTUNITY FOR REDRESS, WHICH PRE- SUPPOSES THE OPPORTUNITY TO BE HEARD, TO ARGUE AND *PRESENT* EVIDENCE, MUST NEVER BE TOTALY FORCLOSED." TOWNSEND 372 U.S. at 322. THE "HEARING POWER MUST BE BROAD AND INDEPENDENT SINCE A NARROW VIEW OF THE HEARING POWER WOULD TOTALY SUBVERT *CONGRESSES* SPECIFIC AIM IN PASSING *THE ACT OF* FEBRUARY 5 IN 18.67 OF AFFORDING *STATE PRISONERS* A FORUM IN FEDERAL TRIAL COURTS FOR THE DETERMINATION OF CLAIMS OF DETENTION IN VIOLATION OF *THE CONSTITUTION.* THE LANGUAGE OF CONGRESS, THE HISTORY OF THE WRIT, THE DECISIONS OF *THIS* COURT, ALL MAKE CLEAR *THAT THE POWER OF INQUIRY ON FEDERAL* HABEAS-CORPUS IS PLENARY.

TOWNSEND, 372 U.S. at 292

THE TOWNSEND COURT ULTIMATELY HELD THAT A DISTRICT COURT ALWAYS HAS *THE AUTHORITY TO HOLD EVIDENTIARY* HEARINGS ON HABEAS-CORPUS CLAIMS; *THE COURT ALSO IDENTIFIED SIX SITUATIONS* WHERE A HEARING IS MANDATORY: IF. 1.) THE MERITS OF THE FACTUAL DISPUTE WERE NOT RESOLVED IN *THE STATE HEARING*. 2.) *THE STATE FACTUAL* DETERMINATION IS NOT FAIRLY SUPPORTED BY *THE RECORD AS A WHOLE.* 3.) THE FACT FINDING PROCEDURE *EMPLOYED BY THE STATE COURT* WAS NOT ADEQUATE TO AFFORD A FULL AND FAIR HEARING; 4.) *THERE IS A SUBSTANCIAL ALLEGATION* OF NEWLY DISCOVERED EVIDENCE. 5.) THE MATERIAL FACTS WERE NOT ADEQUATELY DEVELOPED AT THE STATE COURT HEARING; OR 6.) FOR ANY REASON IT APPEARS *THAT THE STATE TRIER OF FACT DID NOT AFFORD THE* HABEAS APPLICANT A FULL AND FAIR HEARING.

28 U.S.C. §2254(e) AS A GENERAL PROPOSITION *THE A.E.D.P.A.* SHOULD NOT PRECLUDE AN EVIDENTIARY HEARING IN FEDERAL COURT WHERE AN APPLICANT HAS DILIGENTLY SOUGHT TO DEVELOP *THE FACTUAL* BASIS OF A CLAIM FOR HABEAS RELIEF, BUT HAS BEEN DENIED *THE* OPPORTUNITY TO DO SO BY THE STATE COURT. See generally *JONES V. WOOD* 114. F 3d 1002, 1009. (9 TH CIR. 19.98)

UNDER HABEAS CORPUS RULE 8(c) THE DISTRICT COURT MUST APPOINT COUNSEL FOR A QUALIFIED PETITIONER IF AN EVIDENTIARY HEARING IS REQUESTED. *THESE RULES DO NOT LIMIT THE APPOINTMENT* OF COUNSEL UNDER 18 U.S.C. §3006A AT ANY STAGE OF THE CASE IF THE INTEREST OF JUSTICE SO REQUIRES. HABEAS-CORPUS RULE 8(c)

PAGE #

EXCEPTION/DENIAL                                                                        6

STATEMENT OF FACTS                                                                  1-4

CONTENTIONS/PRAYER FOR RELIEF                                            5

ARGUMENTS

   I. APPELLATE COUNSEL DID RENDER                         7.
INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF
THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION

   II. TRIAL COUNSEL DID RENDER INEFFECTIVE          9.
ASSISTANCE IN VIOLATION OF THE 5TH 6TH AND 14TH AMEND. OF
THE U.S. CONST.

   III. THE PROSECUTOR DID COMMIT PREJUDICIAL  15.
MISCONDUCT IN ARGUING THE INCORRECT BURGLARY THEORY
IN VIOLATION OF 5TH 6TH AND 14TH AMEND. OF THE CONST.

   IV. PETITIONER ASSERTS THAT WHEN HE WAS      17.
ADVISED TO WAIVE HIS CONSTITUTIONAL RIGHTS[HE DID SO
WITHOUT INTELLIGENTLY UNDERSTANDING] THEREFORE: HIS
RIGHTS WERE NOT WAIVED(CONCEARNING PRIOR CASE # EE220921)

   V. PERSONS MAY NOT TWICE BE PUT IN JEOPARDY  18.
FOR THE SAME OFFENSE. OR BE COMPELLED IN A CRIMINAL
CAUSE TO BE A WITNESS AGAINST THEMSELVES. OR BE DEPRIVED
OF LIFE LIBERTY OR PROPERTY WITHOUT DUE PROCESS OF LAW:
ART. 1§15

   VI. THE EVIDENCE IS INSUFFICIENT TO SUPPORT  20.
THE CONVICTION OF COUNT 1 §(459) RESIDENTIAL BURGLARY
IN VIOLATION OF STATE AND FEDERAL CONSTITUTIONS.

   VII. INSTRUCTING THE JURY WITH CALTIC NO. 2.15  23.
DID REDUCE THE PEOPLE'S BURDEN OF PROOF IN VIOLATION OF
PETITIONER'S RIGHT TO A FAIR JURY TRIAL AND DUE PROCESS
AS PROMISED IN THE V AND XIV AMENDMENTS TO THE U.S. CONT.

   VIII. IN TERMS OF CONVICTIONS THEMSELVES      25.
RELIEF HAS BEEN GRANTED IN HABEAS ACTIONS FOR CONVICTIONS
UNDER UNCONSTITUTIONAL STATUTES OR ORDINANCES "CRUEL AND
UNUSUAL PUNISHMENT"

    PETITIONER ALSO RESPECTFULLY LODGES
(ENTERS) EXHIBITS A-1 - I-9 UNDER" RULE 15"(C) RELATION BACK
OF AMENDMENTS: AN AMENDMENT OF A PLEADING RELATES BACK TO
THE DATE OF THE ORIGINAL PLEADING WHEN :(2) THE CLAIM OR DEFENSE
ASSERTED IN THE AMENDED PLEADING AROSE OUT OF THE CONDUCT, TRANSACTION
OR OCCURANCE SET FORTH OR ATTEMPTED TO BE SET FORTH IN THE ORIGINAL
PLEADING...

CASES:

|  | | PAGES |
|---|---|---|
| 1 | ALLEN (19.99) 21 Cal. 4TH 424 | 17 |
| 2 | BAINS V. CAMBRA (9TH CIR.) 2000 204 F 3d 964 | 2 |
| 3 | BENSON (19.98) 18 Cal. 4TH 24 36 fn. 8 | 19 |
| 4 | BECK V. ALABAMA (19.80) 447 U.S. 625.633-638 | 20 |
| 5 | BOYKIN V. ALABAMA (19.69) 1.) | 17 |
| 6 | BRADY V MARYLAND (19.63) 373 U.S. 83 [83 S.ct. 1194 10 L Ed. 215] | 15 |
| 7 | BRADY V. MARYLAND 10 L Ed 2d 215.218 | 5 |
| 8 | CROTTS V. SMITH 95 DAR. AT P. 13 668 | 5 |
| 9 | DARDEN V WAINWRIGHT 477 U.S. 168.181 (19.86) | 16 |
| 10 | ESTELLE V. McGUIRE (19.91) 502 U.S. 62 112 S.ct. at 481 | 23 |
| 11 | EVITTS V. LUCEY (19.85) 469 u S. 387.395.83 L Ed 2d 8.21.829,105 S.ct. 1708 | 7 |
| 12 | GARCIA (19.99) 20 Cal. 4TH 490.503 | 19 |
| 13 14 | IN re BIRDWELL (19.96) 50 Cal APP 4TH 926.58 [Cal. Rptr. 2d 244] | 25 |
| 15 | IN re CLARK (19.93) 5 C 4TH 750 783 n20 21 CR 2d 509 | 7 |
| 16 | IN re HODINOITT (19.96) 12 Cal. 4TH 992 [50 Cal.Rptr.2d 706 | 25 |
| 17 | IN re REED (19.83) 33 Cal. 3d 914 [191 Cal.Rptr. 658] | 25 |
| 18 | IN re ROCHA (2005) 135 Cal. ~~app. 4 TH p. 291 [F.3d~~ APP. 4TH 252 | 11 |
| 19 | IN re McVICHERS (19 48) 20 Cal. 2d 284 | 18 |
| 20 | IN re MENDEZ (19.79) 23 Cal. 3d 847 [153 Cal. Rptr. 831] | 18 |
| 21 | IN re FOSS (19.74) 10 Cal. 3d 910 [112 Cal. Rptr. 849] | 4,16 |
| 22 | IN re FREDERICK (1979) 96 Cal. APP. 3d 353.362.365 | 2 |
| 23 | IN re LEE (19.80) 103 Cal. APP. 3d 615 [615 Cal. Rptr. 204] | 16 |
| | IN re TAHL (1969) 1.) | 17 |
| 24 | JACKSON V VIRGINIA (19.79) 443 U.S. 307 317-320 | 1 |
| 25 | JACKSON V. VIRGINIA (19.79) 443 U.S. 307.318-32 | 20 |
| 26 | HEATING V. HOOD (Cal. 19.99) 191 F. 3d 1053 | 23 |
| | PEOPLE V. ANDERSON (2006) 45 Cal. Rptr. 3d 920 | 20 |
| 27 | PEOPLE V. BARTON (19.78) 21 C 3d 513.519 n.3 146 CR 7.27 | 8 |
| | PEOPLE V. BROWN 9 Cal. Rptr. 836.838 | 10 |
| 28 | PEOPLE V. BIVIEFF 226 Cal. APP. 3d 130 at P. 139 | 19 |
| | IN re WOODS (19.68) 64 Cal. 2d [548 Cal.Rptr.889] | 18 |
| | PEOPLE V. GARCIA 20 Cal. 4TH 490.503.85, Cal. Rptr. 2d 280 976 P. 2d 831 (19.99) | 17 |
| | FORD V. WAINWRIGHT 477 US .399. 106 S.ct. 2595 9 1 L Ed 2d 355 (19.86) | 1-A |

TABLE OF AUTHORITIES cont.

CASES:

PAGES

PEOPLE V. CITRINO 46 Cal. 2d 284. 294 P.2d          11.13

PEOPLE V GARETT 112 Cal. Rptr. 2d 643              25

PEOPLE V. GONZALEZ (19.90) 51 Cal. 3d 1197 1214     2

PEOPLE V. GREEN (19.80) 27 Cal. 3d 155              1

PEOPLE V. HATCHETT (1944) 63 Cal. 2d 144 152 [152
146 P. 2d 469]                                      5

PEOPLE V. JOHNSON (19.80) 26 Cal. 3d 557-556        1,16

PEOPLE V. JONES   67 Cal. APP. 4TH 724

PEOPLE V. LEDESMA (19.87) 43 Cal. 3d 171.215        12

PEOPLE V. MCFARLAND 26 Cal. Rptr. 473.476           10

PEOPLE V. MONTOYA (19.94) 7 Cal. 4TH 1027. 10 41-1042   22

PEOPLE V. MOSHER (19.69) Cal. 3d 379 395            1

PEOPLE V. OSBORNE (19.78) 77 Cal. APP. 3d 472 476   11,13

PEOPLE V. PETZNICK (2003) 7 Cal. Rptr. 3d 726       23

PEOPLE V. PERRY   161 Cal. Rptr. 113. 100 Cal. APP. 3d 251   20

PEOPLE V. POPE (19.79) 23 C3d 412.152 CR 732        8

PEOPLE V. PEREZ (19.74) 40 Cal. App 3d 795. 800. 115
Cal. Rptr. 405.)                                    4

PEOPLE V. WELLS 187 Cal. Rptr. 473.476              10

PEOPLE V. ROJAS 206 Cal. APP. 3d. 795 AT P. 802     19

RAMIREZ V. CASTRO (9TH CIR. 2004) 365 F 3d 755      26

REYES V. BROWN (9TH CIR. 2005) 399 F 3d 964         26

PEOPLE V. SHIPMAN (19.65) 62 C 2d 232. 42 CR 1      8

STRICKLAND V. WASHINGTON (19.84) 466 U.S. 668. 80 LEd
2d 674 104 S.ct. 2052                               8

STRICKLAND V. WASHINGTON (19.84) 466 U.S. at 687.688
104 S.ct. 2052 (I.A.C. STANDARD)                   11

SULLIVAN V. LOUISIANA  508 U.S. 275 (93)            20

PEOPLE V. HARDY (19.92) 5 Cal. Rptr. 2d 853 2 Cal. 4TH 86.182   20

TAYLOR V. CARDWELL (9TH CIR. 19.78) 579 F2d 1380    3

PEOPLE V. POPE (19.79) 23 Cal. 3d 412 425           13

PEOPLE V. JOHNSON (19.80) 26 Cal. 3d 557-578        2

PEOPLE V. REDMOND (19.69) 71 Cal. 2d 745 755 [79 Cal.
Rptr. 529                                           2

JONES V. WOOD (9TH CIR 19.97) 114 F 3d 1002         3

NEAL  V. CALIFORNIA (19.60) 55 Cal. 2d 11 [9 Cal. Rptr. 607]  25

(WHITAKER V. ASSOC. CREDIT SERVICE INC. 946 F2d 1222
6TH CIR. 19.91) P. 12

WILLIAMS V. TAYLOR (2000) __ U.S. __ 120 S.ct. 1479. 146
L Ed 2d 435.]                                       3

VICTOR V. NEBRASKA (19.94) 511 U.S. 1 [114 S.ct. 1239. 1251
127 L.Ed 2d 583]                                    23

JOHNSON V. SUBLETT 63 F 3d 926. 929 9TH CIR. (19.95)   16

TOWNSEND V SAIN 372 U.S. 293. 83 S.ct. 745. 9 LEd 2d 770   1.8
(19.63)

PAGES:

PENAL CODE
1  §(459) Subdivision(a)          1-A,2,15,20,21,22,27
2  §667(c)                        19
3  §1170.12(a)(1)                 19
   §1170.12(a)(6)(7)              19
4  §1385                          19
5  §460(a)                        20
   §190 Subdivision(a)            25,26
6  §(496)(a)                      1-A

RULES GOVERNING HABEAS - CORPUS
7  28 U.S.C. § 2254(e)(1)         2
   28 U.S.C. § 2254(e)(2)         3
8  28 U.S.C. § 2241(d)            1-A
   8(a)                           1-A
9  8(c)                           1-B
   28 U.S.C § 2254(e)             1-B
10 18 U.S.C. § 3006A              1-B

RULES AND REGULATIONS
11 § 2.21                         7
   § 2.22                         7
12 § 2.2 B                        7
   § 2.29 D                       7
13 17.4 FEDERAL CONST. STRUCTURE OF THE LEGAL SYSTEM (17.4)   18
EVIDENCE CODES
14 § 1230                         10
   § 240                          10

STATE AND FEDERAL CONST. AMEND.
15
16 5TH 6TH AND 14TH AMEND. TO THE U.S. CONST.   9,15,16
   14TH AMEND. TO THE U.S. CONST.               7,20,23
17 8TH AMEND. TO THE U.S. CONST.                26
18 ART. 1 § 15                                  8,18
   6TH AMEND TO THE U.S. CONST.                 2,20,23
19 PRIOR CASE # EE220921                        17,19

CALIFORNIA CRIM. JURY INSTRUCTIONS
20
21 CALJIC 2.15                                  23,24

ADD. RULE
22 C R C RULE 4.423                             17

23
24
25
26
27
28

TABLE OF AUTHORITIES CONT.
[EXHIBITS A-1 ~ I-9 (2 of 2)]

| EXHIBIT | DOCUMENT |
| --- | --- |
| A-1 | POLICE REPORT P.2 |
| A-2 | C.D.C 1676 (4/91 CHARGE SHEET |
| A-3 | POLICE REPORT P.5 |
| A-4 | POLICE REPORT P.2 of 3 |
| A-5 | DECLARATION OF HIROMI HIGASHI |
| A-6 | CT P. 288 |
| A-7, A-8 | CT P. 303, 304 |
| A-9, A-10, A-11 | CT P. 222, 223, 224 |
| A-12 | RT p.12 |
| A-13 | DECLARATION OF ISRAEL NOEL MCKENZIE |
| B-1 | POLICE REPORT P.3 |
| B-2, B-3, B-4 | RT P. 50, P. 52, P.53 |
| B-5, B-6 | RT P.54, CT P. 229 |
| B-7 | CALJIC 2.13 (REFUSED) |
| B-8 | RT P.46 |
| B-9, B-10, B-11 | PRELIM. HEARING P. 34, P. 10, P. 29 |
| B-12, ~~~~~~ | RT. P. 85, ~~~~~~~~~~ |
| C-1 | SUMMARY OF REVOCATION DECISION P.2 |
| C-2 | STATEMENT OF THE CASE P.1 |
| C-3, C-4 | P. 355, 356 (SENTENCING TRANS.) |
| C-5, C-6 | P. 353, 354 (ROMERO, SENTENCING) |
| C-7, C-8, C-9 | CT P. 295, 296, 297 |
| C-10, C-11 | CT P. 298, 299 |
| C-12, C-13 | CT P. 276, 277 |

TABLE OF AUTHORITIES cont.
[EXHIBITS A-1 ~ I-9 (2 of 2)]

| EXHIBIT | DOCUMENT |
|---|---|
| D-1 | LETTER FROM APPELLATE ATTORNEY |
| D-2, D-3, D-4 | CT p. 213, 214, 215 |
| D-5 | RT p. 12 |
| D-6, D-7 | CT p. 223, p. 224 |
| D-8 | CT p. 292 (DEFENSE CLOSING) |
| D-9 | RT p. 50 (MS. JOHNSTON'S TESTIMONY) |
| E-1, E-2, E-3, E-4 | CT p. 216, 217, 218, 219 |
| E-5 | TABLE OF CONTENTS (OPENING BRIEF) |
| E-6 | RT p. 32 |
| F-1, F-2 | RT p. 66, 67 |
| F-3, F-4 | p. 3 + 8 (OF OPENING BRIEF) |
| F-5, F-6 | RT p. 103, 104 |
| F-7 | RT p. 51 |
| G-1, G-2, G-3 | RT p. 70, p. 64, 65 |
| G-4, G-5, G-6 | CT p. 206, 207, 209 |
| G-7, G-8, G-9 | CT p. 210, 220, 221 |
| G-10 | CT p. 222 |
| H-1 + H-2 | LETTER TO HONORABLE JUDGE MULLIN III |
| H-6 | CT p. 352 |
| H-7 | 10-PAGE ROMERO MOTION |
| H-8, H-9 | RT p. 92, p. 74 |
| H-10 | CT p. 280 |
| I-1 | CT p. 258 |
| I-2 + I-3 | NATURE OF PROCEEDINGS 2 PAGES |

TABLE OF AUTHORITIES
[EXHIBITS A-1 ~ I-9 (2 of 2)]

| EXHIBIT | DOCUMENT |
|---------|----------|
| I-4 | ANSWER FROM ATTORNEY GENERAL P.12 |
| I-5 | CT P.258 |
| I-6 | CALJIC 2.15 |
| I-7 | CHANGE OF PLEA P.6 |
| I-8 | CHANGE OF PLEA P.7 |
| I-8 (2 of 2) | (WAIVING CONST. RIGHTS P.4) |
| I-9 (1 of 2) | (WAIVING CONST. RIGHTS P.8) |
| I-9 (2 of 2) | (WAIVING CONST. RIGHTS P.5) |

## STATEMENT OF FACTS

1. THERE IS PROOF THAT MY DEFENSE COUNSEL IRMA GALLARDO AND
2. THE CRIMINAL JUSTICE SYSTEM FAILED TO PROTECT MY RIGHTS
3. TO A FAIR TRIAL. THE D.A. MARK DUFFY AND DEFENSE COUNSEL
4. CONSPIRED TO CONVICT ME OF A MORE SERIOUS CRIME. (SPECIFICALLY) §(459) RESIDENTIAL BURGLARY. THE SPECIFIC INTENT REQUIRED
5. FOR CONVICTION ON THE OFFENSES WAS TO ILLEGALY FIND PETITIONER GUILTY BY A PREJUDICED, AND IMPROPERLY INSTRUCTED JURY.
6. IT IS A FACT AND MATTER OF RECORD INVESTIGATORS AND
7. POLICE OFFICERS INVOLVED IN THE CASE, THE ALLEGED VICTIM, WITNESSES, AND POLICE REPORTS, AND ALL OF THEIR TESTIMONIES
8. ALL STATE THAT PETITIONER WAS NO WHERE NEAR MS. JOHNSTONS
9. HOME, NO EXCULPATORY EVIDENCE, NO FACTUAL EVIDENCE, THAT THE PETITIONER EVER COMMITED ANY SUCH CRIME OF 1ST DEGREE
10. RESIDENTIAL BURGLARY. IT IS A FACT, AND MATTER OF RECORD THAT EVERY INVESTIGATOR AND POLICE OFFICER INVOLVED IN THE
11. CASE SUPPORTED NOT EVEN ONE FACT THAT PETITIONER McKENZIE
12. COMMITED ANY CRIME AT ALL. IT IS A FACT AND MATTER OF RECORD THAT PETITIONER McKENZIES FINGERPRINTS OR FOOTPRINTS WERE NOT
13. FOUND AT THE SCENE. (See EXHIBITS D-3-4) OFFICER MUNCYS
14. TESTIMONY CT's 214-215 (ALSO See CT's 206,207,209,210,220,221,222 OF THE SAME TESTIMONY [EXHIBITS G-4-G-10] THIS IS THE
15. EVIDENCE THAT IS IN THE RECORD, AND THERE IS NO CREDIBLE
16. EVIDENCE TO SUPPORT A CONVICTION. IN FACT, THE EVIDENCE THE PROSECUTION PRESENTED AT TRIAL POINTS TO ANYTHING
17. BUT AN ILLEGAL CONVICTION. THE ONLY EVIDENCE PRESENTED
18. WAS HEARSAY AND CIRCUMSTANCIAL AND A WITNESS NAMED
19. OCHINARO, WHO TESTIFIED THAT PETITIONER POSSESSED THE ALLEGED CHECK THAT WAS NEVER FOUND NOR LINKED TO THE
20. PETITIONER. SUPPORTING CASES: WHEN SUFFICIENCY OF EVIDENCE
21. IS CHALLENGED, THE COURT MUST DETERMINE WHETHER A REASONABLE TRIER OF FACT COULD HAVE FOUND THAT THE PROSECUTION
22. SUSTAINED IT'S BURDEN OF PROVING IT'S CASE BEYOND A REASONABLE
23. DOUBT. PEOPLE V. JOHNSON 19.80 26 Cal. 3d 557-556. THE SUBSTANCIAL EVIDENCE RULE IS THE YARDSTICK FOR DETERM-
24. INING WHETHER A VERDICT MEETS THE MINIMAL STANDARD OF
25. REASONABLENESS (PEOPLE V. MOSHER)(19.69) Cal. 3d 379
26. 395. UNDER THIS TEST, THE REVIEWING COURT MUST REVIEW THE WHOLE RECORD IN LIGHT MOST FAVORABLE TO THE JUDGMENT
27. TO DETERMINE WHETHER IT CONTAINED SUBSTANCIAL EVIDENCE, i.e. EVIDENCE THAT IS CREDIBLE AND OF SOLID VALUE—
28. FROM WHICH A RATIONAL TRIER OF FACT COULD MAKE FINDINGS BEYOND A REASONABLE DOUBT. PEOPLE V. GREEN(19.80)27 Cal. 3d 1.55(See also) JACKSON V. VIRGINIA(19.79)443 U.S. 307 317-320.

1  PEOPLE V. JOHNSON (1980) 26 Cal. 3d 557-578, IN re FREDERICK
2  (1979) ~~96 Cal. App. 3d~~ 96 Cal. App. 3d 353. 362, 365.
3  SUBSTANCIAL EVIDENCE CANNOT BE BASED ON SPECULATION ABOUT
   ONE FACM AMONG MANY SCENARIOS. *THE EVIDENCE THAT THE PURSE*
4  WAS TAKEN FROM INSIDE THE HOUSE IS CONSTITUTIONALLY INSUFFI-
5  CIENT AND PETITIONER'S CONVICTION FOR BURGLARY MUST BE
   REVERSED. *THE ISSUE OF WHETHER THE EVIDENCE WAS SUFFICIENT*
6  *TO SUPPORT A CONVICTION IS A QUESTION OF LAW THAT MAY BE*
7  RAISED. PEOPLE V. REDMOND (1969) 71 Cal. 2d 745. 755[79
   Cal. Rptr. 529] GENERALLY, A FEDERAL PETITIONER MUST BE
8  ABLE TO SHOW "ACTUAL PREJUDICE" IN OTHER WORDS, *THE COURT*
9  MUST BE ABLE TO FIND THAT THE ERROR HAD SUBSTANCIAL AND
   INJURIOUS EFFECT OR INFLUENCE IN DETERMINING THE JURYS
10 VERDICT. BAING V. CAMBRA (9TH CIR 2000) 204 F3d 964.
11 A DETERMINATION OF A FACTUAL ISSUE MADE BY A STATE COURT
   SHALL BE PRESUMED TO BE CORRECT. IN ORDER TO OVERCOME
12 THIS PRESUMPTION, A PETITION WILL HAVE TO SET FORTH CLEAR
13 AND CONVINCING EVIDENCE *THAT* THE FACTUAL FINDING WAS
   INCORRECT. 28 U.S.C. §2254 (e)(1). IT WAS WITHOUT QUESTION
14 THAT THE PROSECUTION BEARS THE BURDEN OF PROOF BEYOND A
15 REASONABLE DOUBT OF EVERY SINGLE ELEMENT OF THE CHARGED OFFENSE.
16 (PEOPLE V. GONZALEZ (1990) 51 Cal. 3d 1197 1214(AS INCORPOR
   ATED HEREIN) ALL PREVIOUS GROUNDS OF THE ORIGINAL PETITION.
17 LAW ENFORCEMENT INCLUDING INVESTIGATORS AND THE PROSECU-
   TION CREATED AND MANUFACTURED EVIDENCE TO SUPPORT THE CHARG-
18 ED BURGLARY. THEY FAILED TO PROVE BEYOND A REASONABLE
19 DOUBT THAT PETITIONER MCKENZIE COMMITED ANY SUCH CRIME.
   PETITIONER WAS DENIED DUE PROCESS WHEN THE STATE FAILED
20 TO PRESENT EVIDENCE AND EQUAL PROTECTION OF THE LAW.
21 ~~B~~ PETITIONER WAS PREJUDICED BY POLICE INVESTIGATORS
   AND PROSECUTORS AND IT IS CLEAR HIS CONSTITUTIONAL RIGHT
22 OF DUE PROCESS 6TH AMMENDMENT WAS VIOLATED. DEFENSE
23 COUNSEL (IRMA GALLARDO) FAILED TO MOVE TO HAVE CHARGES
   DISMISSED AGAINST PETITIONER DUE TO GOVERNMENTS LACK OF
24 STATUATORY EVIDENCE AND COMPLETEING ALL ELEMENTS TO ~~THE~~
25 CHARGE *THE CRIME* OF RESIDENTIAL BURGLARY §(459). *THERE IS*
   VERY STRONG EVIDENCE THAT A MISTRIAL SHOULD HAVE *BEEN*
26 DECLARED (OCCURED) AND MY COUNSEL DID *NOTHING TO FOLLOW*
   UP ON THIS EVIDENCE. PETITIONER'S TRIAL THAT OF WHICH HE
27 WAS FACING 30 TO LIFE LASTED ONLY TWO DAYS AND INCLUDED
   NO EXCULPATORY EVIDENCE, NO EVIDENCE WHATSOEVER *THAT A CRIME*
28 WAS EVEN COMMITED. IRMA GALLARDO WITHHELD AT *TRIAL*
   PETITIONER'S KNOWN DOCUMENTED HISTORY OF MENTAL INSTABILITY,
   AND CHEMICAL DEPENDENCY, WHICH SHOULD HAVE *BEEN MADE KNOWN*

2)

1  TO THE JURY AS EXPLANATION FOR PETITIONER'S IRRATIONAL
2  BEHAVIOR. THE DEFENSE ATTORNEY (IRMA GALIARDO) AND D.A.
3  (MARK DUFFY) ALONG WITH THE TRIAL COURT JUDGE EX-PARTE
   COMMUNICATIONS PREJUDICED THE PETITIONER AND AN IMMEDIATE
4  UNANIMOUS GUILTY VERDICT RESULTED IN ERROR, ALL OFF THE RECORD,
   AND OUT OF HIS PRESENSE AND PETITIONER NOW CONTENDS THAT THE
5  TRIAL COURT JUDGE, DA, DEFENSE ATTORNEY INFLUENCED THE JURY
6  TO REACH A GUILTY VERDICT BY THE PETITIONER'S VIOLATION OF
   CONSTITUTIONAL RIGHTS. IN THE INSTANT CASE THERE IS NO
7  DIRECT EVIDENCE WHO TOOK MS. JOHNSTON'S PURSE, OR FROM
   WHERE IT WAS TAKEN. RATHER THERE IS ONLY CIRCUMSTANCIAL
8  EVIDENCE THAT PETITIONER McKENZIE WAS SEEN IN POSSESSION
9  OF THE CHECKBOOK. ON THE AFTERNOON THE DAY THE PURSE WENT
   MISSING. IF IT IS NOT CLEAR FROM THE STATE RECORD WHETHER
10 THE TRIAL JUDGE EVER MADE WRITTEN FINDINGS OF FACT, THEN
   THE DISTRICT COURT MUST TRY TO RECONSTRUCT FINDINGS FROM
11 THE STATE COURTS LEGAL FINDINGS AND TO MAKE ITS OWN FINDINGS
12 IF IT CANNOT ADEQUATELY DO SO, ORDINARILY AN EVIDENTIARY
   HEARING SHOULD BE HELD FOR THIS PURPOSE TAYLOR V. CARDWELL
13 (9TH CIR. 19,78) 579 F 2d 1380. HOWEVER, AN EVIDENTIARY
   HEARING WILL NOT BE HELD TO RESOLVE THE FACTUAL ISSUES
14 IN ANY CASE UNLESS THE PETITIONER CAN SHOW THAT THE CLAIM
15 RELIES ON A NEW RETROACTIVE RULE OF CONSTITUTIONAL LAW. OR A
   FACTUAL PREDICATE THAT COULD NOT ~~HAVE~~ PREVIOUSLY HAVE BEEN
16 DISCOVERED THROUGH CONSTITUTIONAL LAW OR A FACTUAL PREDICATE
17 THAT COULD NOT PREVIOUSLY HAVE BEEN DISCOVERED THROUGH
   EXERCISE OF DUE DILIGENCE, AND THE FACTS UNDERLYING THE
18 CLAIM WOULD BE SUFFICIENT TO ESTABLISH BY CLEAR AND
19 CONVINCING EVIDENCE THAT BUT FOR THE CONSTITUTIONAL ERROR
   NO REASONABLE FACT FINDER WOULD HAVE FOUND THE PETITIONER
20 GUILTY. 28 U.S.C. §2254(e)(2) WILLIAMS V. TAYLOR (2000)
   ____ U.S. ____ [120 S.ct. 1479. 146 L.Ed. 2d 435.] THE PRESUMPTION
21 THAT STATE COURT DETERMINATIONS ~~ARE CORRECT~~ OF FACT ARE
22 CORRECT MAY BE REBUTTED WITH ARGUMENTS THAT THE STATE
   COURT DID NOT PROPERLY DETERMINE THE FACTS BECAUSE THE
23 PETITIONER WAS PREVENTED FROM PRESENTING EVIDENCE OR HAD
   INSUFFICIENT OPPORTUNITY TO BE HEARD ON THE MERITS OF FACTUAL
24 DISPUTE. JONES V. WOOD (9TH CIR. 19,97) 114 F 3d. 1002. THERE IS
25 INSUFFICIENT EVIDENCE TO SUPPORT PETITIONER'S BURGLARY
   CONVICTION. SPECIFICALLY THIS EVIDENCE SHOWS THAT ON HIS
26 ORIGINAL STATEMENT TO POLICE ON 3/02/04 See EXHIBIT A
   CHARGE SHEET/CDC 1676 (4/91) THAT THE PETITIONER CLEARLY
27 FOUND A PURSE AT BROCHWOOD LN. IN SARATOGA AND OPENLY
   ADMITTED TO POLICE THAT HE REMOVED A CHECK AND ATTEMPTED
28 TO CASH IT, BUT NEVER DID. THE PETITIONER BEING HONEST AND
   UP-FRONT PUT THE PURSE AND ALL OF ITS CONTENTS IN A
   MAIL-BOX AT THE POST OFFICE LOCATED IN DOWNTOWN
   SARATOGA. (See EXHIBITS A-3 I A-5).  3.)

MS. JOHNSTON TESTIFIED THAT SHE HAD RETURNED HOME AFTER
SHOPPING ON 3/02/04 AND THAT SHE BELIEVES SHE LEFT HER
PURSE ON THE DINING ROOM TABLE AFTER WRITING A CHECK TO
HER GARDENER. BUT WAS NOT SURE. (See EX. B-1-5).
THIS SUPPORTS THE PETITIONERS ASSERTIONS *THAT THERE ARE NO*
SUPPORTING FACTS THAT A BURGLARY EVER HAPPENED.
NO ELEMENTS THAT A CRIME OF BURGLARY EVER TOOK PLACE.
WHERE THE DEFENDANT CANNOT BE SIMULTANIOUSLY GUILTY OF
BOTH CRIMES. BOTH CONVICTIONS ARE VULNERABLE *TO REVERSAL*
WHERE THE REVIEWING COURT CANNOT ASCERTAIN WHAT VERDICT
WOULD HAVE BEEN RETURNED BY A PROPERLY INSTRUCTED JURY.
(PEOPLE V. PEREZ (19.74) 40 Cal. APP. 3d. 795. 800. 115 Cal. Rptr.
405.) PROCEDURAL RIGHTS THAT MAY BE CONSIDERED SO FUNDA-
MENTAL THAT THEIR VIOLATION MAY BE GROUNDS FOR THE ISSUANCE
OF THE WRIT INCLUDE "FAILURE TO REQUIRE PROOF BY THE PROSECUTION
BEYOND A REASONABLE DOUBT OF EVERY ELEMENT OF THE OFFENSE
CHARGED". ~~TREATED~~ IN re FOSS (19.74) 10 Cal. 3d 910 [112
Cal. Rptr. 849] THE ORIGINAL STATEMENT (POLICE REPORT
EXHIBIT A-1) SUPPORTS AS A FACT PETITIONER FOUND THE
PURSE IN THE STREET ON BROOKWOOD LN. AND NEVER ENTERED
THE RESIDENCE. ACCORDING TO DEPUTY MUNCY (THE ARRESTING
OFFICER) HE MADE A THOUROUGH INVESTIGATION AND FOUND
NO EVIDENCE ~~AT~~ THAT PETITIONER WAS NEAR THE SCENE.
(See EX. A-4) NOR WERE FINGERPRINTS FOUND OR ANY SIGN AT
ALL OF ENTRY TO MS. JOHNSTON'S RESIDENCE. (See EXHIBITS D-2+
D-4.) FURTHER COMPELLING EVIDENCE THAT THE GARDENERS
WERE PRESENT AT THE TIME OF THE ALLEGED BURGLARY. AND
DID NOT SEE PETITIONER NEAR OR AROUND THE HOME *THAT DAY.*
(See EXHIBIT F-1-2 CT'S 66-67.) IF AT THE TIME OF PETITIONERS
JURY TRIAL HAD THIS EVIDENCE IN FACT BEEN PRESENTED
TO THE JURY. IT WOULD HAVE CLEARLY SHOWN *THE PETITIONER'S*
*INNOCENCE OF RESIDENTIAL BURGLARY.* PETITIONER COMES
BEFORE *THE COURT A PRISONER WITHOUT PROPER ACCESS TO UP-TO* DATE
LAWS. OR FULL TECHNICAL SKILLS, *HE IS AT AN ENORMOUS DISADVANTAGE*
COMPARED TO THE RESPONDANTS WHO HAVE UNLIMITED ACCESS.
HE PRAYS *THE REVIEWING COURT WILL CONSIDER THE ISSUES ON THEIR*
MERITS. *THERE WAS SUFFICIENT EVIDENCE THAT THE PETITIONER DID*
NOT COMMIT THE CRIME OF 1ST DEGREE RESIDENTIAL BURGLARY AT
*THE TIME OF HIS ARREST.* ARRESTING LAW ENFORCEMENT OFFICIALS
WERE AWARE OF THEIR RESPONSIBILITY TO MEET ALL ELEMENTS OF
*THE CRIME OF BURGLARY.* AND THE LAW REQUIREING THEM TO DO SO.
EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION. LAW ENFORCE-
MENT FAILED, REFUSED TO PRESERVE AND PRESENT EVIDENCE *THAT CLEARED*
THE PETITIONER OF THE CRIME OF RESIDENTIAL BURGLARY.

4.)

# CONTENTIONS

PETITIONER HAS PRESENTED IN THE ORIGINAL HABEAS CORPUS PETITION. AS WELL AS WITHIN THIS DENIAL/OPPOSITION ISSUES, FACTS, TRIAL-TRANSCRIPTS, POLICE REPORTS AND OTHER EXHIBITS. AND *EVIDENCE TO SUPPORT GROUNDS FOR A REVERSAL* ON ALL GROUNDS CONTAINED THEREIN. *CUMULATIVE EFFORT, IS SUFFICIENT TO WARRANT A CONCLUSION OF AN UNFAIR TRIAL AND A MISCARRIAGE OF JUSTICE.* (PEOPLE V. HATCHETT 19.44 63 Cal. 2d 144, 152 [146 P.2d 469.] *THE EXTENT OF THESE ISSUES AND EARORS MADE BY THE TRIAL COURT HAVE PREJUDICED THE PETITIONER TO THE EXTENT THAT HIS CONVICTION MUST BE OVERTURNED* (See UNITED STATES V. FREDERICH) 9TH CIR. 19.96 (78 F.3d 1370. 1381) *PETITIONER PRAYS THE REVIEWING COURT WILL CONSIDER ALL ISSUES CONTAINED WITHIN THE ORIGINAL PETITION.* (AS WELL AS WITHIN THIS DENIAL) ON *THEIR MERITS. AND GRANT REVERSAL ON ALL ~~ISSUE~~ ISSUES.* BRADY V. MARYLAND. 10 L Ed 2d 215.218) ADDITIONALLY THE 9TH CIRCUIT HAS HELD BECAUSE *THE PETITION* WAS PRO SE IT SHOULD BE CONSTRUED LIBERALY.] (CACTIS V. SMITH 95 D.A.R .. at P. 13 668.)

## "PRAYER FOR RELIEF"

PETITIONER IS WITHOUT REMEDY SAVE FOR HABEAS-CORPUS. FOR THE REASONS SET FORTH HEREIN PETITIONER REQUESTS *THAT THIS HONORABLE COURT :*

> i) ISSUE A WRIT OF HABEAS-CORPUS
> ii) ORDER AN *EVIDENTIARY* HEARING AND ... APPOINT COUNSEL.
> iii) BE RE-*TRIED ON ORIGINAL* CHARGES WITH COMPETENT COUNSEL.
> iv) GIVE DISTRICT ATTORNEY OPTION OF OFFERING PETITIONER PLEA-BARGAIN CONSISTENT WITH A RECIEVING STOLEN PROPERTY CHARGE.
> v) ANY AND ALL RELIEF THIS COURT DEEMS NECASSARY.
> vii) GIVE JUDGE ANOTHER CHANCE TO SENTENCE PETITIONER *TO A LESSER* TERM IN ACCORD WITH WHAT HE ORIGINALLY WANTED.

7-21-08
DATE

*Israel N. McKenzie*
ISRAEL NOEL MCKENZIE
T-58501
PETITIONER IN PRO-PER

1
2
3
4
5
6
7
8    UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA
9                        COUNTY OF SANTA CLARA
10

11    In re                              NO. C 08-0551 PJH (PR)
12    ISRAEL NOEL McKENZIE               DENIAL AND EXCEPTION TO THE
13                                       RETURN TO THE ORDER TO SHOW
14                                       CAUSE AND MEMORANDUM OF
                                         POINTS AND AUTHORITIES IN
15    ON Habeas Corpus                   SUPPORT *THEREOF*
16
17
18
19        Petitioner hereby enters his denial and exception
20    to the return to the order to show cause in the above-
21    entitled action. and states:
22              <u>EXCEPTION</u>
23        Respondent has failed to set forth sufficient facts
24    or law to show cause why the relief PRAYED for in
25    the Petition should not be Granted.
26              <u>DENIAL I.</u>
27        Petitioner admits for the Purposes of this action the
28    allegations contained in the return concerning ▓▓▓▓
Paragraph IV. but denies his commitment to (P C)459 (residential
burglary) is Pursuant to a valid Judgment.
                        ▓ 6.)

# I.

## APPELLATE COUNSEL DID RENDER INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION.

PETITIONER FOR THE PURPOSES OF THIS ACTION DENIES EVERY ALLEGATION CONTAINED IN PARAGRAPH 1 OF THE RETURN, AND ALSO DENIES HIS COMMITMENT OF (459) RESIDENTIAL BURGLARY IS PURSUANT TO A VALID JUDGMENT. THE RIGHT TO COUNSEL ON APPEAL ENCOMPASSES A FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL EVITTS V. LUCEY (1985) 469 US 387, 395.83 LEd 2d 821, 829 105 S.Ct. 1708. §2.2 B. "DEFENDANTS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL" RESPONDANT CONTENDS IN THE OPENING OF THE ANSWER TO THE ORDER TO SHOW CAUSE PARAGRAPH 1 LINES 20-23 "SOME OF THESE ASSERTIONS INVOLVE MATTERS THAT ARE OUTSIDE THE RECORD OF APPEAL." THEREFORE, GROUND 1 OF PETITIONERS HABEAS CORPUS SHOULD BE DEEMED NON-PREJUDICIAL. HOWEVER. PETITIONER RESPECTFULLY DISAGREES WITH THIS ALLEGATION AND WOULD NOW REFER TO RULE §2.29 D: DUTY WHEN SHOWING OF ERROR OR PREJUDICE DEPENDS ON FACTS OUTSIDE THE RECORD "APPELLATE COUNSEL HAS NO DUTY TO INVESTIGATE POSSIBLE BASES FOR A COLLATERAL ATTACK ON THE JUDGMENT. IN re CLARK (1993) 5 C4Th 750, 783 N20, 21 CR 2d 509 HOWEVER. WHEN THE RECORD SUGGESTS THAT AN ERROR IN THE PROCEEDINGS COULD HAVE AFFECTED THE OUTCOME, BUT THE RECORD ITSELF IS INADEQUATE FOR THE ARGUMENT TO SUCCEED ON APPEAL, MANY APPELLATE PRACTITIONERS FEEL THAT IT IS GOOD PRACTICE TO LOOK INTO THE MATTER FURTHER TO DETERMINE WHETHER EXTRINSIC EVIDENCE EXISTS THAT WOULD SUPPORT FILING A PETITION FOR A WRIT OF HABEAS CORPUS IN CONJUNCTION WITH AN APPEAL. REFER TO SUPPORTING FACTS (GROUND 1 6-A OF 7) (PETITIONER WOULD ALSO LIKE TO INCORPORATE SAID GROUND HEREIN.) DESPITE CALIFORNIA SUPREME COURTS CLEAR STATEMENT IN IN RE CLARK SUPRA. SOME OF THE ADMINISTRATORS WHO OVERSEE THE APPOINTMENT OF COUNSEL FOR INDIGENT APPELLANTS (See §§ 2.21-2.22) EXPECT ATTORNEYS APPOINTED IN

(circled annotation: ORIGINAL PETITION)

THEIR DISCRETS TO INVESTIGATE POSSIBLE BASES
FOR HABEAS RELIEF THAT APPEAR IN THE RECORD
AND TO FILE A HABEAS PETITION IF INVESTIGATION
ESTABLISHES AN ARGUABLE BASIS FOR RELIEF
WHEN APPOINTED COUNSEL DISCOVERS THE EXISTENCE
OF A POSSIBLE HABEAS ISSUE IN A RECORD HE OR
SHE SHOULD CONSULT WITH THE APPELLATE PROJECT
THAT RECOMMENDED THE APOINTMENT TO FIND OUT
ITS POLICY ON INVESTIGATING AND SEEKING RELIEF
ON HABEAS CORPUS. AN INDIGENT PETITIONER WHO
MAKES A PRIMA FACIE CASE FOR RELIEF ON HABEAS-
CORPUS IS ENTITLED TO APPOINTMENT OF COUNSEL
UNDER CALIFORNIA LAW. PEOPLE V. BARTON (1978)
21 C 3d 513. 519 n 3. 146 CR 727; PEOPLE V.
SHIPMAN (1965) 62 C 2d 226. 232. 42 CR 1
THE SUBSTANCE OF DIRECT APPEAL COUNSELS     AS WELL AS
ARGUMENT IN HIS OPENING BRIEF (EX. E-5   GROUND 1 OF
                                          CRIG. PET)
IN LIGHT OF CASE LAW. AND THE ENTIRE RECORD.
IS DEFICIENT. AND INEFFECTIVE ASSISTANCE OF
COUNSEL, BASED ON US CONST. AMEND. VI AND
CAL. CONST. ART. I. §15; See STRICKLAND V.
WASHINGTON (1984) 466 US. 668. 80 L Ed 2d
674. 104 S. Ct. 2052; PEOPLE V. POPE (1979)
23 C 3d 412. 152 CR 732. MOST APPELLATE
ATTORNEYS AGREE, THAT A BASIC DUTY OF APPELLATE
COUNSEL IN CRIMINAL CASES IS TO EVALUATE THE
ADEQUACY OF TRIAL COUNSELS REPRESENTATION.
HOWEVER, DIRECT APPEAL COUNSEL'S STRATEGY
IS NOT THE HALLMARK OF A COMPETENT LAWYER,
AS HE WAS EVEN CRITISIZED FOR RAISING THE
CRUEL AND UNUSUALL PUNISHMENT CLAIM (EX. D-1   )
AND HIS SPECIFIC I.A.C. CLAIM WAS LACKING
IN MERIT. See EXHIBIT E-5   ) PETITIONER
WOULD NOW LIKE TO RESPECTFULLY INCORPORATE
GROUND 2 OF THE ORIGINAL PETITION HEREIN.
AS WELL AS CLAIM II IN THIS DENIAL "TRIAL COUNSEL
DID RENDER INEFFECTIVE ASSISTANCE OF COUNSEL"

# II.

# TRIAL COUNSEL DID RENDER INEFFECTIVE ASSISTANCE

IN VIOLATION OF THE 5 TH, 6 TH AND 14 TH AMEND. OF THE US. CONST

PETITIONER FOR THE *PURPOSES OF THIS ACTION* DENIES EVERY ALLEGATION CONTAINED IN *PARAGRAPH II OF THE RETURN*, AND ALSO DENIES HIS COMMITMENT OF (P.C.) 459 RESIDENTIAL BURGLARY IS PURSUANT TO A VALID JUDGMENT.

ON DECEMBER 14. 2004, *PETITIONER* ISRAEL N. M^cKENZIE WAS FOUND GUILTY OF BURGLARY IN THE FIRST DEGREE AND RECIEVING STOLEN PROPERTY. THE BURGLARY GUILT WAS INFERRED FROM POSSESSION OF STOLEN PROPERTY AND A "SLIGHT CORROBORATING EVIDENCE" *STANDARD*. PETITIONER HAS ALWAYS MAINTAINED *THAT HE DID* HAVE POSSESSION OF VICTIMS PURSE—"— *HE FOUND IT* IN THE NEIGHBORHOOD, "AS STATED IN THE POLICE REPORT" EXHIBIT A-1, A-2, A-3 AS WELL AS THE DECLARATION OF HIROMI HIGASHI EXH. A-5 PETITIONERS ROOM- MATE AT PERTINENT TIME, RESPECTIVELY. IN LIMINE MOTIONS AND DISCOVERY PROCEEDINGS WERE CONDUCTED ON *THE DAY OF TRIAL*, BOTH THE STATE AND DEFENSE COUNSEL URGED *THE COURT NOT* TO ADMIT ANYTHING *THAT WOULD INFORM THE* JURY WHAT THE PETITIONER TOLD ARRESTING OFFICER ABOUT *THE PROPERTY IN QUESTION*. JUDGE RULED PETITIONER'S STATEMENTS TO POLICE INADMISSABLE. EXHIBIT A-12 PETITIONER ASSERTS *THAT HIS STATEMENTS TO POLICE* FALL WITHIN AN EXCEPTION TO THE *HEARSAY* RULE AS A DECLARATION AGAINST A PENAL INTEREST BECAUSE. BY DEFINITION, *PETITIONER WAS "UNAVAILABLE AS A WITNESS* (PETITIONERS TAKING OF *THE STAND WOULD*

9)

BE TANTAMOUNT TO "WITNESSING AGAINST HIMSELF" DUE TO HIS PRIOR FELONIES. EVIDENCE CODE § 1230 (penal interest). EVIDENCE CODE § 240 (definition of unavailable as a witness" as used in the exception rule.) THE AFOREMENTIONED INFORMATION WAS *NEEDED* FOR PETITIONERS WHOLE *AND ONLY* OFFERABLE DEFENSES, BUT NOTHING WAS PRESENTED TO *THE JURY. PETITIONER* HAD A DUTY TO EXPLAIN WHY HE WAS *IN POSSESSION* OF STOLEN PROPERTY, PEOPLE V. WELLS 187 Cal. App. 2d 324 331-332; PEOPLE V. McFARLAND 26 Cal. Rptr. 473, 476; PEOPLE V. BROWN 9 Cal. Rptr. 836, 838 (ALL OF *THESE CASES* DISCUSS THE EFFECT *OF "NO EXPLANATION"* FOR BEING IN POSSESSION OF STOLEN PROPERTY *ON A JURY'S INFERENCE* OF BURGLARY (GUILT) DEFENSE COUNSEL NEVER PROFFERS AN OPENING STATEMENT, *AND RESTS WITHOUT* PRESENTING A CASE FOR DEFENSE. SEE EXH. A-9,A-10,A-11 DEFENSE COUNSEL DEMONSTRATES BY *THE TOTALITY OF HER* DISPLAY THAT SHE RELIED ON A "INSUFFICIENT EVIDENCE" DEFENSE/ *STRATEGY/THEORY*. BUT THIS IS THE EXACT EQUIVALENT OF NO DEFENSE/STRATEGY/*THEORY IN LIGHT* OF THE SLIGHT CORROBORATING EVIDENCE EXPECTED OF *THE* STATE AND PRESENTED BY *THE SAME*. See EXHIBIT'S C-7~C-13 THIS FUNDAMENTAL *ERROR* OF BEING DENIED ANY DEFENSE TO THE STATE'S ALLEGATIONS IS *EXTREMELY* PREJUDICIAL TO PETITIONERS *TRIAL FUNCTIONING PROPERLY*, PETITIONER CANNOT FATHOM ANY REASON FOR *NOT OFFERING ANYTHING* TO A JURY *THAT* WANTS TO HEAR SOMETHING NEGATING *THE PROSECUTIONS* "SLIGHT CORROBORATING EVIDENCE" STANDARD. PETITIONER'S DEFENSE COUNSEL WAS INCOMPETENT AT *TRIAL. ONLY* A SPECK OF STRATEGY WAS REQUIRED TO VINDICATE PETITIONER, BUT APPOINTED COUNSEL (IRMA GALLARDO) FAILED TO *EVEN APPROACH* ANY MINIMAL WORK STANDARDS AS ARTICULATED

BY *THE UNITED STATES* SUPREME COURT. STRICKLAND V.
WASHINGTON (19.84) 466 U.S. at 687-688. 104 S.Ct.
2052 (I.A.C. STANDARD); See also In re ROCHA (2005)
135 Cal. APP. 4th 252 (HABEAS GRANTED IN BURGLARY
CASE BECAUSE *TRIAL COUNSELS ACTS AND OMMISIONS
DEPRIVED HIM OF A FAIR TRIAL*). THE BURGLARY
WAS INFERRED FROM *THE POSSESSION OF RECENTLY*
STOLEN PROPERTY, BUT PETITIONER ASSERTS THAT
THE INFERENCE WAS IRRATIONAL AND THAT PETITIONERS
ORIGINAL HABEAS PETITION SHOWS WHY. IF BURGLARY
WOULD NOT HAVE BEEN FOUND. PETITIONER WOULD HAVE
MOST LIKELY BEEN REMOVED FROM THE 3-STRIKES
PURVIEW. See EXHIBITS C-5 ~ C-6 PETITIONER HAS
ALWAYS MAINTAINED *THAT HE FOUND THE VICTIMS* PURSE
IN THE NEIGHBORHOOD ON BROOKWOOD LN. See EXHIBIT
___A-1___ DEFENSE COUNSEL HAD A DUTY TO SHOW
THE JURY WHY HE HAD *THE PROPERTY IN HIS POSSESS-
ION*. PEOPLE V. CITRINO 46 Cal. 2d 284 294. P.2d (failure
to show possession was honestly obtained is itself a
Strong circumstance); See also PEOPLE V. OSBOURNE (1978)
77 Cal. APP. 3d 472 476 (innocent POSSESSION IS AN
Affirmitive defense which must be proven) DEFENSE
COUNSEL *DOESNT EVEN ATTEMPT* TO GET ARRESTING
OFFICER MUNCYS TESTIMONY REGUARDING PETITIONERS
EXPLANATION ADMITTED; THIS INFORMATION WAS
CRUCIAL TO A DEFENSE; See EXHIBIT ___D-5___
THERE WAS A WITNESS READY AND WILLING TO
TESTIFY *THAT PETITIONER ON PERTINENT DAY*,
SHOWED HER *THE RECENTLY* FOUND PURSE AND EXPRESSED
A DESIRE TO RETURN *THE PURSE* TO OWNER See HIATTI
JANE HIGASH is ATTACHED DECLARATION ___A-5___
COUNSEL NEVER CALLED ON THIS EASILY OBTAINABLE
WITNESS, WHOM THOUGH SHE DID NOT SEE HOW PETITIONER
AQUIRED *THE PURSE*. COULD TESTIFY TO THE EVENTS
REGUARDING ITS RETURN. ___A-5 + A-13___
(~11)

1   ALSO. THERE WERE GARDENERS AT THE VICTIMS HOME AT THE PERCISE
    TIME OF THE ALLEGED BURGLARY. BUT DEFENSE COUNSEL NEVER ATTEMPTS
2   TO LOCATE THEM OR USE THEM AT THE PRELIMINARY HEARING OR AT
3   TRIAL (See EX. B-1). THIS FAILURE TO INVESTIGATE WAS VERY PREDJU-
    DICIAL AND DAMAGED PETITIONER'S WELL FOUNDED CLAIM OF INNOCENCE
4   BEYOND REPAIR. PETITIONER ASSERTS THAT COURT APPOINTED DEFENSE
    COUNSEL CANNOT WAIVE ANY FUNDAMENTAL RIGHTS OF A DEFENDANT,
5   ESPECIALLY WHEN THE ACCUSED IS NOT AWARE THAT A CONSTITUTIONAL
6   RIGHT OF HIS IS ABOUT TO BE VIOLATED, OR EVEN EXISTS. PETITIONER
    CALLS ATTENTION OF THIS HONORABLE COURT TO THE MANY EXAMPLES
7   IN GROUNDS 1-2 (ORIGINAL PETITION) INCORPORATED HEREIN: OF
8   INEFFECTIVE ASSISTANCE OF COUNSEL AND FAILURE TO DEFEND
    THAT ARE CITED IN THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS.
9   THESE INCIDENTS ADD TO THE LONG AND CUMULATIVE LIST (WHITAKER
    V. ASSOC. CREDIT SERVICE INC. 946 F2d 1222 6TH CIR. 1991)
10  THERE IS NO TACTICAL OR STRATEGIC REASONING IN ALLOWING THE
11  THE JUDGMENT OF (459) RESIDENTIAL BURGLARY TO REMAIN UPHELD.
    DEFENSE COUNSEL SHOULD HAVE INFORMED THE COURT. THE JURY. THE D.A,
12  OF THE PETITIONER'S ORIGINAL STATEMENTS TO POLICE CONCEARNING
    WHERE AND HOW HE FOUND THE PURSE, (See EX. A-1) ALSO. See EX. B
13  [OF THE ORIGINAL PETITION] AND RETURNED IT. AND TO ALL STATEMENTS
    CONCEARNING ALIBY. DEFENSE COUNSEL SHOULD HAVE MAINTAINED A
14  PROFESSIONAL RELATIONSHIP WITH PETITIONER SINCE SHE DID NOT
    DO SO, HER (IRMA GALLARDO'S) REPRESENTATION FELL BELOW AN OBJECTIVE
15  STANDARD OF REASONABLENESS. UNDER PREVAILING PROFESSIONAL NORMS.
16  PEOPLE V. LEDESMA (1987) 43 Cal. 3d 171. 215. WITH REGARD TO
    EACH SUCH ACT OR OMISSION DEFENSE COUNSEL HAD THE RESPONSIBILITY
17  TO MAKE A RATIONAL AND INFORMED DECISION, ON STRATEGY AND
    TACTICS FOUNDED ON ADEQUATE INVESTIGATION AND PREPARATION.
18  IF COUNSEL FAILS TO MAKE SUCH A DECISION, HIS (OR HER) ACTION,
    NO MATTER HOW UNOBJECTIONABLE IN THE ABSTRACT — IS PROFESSIONALLY
19  DEFICIENT; IN THE INSTANT CASE, COUNSEL COULD NOT HAVE MADE
    ANY TACTICAL DECISIONS. SHE DID NOT INVESTIGATE PLAINLY
20  VISIBLE DEFENSES. FAILURE TO INVESTIGATE PETITIONER'S SOLE VIABLE
21  DEFENSE." (GROUND 1 OF THE ORIGINAL PETITION) P. 6-C. ALSO EXHIBIT A-1
    IN THIS PETITION (STATEMENTS TO OFFICER MUNCY) COUNSEL COULD NOT
22  HAVE BEEN LOOKING OUT FOR PETITIONER'S WELFARE. COUNSEL SHOULD
    HAVE INVESTIGATED THE DEFENSES AND EVIDENCE. POLICE REPORTS
23  WERE NEVER SEEN OR HEARD ABOUT BY THE JURY. THE JURY SHOULD
    HAVE BEEN MADE AWARE OF, AND KNOWN ABOUT ALL AND EVERY FACT(S)
24  CONCEARNING THE ORIGINAL POLICE REPORT. AND THE ORIGINAL
    CHARGES. BUT THEY WERE NOT. AND THE ONE SIDED (PREJUDICIAL)
25  PRESENTATION OF THE CASE BY THE PROSECUTOR LED TO A GUILTY
    VERDICT. AS WELL AS THE UNCONSTITUTIONAL SENTENCE OF 30-TO LIFE
26  IN STATE PRISON. DEFENSE COUNSEL NEVER PROFFERS AN OPENING
    STATEMENT. OR PRESENTS ANYTHING AFTER THE STATE RESTS ITS CASE (EX. E-6)
27  DEFENSE COUNSEL NEVER OFFERED ANYTHING AT THE PRELIMINARY HEARING
    EITHER (EX.S: B-9 + B-13) DEFENSE COUNSEL DOESN'T TAKE ISSUE WITH
28  INCONSISTANT TESTIMONY ON MATERIAL POINTS MADE BY VICTIM AND
    WITNESS OCHINARO. THAT IS, POINTS ABOUT IF VICTIM COULD HAVE HEARD
    THINGS GOING ON AROUND HER; AND ABOUT WITNESS OCHINARO'S TIME FRAME
    [WHICH PRIMARILY, THE ENTIRE CASE IS BASED UPON ] FROM PRELIMINARY
    TO TRIAL THEIR

12.)

ANSWERS CHANGE (See Exhibits B-8-B-12) AN OBJECTIVE PERSON, CONSIDERING DEFENSE COUNSELS REACTIONS TO THESE INTERVIEWS WOULD REALIZE HOW DANGEROUS SHE WAS TO PETITIONERS CASE (See Exhibits B-7 + B-6 IN LIGHT OF THE SELF-INCORROBORATING EVIDENCE PRESENTED IN THIS TRIAL AND THE AVAILABLE REBUTTAL DEFENSE WITNESSES. DEFENSE COUNSELS RELIANCE ON AN "INSUFFICIENT EVIDENCE STRATEGY/TACTIC" IS UNACCEPTABLE AS A PROFESSIONAL NORM AND VERY ANOMALOUS —//— IT IS ESSENTIALLY "NO STRATEGY TACTIC" AT ALL. PEOPLE V. POPE (1979) 23 Cal. 3d 412, 425 (when there is no satisfactory explanation for counsels performance in regard to strategy/ tactic) IF HER RELIANCE ON AN INSUFFICIENT EVIDENCE THEORY WAS REASONABLE WHY DOESN'T SHE MOVE FOR ACQUITTAL AT PROSECUTORS CLOSE? See EXHIBITS D-6 + D-7 DEFENSE COUNSEL SEEMS TO BE IN PROSECUTORS CORNER ON A PERTINENT MATTER AT IN LIMINE MOTIONS —//— PETITIONER ALWAYS URGED HIS COUNSEL TO SHOW HIS DEFENSE TO THE CHARGES (See EXHIBITS A-13 + A-12) PETITIONERS COUNSEL IS UNLOYAL AT SENTENCING AS SHE SUBMITS TO THE PROSECUTORS ARGUMENT REGUARDING THE JUDGES DISCRETION —//— FIVE YEARS OF LIBERTY WERE LOST. AND DEFENSE COUNSEL HAS NOTHING TO HELP THE JUDGE OUT. (See EXHIBITS C-3 + C-4) DEFENSE COUNSEL. AT CLOSING ARGUMENTS TELLS THE JURY THAT THE VICTIMS PURSE WAS INSIDE THE HOUSE —// BUT EVEN THE VICTIM IS LESS THAN SURE WHERE THE PURSE WAS LEFT (See EXHIBITS D-8 + D-9) THIS WAS ANOTHER BREACH BY DEFENSE COUNSEL BECAUSE BURGLARY WAS THE DISPOSITIVE ISSUE HERE AND THE STATES CASE WAS NEVER ESTABLISHED BY A CONSTITUTIONAL STANDARD. AND PETITIONERS RIGHTS HAVE BEEN VIOLATED REGUARDING THAT STANDARD. IT APPEARS THAT DEFENSE WAS TRYING TO STRENGTHEN THE CASE FOR THE STATE SOLELY TO OBTAIN A THREE STRIKES CONVICTION. PETITIONER WANTED TO TAKE THE STAND AT TRIAL. BUT COUNSEL FORBADE IT. (See EXHIBIT A-13) PETITIONER McHENZIE

PEOPLE V. OSBORNE (19,78) 77 Cal. App. 3d 472, 476 (INNOCENT POSSESSION IS AN AFFIRMATIVE DEFENSE, WHICH MUST BE PROVEN)
1 PEOPLE V. CITRINO 46 Cal. 2d 284, 294 P. 2d 32   *See also the many cases where defendant has a duty to have some explanation for
(FAILURE TO SHOW POSSESSION WAS HONESTLY OBTAINED IS ITSELF A STRONG CIRCUMSTANCE)    13.)

1  HAS ALWAYS BEEN AN ADDICT/ALCOHOLIC. IN REGARDS TO THE
2  INSTANT MATTER. HE WAS DRUNK WHEN TRYING TO GET A
3  COMPLETE STRANGER, MR. OCHINARD, TO CASH THE CHECK HE
4  FOUND. DEFENSE COUNSEL NEVER EXPLORED THIS AREA
5  AS TO WHY PETITIONER WOULD BE ACTING IN SUCH A
6  BIZZARE FASHION. OR AS TO WHY HE WOULD EVEN ASK MR.
7  OCHINARD TO CASH A CHECK IN THE FIRST PLACE. WHOM HE
   DID NOT KNOW.(See EXHIBITS) A-2+A-3. DEFENSE COUNSEL
8  NEVER INVESTIGATED STATES' WITNESS AND IT SEEMS ILLOGICAL
9  THAT THIS WITNESS IDENTIFIED THE VICTIMS NAME ON A
   CHECK FROM 8 FT. AWAY WHEN MR. OCHINARD CANNOT EVEN [See F-5]
10 SEE VERY WELL AND WEARS GLASSES. PETITIONER SUSPECTS
11 THE POLICE AND OR D.A. FIRST INFORMED THIS WITNESS
12 WHAT THE VICTIMS NAME WAS, IN ORDER FOR HIM TO BE
13 AWARE OF WHO THE CHECK BELONGED TO SPECIFICALLY. AND
   THEREFORE BE A CREDIBLE WITNESS FOR THE STATE. AS WELL
14 FOR THE PROSECUTOR MARK DUFFY. PETITIONERS TRIAL
15 WAS FUNDAMENTALLY PREJUDICED BY HIS COUNSELS
16 UNREASONABLE/DEFICIENT PERFORMANCE AND HE CONSEQENTLY
   RECIEVED A THREE STRIKES' LIFE SENTENCE BECAUSE THIS
17 BURGLARY CHARGE WAS SIMILAR TO HIS PRIORS. See EX. C-5+C-6
18 DEFENSE COUNSEL HAD A RESPONSIBILITY TO OFFER THE JURY
19 A DEFENSE. AND IN FAILING TO DO SO. FLAGRANTLY VIOLATED
   ISRAEL NOEL McKENZIES CONSTITUTIONAL RIGHT TO
20 EFFECTIVE COUNSEL. THE TOTALITY OF DEFECTS, INCLUDING
21 CLAIMS IN THE ORIGINAL PETITION RENDERED THE TRIAL
22 FUNDAMENTALLY PREJUDICED. AT THE VERY LEAST. THE 5
   YEAR ENHANCEMENT WOULD HAVE BEEN INAPPLICABLE
23 IF DEFENSE COUNSEL WOULD HAVE UPHELD HER PROFESSIONAL
24 DUTIES.(See EX's C-3+C-4___)* PETITIONER WOULD LIKE
25 TO STATE FOR THE RECORD. THAT HE NEVER TOLD HIS TRIAL
   COUNSEL THAT HE WENT INTO VICTIMS HOUSE AND STOLE
26 HER PURSE.(See RoPorRs... P.5 EX.H-6+H-7.) SHE NEVER
27 GOT THIS INFO FROM HIM. FURTHER. IF THIS REQUEST IS
28 FORMAL AND ABLE TO BE PREJUDICIAL TO PETITIONER.
   PETITIONER ALLEGES THIS BREACH TO BE INCORPORATED IN
   THE INSTANT CLAIM.

## III.

## THE PROSECUTOR DID COMMIT
## PREJUDICIAL MISCONDUCT

IN ARGUING THE INCORRECT BURGLARY THEORY IN VIOLATION OF AMENDMENTS 5TH 6TH & 14TH

PETITIONER FOR THE PURPOSES OF THIS
ACTION DENIES EVERY ALLEGATION CONTAINED IN
PARAGRAPH III OF THE RETURN, AND ALSO DENIES
HIS COMMITMENT OF (459) RESIDENTIAL BURGLARY IS
PURSUANT TO A VALID JUDGMENT.

IN VIOLATION OF DUE PROCESS. AND A FAIR
TRIAL UNDER THE 5TH 6TH AND 14TH AMENDMENTS OF THE
U.S. CONSTITUTION THE PROSECUTOR (MARK DUFFY) DID
COMMIT PREJUDICIAL MISCONDUCT IN ARGUING IN THE
CLOSING AND REBUTTAL THE "INCORRECT BURGLARY THEORY"
THAT LOWERED THEIR BURDEN TO BE SLIGHT SPECIFICALLY
TO MATTERS NOT IN EVIDENCE (SEE INSUFFICIENT EVIDENCE
CLAIM IN THE ORIGINAL PETITION. AS WELL AS CLAIM VI.
IN THIS DENIAL/OPPOSITION.) RT P 230 SEE A-6. THE
PROSECUTOR STATES IN HIS CLOSING ARGUMENT LINE 10,
"IT'S A PERFECT TIME FOR SOMEONE TO SLIP IN THE DOOR
AND TAKE THE PROPERTY." THIS IS PURELY A MATTER OF
SPECULATION + GUESS WORK. AND NOT IN THE RECORD OF
"EXCULPATORY EVIDENCE" THAT PETITIONER HAS A
CONSTITUTIONAL RIGHT TO BE CHARGED BY. PETITIONER
ASSERTS THAT HE NEVER TOLD DEFENSE COUNSEL OR THE
PROSECUTOR THAT HE ENTERED MS. JOHNSTON'S RESIDENCE
(WITH INTENT TO COMMIT THEFT) AND STOLE HER PURSE.
THEREFORE. HOW AND WHY IS THIS INCORRECT AND
UNCONSTITUTIONAL THEORY BEING PRESENTED TO THE JURY?
(PETITIONER WOULD NOW LIKE TO INCORPORATE CLAIM II.
AND GROUND 2 IN THE ORIGINAL HABEAS HEREIN.)
[TRIAL COUNSEL DID RENDER INEFFECTIVE ASSISTANCE]
TRIAL COUNSEL DID NO OBJECTION TO PROSECUTORS CLOSING
AND REBUTTAL EVEN WHEN PROSECUTOR DEMONSTRATED
HOW. SEE RT 295; 296 28-1 AND 296 16-18 IT'S AN
OPPORTUNITY"-11 "HE GOES IN. TAKES THE PURSE. GONE."
RT 230 L 16-18  ALSO A-7 A-8) THIS CLOSING ARGUMENT
AND INCORRECT THEORY OF BURGLARY WAS PREJUDICIAL.
AS WELL AS CONSTITUTIONALLY UNFAIR TO PETITIONERS
TRIAL AS IT WAS MISLEADING TO THE JURY AND
CONTRIBUTED TO A GUILTY VERDICT BRADY V. MARYLAND
(1.9..63) 373 U.S 83 [83 S Ct 1194 10 LEd 215]

— 15.)

1  THIS PETITION AS WELL AS THE ORIGINAL HABEAS PETITION
2  SPECIFICALLY SHOW THAT ON HIS ORIGINAL STATEMENT TO
3  THE POLICE ON 3/02/04 (See Ex. A CHARGE SHEET/C.DC.1676
   (4/41) THAT THE PETITIONER CLEARLY FOUND A PURSE AT
4  BROOKWOOD LN. IN SARATOGA, AND OPENLY ADMITTED TO
5  POLICE THAT HE REMOVED A CHECK AND ATTEMPTED TO
6  CASH IT (BUT NEVER DID) THE PETITIONER BEING HONEST
   AND UP-FRONT, PUT THE PURSE AND ALL OF ITS CONTENTS
7  IN A MAIL BOX AT THE POST-OFFICE LOCATED IN DOWN-
   TOWN SARATOGA (See Ex. A-3 + A-5) MS. JOHNSTON
8  TESTIFIED THAT SHE HAD RETURNED HOME AFTER
9  SHOPING ON 3/02/04, AND SHE BELIEVES SHE LEFT
10 HER PURSE ON THE DINING ROOM TABLE AFTER WRITING
   A CHECK TO HER GARDENER, BUT, WAS NOT SURE,
11 (See EXHIBIT B-1-5) PETITIONER ASSERTS THAT THERE
12 ARE NO SUPPORTING FACTS THAT A BURGLARY EVER HAPPENED,
13 NO ELEMENTS THAT A CRIME OF BURGLARY EVER TOOK PLACE,
14 "PROCEDURAL RIGHTS THAT MAY BE CONSIDERED SO FUNDA-
   MENTAL THAT THEIR VIOLATION MAY BE GROUNDS FOR THE
15 ISSUANCE OF THE WRIT INCLUDE; FAILURE TO REQUIRE
16 PROOF BY THE PROSECUTION BEYOND A REASONABLE DOUBT
17 OF EVERY ELEMENT OF THE OFFENSE CHARGED. IN re FOSS
18 (19.74) 10 Cal. 3d 910 [112 Cal Rptr. 849] PETITIONER
   WOULD HAVE THIS HONORABLE COURT NOTICE THAT IF A
19 "PROSECUTOR MISCONDUCT" CLAIM IS DENIED, BECAUSE
20 THE PROSECUTORS COMMENTS IN CLOSING ARGUMENT DID
21 NOT "SO INFECT THE TRIAL WITH SUCH UNFAIRNESS AS
   TO MAKE THE RESULTING CONVICTION A DENIAL OF DUE
22 PROCESS" THEN AN I.A.C. CLAIM SHOULD BE FOUND
23 MERITORIOUS, BECAUSE DEFENSE COUNSEL FAILED TO
24 OBJECT TO THE SPECIFIC COMMENTS BY THE PROSECUTION
25 THAT LOWERED THEIR BURDEN TO BE SLIGHT THAT
   INFECTED THE TRIAL WITH SUCH UNFAIRNESS AS TO
26 MAKE THE RESULTING CONVICTION A DENIAL OF DUE
   PROCESS" IN VIOLATION OF THE 5TH 6TH 3 14TH
27 AMENDMENTS TO THE U.S. CONSTITUTION THERE TO,
28 DARDEN V. WAINWRIGHT, 477 U.S. 168, 181 (19.86)
   accord Johnson v. Sublett, 63 F 3d 926, 929 9th CIR.
   (19.95) PEOPLE v. JOHNSON (19.80) 26 Cal. 3d 557, 556
   IN re LEE (19 80) 103 Cal. APP. 3d 615 [613 Cal. Rptr. 104]  16.)

# IV.

PETITIONER ASSERTS THAT WHEN HE
WAS ADVISED TO WAIVE HIS CONSTITUTIONAL
RIGHTS [HE DID SO WITHOUT INTELLIGENTLY
UNDERSTANDING.] THEREFORE, HIS RIGHTS WERE
NOT WAIVED.(CONCEARNING PRIOR CASE # EE220921)

PETITIONER ADMITS (CONCEEDS) THAT HE
WAS INDEED ADVISED OF STRIKES IN HIS 2002 PRIOR CASE #EE220921
AND FOR THE PURPOSES OF THIS ACTION AGREES *THAT THIS IS TRUE*, AS
PETITIONER WAS MISINFORMED, AND ILL-ADVISED IN RAISING *THIS*
PARTICULAR CLAIM; HOWEVER, PETITIONER NOW ASSERTS *THAT THE*
UNINTELLIGENT WAIVING OF HIS OWN RIGHTS (WITHOUT EVEN UNDERSTAND-
ING THAT THEY EXIST. IS UNFAIR, AND PREJUDICIAL; PETITIONER ALSO
ASSERTS UNDER THESE SAME FACTS, THAT TRIAL COUNSEL CANNOT WAIVE
ANY FUNDAMENTAL RIGHTS OF HIS; AND IN SO DOING, HAS BLATANTLY
VIOLATED ISRAEL NOEL MCKENZIE'S CONSTITUTIONAL RIGHTS. PETITIONER
WOULD CALL THIS HONORABLE COURTS ATTENTION TO LINES ~~TO LINES~~
18-21 P 6 AND LINES 21-24 P.7 OF THE CHANGE OF PLEA" TRANSCRIPTS
FROM PETITIONER'S PRIOR. [THE WAIVING OF HIS OWN CONSTITUTIONAL
RIGHTS] (EX. I-7 & I-8.) ALLEN (1999) 21 Cal. 4ᵀᴴ 424 HELD THAT
BOYKIN/TAHL CHALLENGES TO PRIOR CONVICTIONS FROM CALIFORNIA
THAT WERE SUFFERED ON OR AFTER NOVEMBER 7ᵀᴴ 1969 THE DATE
TAHL WAS DECIDED CAN BE MADE COLLATERALLY. (BOYKIN V. ALABAMA
1969).1.) IN OTHER WORDS YOU CAN MAKE *THE* BOYKIN/TAHL CHALLENGE
TO PRIORS IN THE CASE WHERE *THEY ARE ALLEGED*; YOU DO NOT HAVE TO
MAKE THE CHALLENGE IN THE RENDERING COURT WHERE THE PRIOR
ORIGINATED. NOTE: UNDER BOYKIN/TAHL A DEFENDANT MUST BE
ADVISED OF HIS CONSTITUTIONAL RIGHTS (See EXHIBITS I-7 & I-8.)
AND MUST WAIVE THEM WHEN PLEADING GUILTY TO A CRIME (EX. I-9.)
THE DEFENDANT MUST UNDERSTAND THAT HE HAS THE RIGHT TO A JURY
TRIAL. THE RIGHT TO CONFRONT WITNESSES AGAINST HIM; AND THE
RIGHT TO BE FREE FROM COMPELLED SELF-INCRIMINATION.] IF A
DEFENDANT PLEAD GUILTY, OR NO CONTEST WITHOUT INTELLIGENTLY,
UNDERSTANDING AND WAIVING HIS OR HER RIGHTS, THE PLEA IS
~~INVERSED~~ INVALID AND THE CASE CANNOT BE USED AS A PRIOR
CONVICTION TO INCREASE HIS CURRENT SENTENCE. THE SUPREME
COURT HELD. THAT A DEFENDANT CAN COLLATERALLY/CHALLENGE
PRIORS BASED ON BOYKIN/TAHL; ADDITIONALLY. DEFENDANTS PRIOR
CONVICTION(S) ALL AROSE FROM A SINGLE PERIOD OF ABERRANT
BEHAVIOR FOR WHICH HE SERVED A SINGLE PRISON TERM; DEFENDANT
COOPERATED WITH THE POLICE, HIS CRIMES WERE RELATED TO DRUG
ADDICTION AND HIS CRIMINAL HISTORY DOES NOT INCLUDE ANY
ACTUAL VIOLENCE. ABUSE CAN RESULT WHERE *THE COURT CONSIDERED*
IMPERMISSABLE FACTORS IN DECLINING TO DISMISS" OR WHEN A
JUDGES REFUSAL TO DISMISS PRODUCES AN ARBITRARY CAPRICIOUS OR
PATENTLY ~~ABSSORES~~ ABSURD RESULT UNDER THE SPECIFIC FACTS OF
A PARTICULAR CASE . IN re TAHL (1969.) 1.) PEOPLE V. GARCIA
20 Cal. 4ᵀᴴ 490.503 85 Cal. Rptr. 2d 280,976 P2d 831 (1999)
CRC. RULE 4.423 PROVIDES THE FOLLOWING MITIGATING FACTS *THAT*
CAN SUSTAIN THE COURTS STRIKING OF THE PRIOR CONVICTION, OR ITS
*PUNISHMENT;* THE DEFENDANT EXERCISED CAUTION TO ~~AVOID~~ AVOID
*HARM TO PERSONS OR DAMAGE TO PROPERTY.* OR THE AMOUNTS OF MONEY
OR PROPERTY TAKEN WERE DELIBERATELY SMALL. OR NO HARM WAS DONE OR
THREATENED AGAINST THE VICTIM.

## V.

"PERSONS MAY NOT TWICE BE PUT IN JEOPARDY FOR THE SAME OFFENSE, OR BE COMPELLED IN A CRIMINAL CAUSE TO BE A WITNESS AGAINST THEMSELVES, OR BE DEPRIVED OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS OF LAW." ART.1.§15

PETITIONER FOR THE PURPOSES OF THIS ACTION DENIES EVERY ALLEGATION CONTAINED IN PARAGRAPH OF THE RETURN. AND ALSO DENIES HIS COMMITMENT OF (459) RESIDENTIAL BURGLARY IS PURSUANT TO A VALID JUDGMENT.

AT THE APRIL 1ST 2005 HEARING ON PETITIONER'S ROMERO MOTION, COUNSEL ARGUED "INTER ALIA" THAT PETITIONER CERTAINLY SERVED HIS TIME IN PRISON FOR HIS PRIOR STRIKE, RAISING DOUBLE JEOPARDY CONCEARNS RELATIVE TO THE POTENTIAL LIFE SENTENCES IMPOSED IN THE INSTANT CASE. (CT 258) THE LEGASLATIVE BRANCH OF GOVERNMENT CAN CREATE MORE SPECIFIC LAWS, BUT THOSE LAWS MUST BE WITHIN THE BOUNDS OF THE CONSTITUTION. THE COURTS HAVE THE JOB OF DETERMINING WHETHER THOSE STATUTES CONFORM TO THE CONSTITUTION AND INTERPRETING THE CONSTITUTION AS IT APPLIES TO THE FACTS IN A GIVEN CASE." 17.4 FEDERAL CONSTITUTION STRUCTURE OF THE LEGAL SYSTEM.(ALSO SEE CA. CONST. ART.1 §15) THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE HAS BEEN INTERPRETED BY THE UNITED STATES SUPREME COURT AS MAKING MOST OF THE FIRST TEN AMENDMENT PROTECTIONS APPLY TO THE STATE GOVERNMENT ACTIONS AS WELL" (THE CONSTITUTION, PUBLISHED BY THE SENATE 2003-2004) PETITIONER ASSERTS THAT THE STATE AND FEDERAL CONSTITUTION DOES INDEED PREVENT POTENTIAL LIFE SENTENCES FOR RESIDENTIAL BURGLARY AND RECIEVING STOLEN PROPERTY; PROCEDURAL RIGHTS THAT MAY BE CONSIDERED SO FUNDAMENTAL THAT THEIR VIOLATION MAY BE GROUNDS FOR THE ISSUANCE OF THE WRIT INCLUDE THE PLACEMENT OF PETITIONER TWICE IN JEOPARDY IN re MENDEZ (1979) 23 Cal. 3d. 847 [153 Cal. Rptr. 831] SENTENCES THAT ARE BEYOND THOSE ALLOWED BY LAW MAY BE CHALLENGED BY A WRIT FOR HABEAS-CORPUS. EXAMPLES OF UNCONSTITU- TIONAL SENTENCES INCLUDE SENTENCES INCREASED BY INVALID PRIOR CONVICTIONS; IN RE WOODS (1968) 64 Cal. 2d 3 48 Cal. Rptr. 889 ] IMPROPER ADJUDICATION AS AN HABITUAL CRIMINAL; IN RE MCVICKERS (1948) 20 CAL. 2d 264;

18.)

THE COURT CAN, AND SOMETIMES MUST DISMISS ONE OF THE PRIORS
UNDER PENAL CODE SECTION 1385 IN THE FURTHERANCE OF JUSTICE,
DUE TO THE FACT THAT THE PRIORS CAME FROM A SINGLE CASE.
BENSON (1998) 18 Cal. 4TH 24, 36, fn. 8, A COURT DEFINATELY CAN
DISMISS, GARCIA (1999) 20 Cal. 4TH 490, 503. APPROVED *THE COURT
DISMISSING UNDER PENAL CODE SECTION 1385 BASED ON PRIORS
ORIGINATING FROM A SINGLE PAST CASE.* THE PETITIONER ISRAEL
NOEL MCKENZIE ADMITED TO SIX PRIOR CONVICTIONS [WHICH ALL
RESULTED FROM (1) SINGLE CONVICTION.] THE PETITIONER WAS CONVICTED
ON MAY 20TH 2002, IN SANTA CLARA CO. OF 1ST DEGREE BURGLARY.
ALL SENTENCED AT THE SAME TIME. *PETITIONER* COOPERATED WITH THE
POLICE, AND ASSERTS ~~THAT HE "WERE NOT A PART OF THE BURGLARY" OF
SEVERAL.~~ _____ .) THE DISTRICT ATTORNEY'S OFFICE
ILLEGALLY USED COUNTS (1) AND (2) FOR 1ST AND 2ND STRIKES, ALTHOUGH
THE PETITIONER ADMITTED *THE PRIOR* CONVICTION IN SANTA CLARA CO.
THIS CONVICTION DOES NOT CONSTITUTE A 2ND STRIKE. THE ALLEGED
OFFENSES IN THE CURRENT CASE OCCURED IN 2004 IN SANTA-CLARA
CO. WITHIN A THREE YEAR PERIOD (PEOPLE V. ROJAS, 206 Cal. APP. 3d
795 at p. 802; PEOPLE V. BIVIEFF 226 Cal. APP. 3d. 130 at p. 139)
THEREFORE THIS MATTER SHOULD BE CONSIDERED A 1 STRIKE CASE
FOR WHICH PETITIONER MCKENZIE IS STATUTORILY ELIGABLE FOR
*PROBATION* PURSUANT CALIFORNIA PENAL CODE SECTIONS 667(c) AND
1170.12(a)(1) IN ADDITION THE PETITIONER WAS CURRENTLY SERVING
A PRISON TERM FROM SANTA CLARA CO. CASE #EE220921. THUS,
HE IS ENTITLED TO TIME CREDITS FOR PAROLE FROM THIS PRESENT CASE.
(PEOPLE V. ROJAS. 206 Cal. APP 3d 795) ON DEC. 14TH 2004. A JUDGMENT
AND SENTENCING REPORT WAS FILED WITH THE COURT REGUARDING
PETITIONER MCKENZIE. SHORTLY *THEREAFTER* MR. MCKENZIE'S PROBATION
OFFICER RECIEVED A COPY OF A MOTION TO STRIKE PRIOR CONVICTIONS,
DECLARATION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF. SUBMITTED BY DEFENSE COUNSEL IRMA GALLARDO.
THE DEFENSE IS REQUESTING THAT THE COURT STRIKE BOTH THE
PETITIONER'S PRIOR CONVICTIONS FROM CASE #EE220921. THE
PROBATION DEPARTMENT KEPT IT'S POSITION REGUARDING THE PRIOR
CONVICTIONS CASE #EE220921 CONSTITUTING THE STRIKES WOULD
BE UNCHANGED. UPON REVIEW THE PRIOR SANTA-CLARA CO. CONVICTIONS
DO NOT CONSTITUTE PRIOR CONVICTIONS, AND THEREFORE THEY
CANNOT BE USED TO ENHANCE THE PETITIONER'S PRISON TERM.
MR. MCKENZIE FURTHER ASKS THE COURT TO AMMEND THE JUDGMENT
AND SENTENCING REPORT. FURTHER, PURSUANT 1170.12(A)(6)(7) P.C.
"IF CURRENT MULTIPLE FELONIES, EITHER A SECOND OR THIRD STRIKE
CASE, ARE NOT COMMITED ON THE SAME OCCASION, AND DO NOT ARISE
FROM THE SAME SET OF OPERATIVE FACTS. CONSECUTIVE SENTENCING
IS NOT MANDATORY. (PEOPLE V. JONES 67 Cal. APP. 4TH 724).

19.)

# VI.

## THE EVIDENCE IS INSUFFICIENT TO SUPPORT *THE* CONVICTION OF COUNT 1 (459) RESIDENTIAL BURGLARY IN VIOLATION OF STATE AND FEDERAL CONSTITUTIONS

PETITIONER FOR THE PURPOSES OF THIS ACTION DENIES EVERY ALLEGATION CONTAINED IN PARAGRAPH VI. OF THE RETURN, AND ALSO DENIES HIS COMMITMENT OF (459) RESIDENTIAL BURGLARY IS PURSUANT TO A VALID JUDGMENT.

IN VIOLATION OF PETITIONER'S RIGHT TO A FAIR TRIAL *THROUGH* DUE PROCESS AS PROMISED IN THE V AND XIV AMENDMENTS TO THE UNITED STATES CONSTITUTION PETITIONER'S TRIAL JURY MADE AN UNREASONABLE FINDING OF BURGLARY FROM INSUFFICIENT EVIDENCE. JACKSON V. VIRGINIA (1979) 443 U.S. 307. 318-32 (a mere modium of evidence doesn't pass muster - INSUFFICIENT EVIDENCE STANDARD) PEOPLE V. ANDERSON (2006) 45 Cal. Rptr. 3d 920; See also PEOPLE V. PERRY 161 Cal. Rptr 113. 100 Cal. APP. 3d 251 (a reviewing court should not be blind to the QUALITY, or LACK thereof, of evidence to support a verdict) THE TRIAL JUDGE FAILED TO INSTRUCT ON A 'LESSER' CHARGE IN LIGHT OF THE FAINT OFFERENCE FROM THE STATE. BECK V. ALABAMA (1980) 447 U.S. 625, 633-638 (when an element of crime is questioned, lesser included offense is intitled to defendant. Sua Sponte) See also PEOPLE V. HARDY (1992) 5 Cal. Rptr. 2d 853. 2 Cal. 4TH 86. 182 (if there's evidence to justify A lesser included offense, one should be GIVEN Sua Sponte, if an element of a greater offense is questioned.) SULLIVAN V. LOUISIANA 508 U.S. 275 (93) IN THE TRIAL COMPLAINED OF HEREIN, "SLIGHT CORROBORATING EVIDENCE" WAS REQUISITE TO FINDING OF BURGLARY CULPABILITY! INSTEAD, A LOOK AT THE PROSECUTORS PRESENTMENT REVEALS "SLIGHT OF HAND CORROBORATING EVIDENCE" (NOTE: Original action in this matter was dismissed due to lack of evidence—!! D.A. MARK DUFFY DUBIOUSLY RE-FILED WITH NO ADDITIONAL EVIDENCE. POSSIBLY BECAUSE HE WANTED A THREE STRIKES CONVICTION? (See EXHIBIT C-1 ON DEC. 14TH 2004 PETITIONER'S JURY FOUND HIM GUILTY OF

20.)

2.

1  BURGLARY IN THE 1ST DEGREE, A VIOLATION OF PENAL CODE
2  §459-460(a) THE ESSENCE OF THE EVIDENCE PROVIDED TO
   THAT JURY FOLLOWS.( I-2 + I-3      )
3  ① MS. JOHNSTON PROVES HER PURSE WAS MISSING/TAKEN; SHE
4  ALSO STATES AN OCCASION WHEN PETITIONER WAS AT HER HOUSE.
5  (HOWEVER THIS IS OF NO CONCEQUENCE AS PETITIONER AND
   HIS ROOM-MATE LIVED ACCROSS THE STREET IMMEDIATELY
6  TO MS. JOHNSTON; THEY KNEW HER.)See EX. E-7
7  for proof of living Arangment proximity.)[B-1]
8  ② MR. OCHINERO TESTIFIES THAT PETITIONER HAD VICTIMS
   CHECKS (See EX. H-8   )(3) MR. MOGHADAM PROVES TO THE
9  JURY THAT HE WAS A MAILMAN WHO FOUND VICTIMS PURSE
10 IN A POST OFFICE BOX(See EX. H-9  )(4) DEPUTY MUNCY
   PROVES THAT HE DID ARREST ISRAEL McKENZIE PETITIONER,
11 BUT NOTHING OF THE VICTIM WAS FOUND AT HIS RESIDENCE
12 OR ON HIS PERSON(See EX. G-9   ) THE PROSECUTOR
   TIES EVERYTHING UP IN A CONCLUSIONARY FASHION, AND IN
13 IN DOING SO HE INVITES THE REASONABLE JURY TO MAKE
14 UNREASONABLE INFERRENCES. FROM INSUFFICIENT CORROBOR-
   ATING EVIDENCE (See EX. H-10   ) TRIAL JUDGE DOESNT
15 INSTRUCT ON ANY LESSERS! DEFENSE COUNSEL IS ALSO INEFFECTIVE
16 IN THIS REALM. THE JUDGES EXPLAINATION OF CONSIDERABLE
   CORROBORATION TO THE JURY WAS UNFAIR WHEN WE KNOW
17 THAT PETITIONER LIVED NEXT DOOR/ACCROSS THE STREET TO
18 VICTIM (See EX. I-1   ) THE EFFECT OF THE IRRATIONAL
19 FINDING OF BURGLARY WAS EXTREMELY PREJUDICIAL TO
20 PETITIONERS SENTENCE, i.e. THE JUDGE REFUSED TO STRIKE
   PRIOR CONVICTIONS BASICALLY BECAUSE OF THE SIMILARITY
21 OF THE INSTANT OFFENSE TO THOSE PRIORS; THE JUDGE
22 HANDED DOWN 30 YEARS TO LIFE TO PETITIONER (See EX. C-5 + C-6)
   A FIVE YEAR ENHANCEMENT WAS ALSO IMPOSED, WHICH BY
23 IT'S SELF IS SUFFICIENTLY PREJUDICIAL FOR REVERSAL (C-3 + C-4)
24 SINCE WITHIN THIS GROUND THE EVIDENCE" IS INDEED
   IN QUESTION PETITIONER WOULD CALL TO THE COURTS
25 ATTENTION THE COURT OF APPEALS EXPLAINATION FOR DENIAL
26 OF THIS CLAIM ON HABEAS CORPUS WHICH RESPONDANT NOW
   RELIES ON TO WIN HIS ARGUMENT. SPECIFICALLY" DEFENDANTS
27 ARGUMENTS ARE NOTHING MORE *THAN ARGUABLE INTERPRE-*
   *TATIONS OF THE [EVIDENCE]"* RESPONDANTS CONTENTION
28 [ALLEGATION] THAT IT IS REASONABLE TO INFER *THAT*

1  UNLAWFUL ENTRY WITH INTENT TO COMMIT GRAND OR PETIT
2  LARCENY BASED ON THE COURT OF APPEALS DECISION TO UPHOLD
3  THE CONVICTION WHEN ACTUAL [EXCULPATORY] EVIDENCE IS
4  IN QUESTION IS MISTAKEN, AND PREJUDICIAL. *THE COURT
5  OF APPEAL UPHELD "THE EVIDENCE WAS SUFFICIENT TO SUPPORT
6  AN INFERENCE BEYOND A REASONABLE DOUBT THAT PETITIONER
7  TOOK MS. JOHNSTONS PURSE FROM HER HOME AFTER ENTERING
8  FOR THAT PURPOSE". THE COURT THEN BRINGS UP THE FACT
9  THAT DEFENSE COUNSEL FAILS TO RAISE A MERITORIOUS DEFENSE
10 AS TO WHETHER THE PURSE WAS EVEN KNOWN TO HAVE BEEN See
11 IN THE HOUSE AT ALL AG:ANSWER P.12') ALL OF THIS DOES NOT [EXI-4]
12 NEGATE THE FACT THAT THE ELEMENT(S) OF(459) RESIDENTIAL
13 BURGLARY CONSIST OF "UNLAWFUL ENTRY" ACCOMPANIED
14 BY THE INTENT TO COMMIT LARCENY (OR ANY FELONY) WHICH
15 WAS NEVER PROVEN HERE. PEOPLE V. MONTOYA (19,94) 7 Cal. 4Th
16 1027.1041-1042. PETITIONER HAS A CONSTITUTIONAL RIGHT
17 TO BE CONVICTED ON SUFFICIENT EVIDENCE AND PRAYS
18 THIS REVIEWING COURT WILL CONSIDER THE ISSUES ON
19 THEIR MERITS, AS SET FORTH WITHIN.
   PETITIONER WOULD HAVE THIS HONORABLE COURT NOTICE
   THAT IF AN INSUFFICIENT EVIDENCE CLAIM IS DENIED
   BECAUSE IT FINDS SUFFICIENCY OF *THE EVIDENCE TO
   SUPPORT A BURGLARY CONVICTION, THEN AN I.A.C.
   CLAIM SHOULD BE FOUND MERITORIOUS BECAUSE DEFENSE
   COUNSEL RELIED 100% ON AN INSUFFICIENT EVIDENCE
   *THEME.*

# VII

## INSTRUCTING THE JURY WITH CALJIC No. 2.15 DID REDUCE THE PEOPLES BURDEN OF PROOF IN VIOLATION OF PETITIONERS RIGHT TO A FAIR JURY TRIAL AND DUE PROCESS AS PROMISED IN THE V AND XIV AMENDMENTS TO THE U.S. CONSTITUTION

ON DEC. 13. 2004. CALJIC No. 2.15 WAS GIVEN TO PETITIONER'S JURY. INITIALLY THE JUDGE DENIED THE INSTRUCTION, THEN THE PROSECUTOR ARGUED SUCCESSFULLY TO HAVE IT GIVEN. THE TRIAL JUDGE IN THE INSTANT MATTER GAVE AN EXCEEDINGLY MISPLACED CALJIC INSTRUCTION, SAID INSTRUCTION MISLED THE JURY INTO ABSURDLY APPLYING IT TO THE FACTS ESTABLISHED IN THE TRIAL, HENCE, PETITIONER WAS CONVICTED OF BURGLARY. (See Ex __C-2__ ) ESTELLE V. MCGUIRE (19.91) 502 U.S. 62. 112 S.Ct. at 481 (reasonable likelihood that jury has applied Challenged instruction in a way that violates the Constitution.) See also People v. Petznick (2003) 7 Cal. RPtr. 3d 726 (test for harmful error is if the erroneous instruction complained of contributed to the verdict obtained.) AT THE OUTSET OF THIS CLAIM. PETITIONER REASSERTS HIS POSITION OFFERED ON THE ORIGINAL HABEAS PETITION. THE VICE IS THAT THERE WAS NEVER ANY EVIDENCE TO SHOW ANY ELEMENT OF BURGLARY. A VARIANCE OF THIS ISSUE HAS BEEN RAISED ON DIRECT APPEAL, BUT I HIGHLIGHT THE FACT THAT NO ELEMENT(S) OF BURGLARY WAS REMOTELY SUPPORTED BY ANY SUBSTANCIAL EVIDENCE REGUARDLESS IF THE STATE LABELS WHAT THEY PRESENTED AS "SLIGHT CORROBORATING EVIDENCE" PLEASE INCORPORATE ANY AND ALL GROUNDS THAT MAY BE NEEDED FROM THE ORIGINAL HABEAS PETITION (IF NEEDED) TO CLARIFY. RESPONDANTS CONTENTION(ALLEGATION) IN THIS GROUND IS BASED SOLELY ON THE COURT OF APPEALS DECISION. WHICH IS A DIRECT CONTRADICTION TO THE SUBSTANCE OF THE "PRIMA FACIE" SHOWING CONTAINED HEREIN. PETITIONER ASSERTS THAT CALJIC 2.15 IS UNREASONABLE AND PREJUCIAL. THEREFORE THE COURT OF APPEALS DICISION IS ALSO UNREASONABLE IN THE CONTEXT OF THIS PARTICULAR CASE, AND SHOULD THEREFORE BE REJECTED. BY THIS COURT; PETITIONER WOULD LIKE TO CONTEND. ASSERTING AGAIN. THERE WAS ONLY EVIDENCE OF POSSESSION OF STOLEN PROPERTY. KEATING V. HOOD (Cal. 19.99) 191 F. 3d 1053 (instructions that allow a jury to convict without finding every element of the offense violate due process requirement that every fact necessary to constitute the crime must be proven beyond a reasonable doubt.), THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION IS VIOLATED WHEN AN INSTRUCTION ALLOWS for conviction on a lesser showing than proof beyond a reasonable doubt (VICTOR V. NEBRASKA (1994) 511 U.S. 1, 114 S.Ct. 1239, 1261, 127 LED 2d 583)

23.

1  PETITIONER INVITES THIS HONORABLE REVIEWING COURT TO TAKE
2  ISSUE WITH THIS INSTRUCTION — CALJIC 2.15; AND HERE ARE
   COGENT REASONS WHY:

3  [A] PETITIONER WOULD LIKE TO SHOW THE COURT THAT THE 2nd
4  PARAGRAPH OF THIS INSTRUCTION IS ABSURD IN THE CONTEXT OF
5  THIS CASE; (See EXHIBITS __I5+I-6__.)... "YOU MAY CONSIDER
6  ATTRIBUTES OF POSSESSION —", THATS TIME, PLACE, AND MANNER,
7  THAT THE DEFENDANT HAD THE OPPORTUNITY TO COMMIT THE CRIME
   CHARGED"( THE PETITIONER LIVED IMMEDIATELY ACROSS THE
8  STREET FROM THE ALLEGED BURGLARY, WHICH IS WHERE HE WAS
   APPREHENDED WHILE ASLEEP ON MARCH 2nd, 2004. HE WAS
9  THE NEIGHBOR TO MS. JOHNSTON, OF COURSE HE WOULD BE IN
10 THE AREA AT THAT TIME. PROSECUTOR DOWNPLAYED THIS FACT,
   See Ex __B-1__ ).[B] "THE DEFENDANTS CONDUCT AND OR
11 STATEMENTS MADE BY HIM —"— STRIKE THAT —" AND/OR STATEMENTS
   HE MAY HAVE MADE WITH REFERENCE TO THE PROPERTY, A FALSE
12 ACCOUNT OF HOW HE AQUIRED POSSESSION OF THE STOLEN PROPERTY."
13 ( PETITIONER WAS ATTEMPTING TO PERSUADE A COMPLETE STRANGER
   WITNESS OCHINERO, TO CASH A CHECK HE FOUND IN A PURSE THAT WAS
14 LAYING ON THE GROUND. IT WOULD BE ABSURD TO TELL A STRANGER
15 THAT YOU FOUND IT. WE CAN ASSUME NOBODY WOULD AGREE TO
   CASH A CHECK UNDER THOSE CIRCUMSTANCES, SO, PETITIONER DID
16 SAY IT WAS HIS GRANDMOTHERS CHECK. THE PRECEEDING PART
17 IS ESPECIALLY CONSTITUTIONALLY UNFAIR, BECAUSE THE STATE
   INSTRUCTION IMPLIES THAT THE "STORY" TOLD BY PETITIONER
18 TO MR. OCHINARD PROVES HIS GUILT OF BURGLARY: BUT THE JURY
19 IN THIS CASE NEVER GOT TO HEAR THAT THE PETITIONER HAS
   ALWAYS MAINTAINED HE FOUND THE PURSE/CHECK IN QUESTION.
20 [C] " AND ANY OTHER EVIDENCE WHICH TENDS TO CONNECT THE
   DEFENDANT (NOW PETITIONER) WITH THE CRIME CHARGED."
21 (PETIONER ASSERTS THAT THIS CATCH-ALL PHRASE IS UTTERLY
22 MISPLACED) AS THERE IS, NOR HAS THERE EVER BEEN ANY
   SUBSTANCIAL EXCULPATORY EVIDENCE(BEYOND A MERE
23 SPECULATION) TO SUPPORT THE ELEMENTS OF BURGLARY.
   PETITIONER WOULD NOW CONTEND (ASSERT) THAT THE
24 DECISION UPHELD BY THE U.S. APPEALS COURT. ~~STATE~~
25 ~~APPELLATE DISTRICT~~ IS UNCONSTITUTIONAL BASED ON
   THE WRONGFUL APPLICATION OF CALJIC 2.15 TO THE SPECIFIC
26 CONTEXT OF HIS CASE, AND REQUIRES REVERSAL. PETITIONER
   CONCLUDES THAT CALJIC NO.2.15 IS UNFAIR AND EXTREMELY
27 PREJUDICIAL IN REGUARDS TO THE 1st AND 2nd PARAGRAPHS.—
   IN THE CONTEXT OF HIS SPECIFIC FACTS, PETITIONER ASSERTS
28 THAT THE TOTALITY AND CUMULATION OF THESE ERRORS UNDENIABLY
   REQUIRES REVERSAL. LASTLY, THE PROSECUTOR AKNOWLEDGES
   THAT PETITIONER LIVES NEAR AND KNOWS VICTIM EX. __C-13__

## VIII.

IN TERMS OF CONVICTIONS *THEMSELVES*
*RELIEF HAS BEEN GRANTED IN HABEAS*
ACTIONS FOR CONVICTIONS *UNDER UNCONSTITUTIONAL*
*STATUTES OR ORDINANCES* "CRUEL AND UNUSUAL PUNISHMENT"

"ACTIONS TAKEN IN EXCESS OF A COURTS AUTHORITY
MAY BE CHALLENGED ON HABEAS-CORPUS *EVEN IF THERE*
HAS BEEN A PRIOR AFFIRMANCE ON DIRECT APPEAL".
See, E.G. IN re BIRDWELL (1996) 50 Cal. APP 4ᵀᴴ 926 58
Cal. RPtr 2d 244] IN re HODINDITT (1996) 12 Cal. 4ᵀᴴ 992
[50 Cal. RPtr 2d 706]* *THE MAJORITY OF THE COURT OF APPEAL*
*WAS TROUBLED BY THE SENTENCE IMPOSED IN THIS CASE*".
(See GROUND C P 400 OF 6) IN THE ORIGINAL PETITION.
THE JUDGE PLAINLY SHOWS AT APRIL 1ˢᵀ'ˢ SENTENCING
*THAT HE IS UNSURE OF HIS AUTHORITY IN REGUARDS TO*
MINIMIZING PUNISHMENT. WE ASSERT, BY PROOF OF *THE*
RECORD, *THAT THE JUDGE PROBABLY THOUGHT, ON THE VERGE*
OF SENTENCING, THAT HE HAD AUTHORITY TO STRIKE *THE*
5 YEAR ENHANCEMENT, AND THUS LEFT THE 25 TO LIFE
SENTENCE INTACT, BUT, WE PREDICT, RETROACTIVELY, THAT
IF JUDGE WOULD HAVE KNOWN HIS "MANDATED DUTY" HE WOULD
HAVE FIRST STRUCK A STRIKE See EXHIBITS (C-3 ~ C-6 .)
FURTHER, *THE COURT KNEW ALL PRIORS AROSE FROM A SINGLE*
ABERRANT PERIOD, FOR WHICH 1 PRISON TERM OF 2 YEARS EX.I10+I-11
WAS SERVED *EXAMPLES OF SENTENCES THAT MAY BE IN EXCESS*
OF A COURTS AUTHORITY INCLUDE: UNCONSTITUTIONAL
SENTENCES IN re RODRIGUEZ (1975) 14 Cal. 3d 639 [122 Cal.
RPtr. 552.] IN re REED (1983) 33 Cal. 3d 914 [191 Cal. RPtr.
658'. THIS WOULD EXPLAIN WHY A JUDGE WOULD WANT TO
MINIMIZE PUNISHMENT. (See ROMEAD MOTION AFTER EXHIBIT H-7 .)
PETITIONER ALSO BEGS THAT *THE* DOCUMENTARY EXHIBITS WERE
INSUFFICIENT TO UPHOLD, BEYOND A REASONABLE DOUBT, *THAT*
*HIS PRIORS CONSTITUTED* "STRIKES", NOTHING IN *THE RECORD*
REFLECTS SUFFICIENT EVIDENCE, UNDER CASE LAW, SUPPORT-
ING A *TRUE FINDING* OF SERIOUS/VIOLENT *PRIOR ELEMENTS.*
TAYLOR V. U.S. ~~U.S.~~ 495 U.S. 575
PEOPLE V. GARRETT 112 Cal. RPtr 2d 643, *THE PENALTY*
IS EXCESSIVE IN LIGHT OF PETITIONERS CONDUCT, HERE,
WHILE NUMEROUS, NONE OF PETITIONERS OFFENSES WERE
PARTICULARY SERIOUS. NONE INVOLVED VIOLENCE ALL
WERE ESSENTIALLY PETTY THEFTS COMMITTED INSIDE HOUSES
TO SUPPORT PETITIONERS DRUG HABIT. ~~NEAL V. CALIFORNIA~~
INVALID MULTIPLE PUNISHMENT FOR A SINGLE CRIMINAL
ACT. NEAL V. CALIFORNIA [1960] 55 Cal. 2d 11 [9 Cal RPtr 607]

1  THUS, WHILE BREAKING INTO RESIDENCES IS CERTAINLY SERIOUS,
2  IN ESSENCE PETITIONER *HAS* BEEN SENTENCED TO PRISON
   FOR AT LEAST 30 YEARS FOR A SERIES OF PETTI THEFTS FROM
3  RESIDENCES IN WHICH HE *NEVER CONFRONTED ANYONE*. AND
   NEVER COMMITTED ANY VIOLENCE. HIS TRUE CRIME IS BEING
4  A DRUG ADDICT AND HAVING SERIOUS MENTAL PROBLEMS.
5  (PETITIONER WOULD *LIKE* TO *INCORPORATE* GROUND "C" HEREIN
   IN THE ORIGINAL PETITION.) SPECIFICALLY, THE COURT OF
6  APPEALS ASSERTION, "P.4-DD OF 6" WE ARE NOT INSENSATE
7  TO DEFENDANTS ARGUMENTS CONCERNING HIS OWN
   MITIGATING BACKGROUND AND MENTAL CONDITION, OR
8  THOSE CONCERNING THE *OVERALL WISDOM OF THE*
9  *THREE STRIKES LAW* AS CURRENTLY IN EFFECT. WE *CANNOT*
   HELP BUT NOTE *THAT ALL OF DEFENDANTS VICTIMS COULD*
10 BE MADE WHOLE MANY *TIMES OVER* WITH THE COST OF ONE
11 YEAR'S INCARCERATION OF DEFENDANT." PETITIONER *ASSERTS*
   CONCERNING HIS PRIOR PRISON TERM. (STRIKE ONE AND TWO)
12 *THE ATTORNEY GENERALS* ANSWER P 14, "VICTIM SCHREIBER"
13 *NEVER CONFRONTED PETITITIONER*, AS PETITIONER WAS
14 DISCOVERED BREAKING OFF A DOGGIE DOOR, AND NEVER
   *ENTERED* THE RESIDENCE. AS SOON AS PETITIONER NOTICED
15 MR. SCHREIBER HE RAN, *THEREFORE AVOIDING* CONFRONTA-
16 TION, AS WAS THE CASE WITH ALL 6 COUNTS CONTAINED
   WITHIN *THE SINGLE PRISON PRIOR*. BUT FOR THE ENTERING
17 INTO MS. JOHNSTON'S RESIDENCE FOR WHICH *THERE IS*
18 *INSUFFICIENT* EVIDENCE AS SET FORTH IN ORIGINAL PETITION;
   *THE CURRENT ALLEGATION IS MINOR* BY ANY CALCULATION.
19 IN REALITY PETITIONER HAS NEVER CONFRONTED ANYONE,
20 ENGAGED IN VIOLENCE, OR DONE MORE *THAN MINOR*
   HARM TO ANYONE BUT *HIMSELF*. PETITIONER WAS SENTENCED
21 *TO A GREATER INDETERMINATE TERM* (25 YEARS TO LIFE)
22 *THAN A PERSON CONVICTED OF 2ND DEGREE MURDER*
   (15 YEARS TO LIFE) (190,Subd.(a).) CONSEQUENTLY AN
23 *ENTIRELY MINOR CURRENT OFFENDER* SUCH AS PETITIONER
24 IS SUBJECTED TO THE SAME PUNISHMENT AS A PERSON
   WHO RAPES AS HIS *THIRD STRIKE*. COMPARED TO HOW *THE*
25 *LEGISLATURE TREATED* OTHER REPEAT OFFENDERS. *THE*
26 SEVERITY OF PETITIONERS PUNISHMENT FAR OUTWEIGHS
   THE GRAVITY OF HIS OFFENSE. BEFORE *THIS* COURT IS A NON-
27 VIOLENT PETITIONER WITH *SERIOUS DRUG PROBLEMS AND*
28 *SERIOUS MENTAL PROBLEMS*, HE HAS REPEATEDLY *ENGAGED*
   IN STEALING PETTY AMOUNTS FROM HOUSES. HE HAS NEVER CONFRONTED
   ANYONE OR ENGAGED IN ANY KIND OF VIOLENCE. *THE EIGHTH AMEND.*
   STATES THAT PEOPLE *HAVE A RIGHT TO BE FREE FROM* PUNISHMENTS
   *THAT ARE CRUEL AND UNUSUAL*", RAMIREZ V. CASTRO (9TH CIR. 2004) 365
   F. 3d 755; REYES V. BROWN (9TH CIR. 2005) 399 F. 3d. 964. 26.)

**CONCLUSION**

FOR EVERY AND ALL GROUND(S) OF THE ORIGINAL HABEAS-CORPUS, AS WELL AS EVERY CONTENTION RESPECTFULLY EXPRESSED HEREIN: (EXCLUDING PARAGRAPH I.V.) RESPONDANT HAS FAILED TO SET FORTH SUFFICIENT FACTS WHY THE RELIEF PRAYED FOR SHOULD NOT BE GRANTED. FOR THESE AND EVERY GROUND CONTAINED IN THE ORIGINAL PETITION (EXCLUDING GROUND 4 BREACH OF THE PLEA AGREEMENT.) THE PROSECUTION HAS FAILED TO MEET ITS BURDEN AND THE CONVICTION OF §(459) RESIDENTIAL BURGLARY AGAINST PETITIONER MCHENZIE MUST BE REVERSED.

RESPECTFULLY
SUBMITTED,

*Israel N. M°Kenzie*

ISRAEL NOEL MCHENZIE
IN PRO-PER

_7-21-08_ DATE

27.)

| REPORT TYPE ☑ SUPPLEM; | Office of the Sheriff | C. | |
|---|---|---|---|
| 498-PC- Petty Theft | Santa Clara County | NO. | **04-062-0265S** |
| 496-PC-Possession of Stolen Property | NARRATIVE FORM | | |

LOCATION OF ORIGINAL EVENT (IF KNOWN)
Brookwood Lane / Saratoga / 95070

VICTIM NAME (LAST, FIRST, MIDDLE (FIRM, IF BUSINESS))
Johnston          Evelyn

## EXHIBIT A-1

1 INVESTIGATION:

2

3 On 3/3/04, at approximately 0900, I was dispatched to assist Deputy

4 Muncy who was attempting to contact a burglary suspect. When Muncy

5 talked with the suspect, he claimed he found victim Johnston's purse.

6 After finding the purse, he attempted to cash a check he took from

7 the purse and then dumped the purse in a postal drop box in downtown

8 Saratoga.

9

10 I called the Saratoga post office and had a postal a employee respond

11 to my location and open the postal drop box.  I was unable to find

12 the purse in the Postal drop box.  I had the postal employee check

13 with her supervisor and to see if the purse had been found by another

14 employee.

15

16 INVESTIGATION CONTINUED:

17

18 On 3/4/04, at approximately 0800 hours I received a call from postal

19 employee Carol Black who said she had found a purse in the village

20 postal box.  I responded to the Saratoga Main Post Office and

21 retrieved the stolen purse.  I found the purse to be undamaged.

22 Victim Johnston's identification and ATM card were loose in the purse

23 along with the a Wells Fargo check book.  There was no cash or change

24 in the purse.

25

26 INVESTIGATION CONTINUED:

27

28 I returned the purse to victim Johnston.  Johnston looked through the

29 purse and noticed that her drivers licenses and ATM card were in

30 where she had left them.  Johnston also noticed her Bank of America

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | | SUPERVISORS REVIEW | ID NUMBER | DATE | PAGE | OF |
|---|---|---|---|---|---|---|---|---|---|
| Novick | 1713 | 03/04/04 908 | II | FSS | Atlas, Edward M. | 1363 | 03/04/04 1942 | 2 | 4 |

Rev 12/95          C1000-FS

| REPORT TYPE ☑ SUPPLEI  AL<br>488-PC- Petty Theft<br>496-PC-Possession of Stolen Property | | | Office of the Sheriff<br>Santa Clara County<br>Additional Parties | | NO. | | 04-062-0265S | | |
|---|---|---|---|---|---|---|---|---|---|
| | | "V" = VICTIM | "R" = REPORTING PARTY | | "W" = WITNESS | | "O" =OTHER | | |

| O01 | LAST, FIRST, MIDDLE (FIRM, IF BUSINESS) | | | STATE OF CA | RACE<br>white | M ☐<br>F ☒ | DOB | AGE | HT | WT |
|---|---|---|---|---|---|---|---|---|---|---|
| | Black | Carol | | | | INTERPRETER NEEDED: ☐ SPANISH | | ☐ VIETNAMESE | | |

| VICTIM ADVISED: ☐ SEXUAL ASSAULT  ☐ VIC/WIT ASSIST.  ☐ DOMESTIC VIOLENCE | | | ☐ OTHER | |
|---|---|---|---|---|

| ADDRESS | | CITY/STATE | | ZIP<br>95070 | PHONE<br>. | | DL NUMBER | | STATE |
|---|---|---|---|---|---|---|---|---|---|
| BUSINESS NAME/SCHOOL NAME AND ADDRESS | | CITY/STATE | | ZIP<br>95070 | PHONE | | SSN | | |

| VICTIM INFORMATION: ☒ NON DISCLOSURE (WHERE APPLICABLE) ☐ INJURY ☐ SART ☐ BLOOD ☐ URINE ☐ PHOTOGRAPH ☐ STUDENT |
|---|

| OFFICER'S NAME<br>Novick | ID NUMBER<br>1713 | DATE<br>03/04/04 908 | SHIFT/DAYS OFF<br>II    FSS | SUPERVISORS REVIEW<br>Atlas, Edward M. | ID NUMBER<br>1363 | DATE<br>03/04/04 1942 | PAGE<br>1 | OF<br>4 |
|---|---|---|---|---|---|---|---|---|

Rev 1285    C1085-FS

STATE OF CALIFORNIA
CHARGE SHEET/REVOCATION TRACKING, EDULING REQUEST
CDC 1676 (4/91)

EXIBIT
A-2

DISTRIBUTION:     DEPARTMENT OF CORRECTIONS
ORIGINAL - BOARD REPORT
1ST COPY - R.H.C.

**REPORT TO:**     ☒  **BOARD OF PRISON TERMS**

☐  NARCOTIC ADDICT EVALUATION AUTHORITY

2ND COPY - H.A.
3RD COPY - PAROLEE
4TH COPY - U.S.

| CDC NUMBER | NAME (LAST, FIRST, MI) | | NAME BOOKED AS | | REGION/UNIT | | CSTCU - ST | |
|---|---|---|---|---|---|---|---|---|
| T58501 | MCKENZIE, ISRAEL | | SAME | | II/ SCRUZ | | YES ☒ NO | |

| ARREST DATE | ARRESTING AGENCY | | BPT REFERRALS: | | | | BOOKING NUMBER AND/OR LOCATION | |
|---|---|---|---|---|---|---|---|---|
| 03/03/04 | SCLCO SO | | ☒ MANDATORY | | NON-MANDATORY | | | |

| ARREST CODE * | * ARREST CODES: | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B | A       P&CSD STAFF ALONE | | | B   LAW ENFORCEMENT AGENCY ALONE | | | | |
| | AB      P&CSD ASSISTED BY LAW ENFORCEMENT AGENCY | | | D   LAW ENFORCEMENT AGENCY WITH INFORMATION FROM P&CSD | | | | |

| HOLD DATE | DISCOVERY DATE | HOLD REMOVED DATE | AGENT OF RECORD | CONTROLLING | DISCHARGE REVIEW | IMMINENT DISCHARGE |
|---|---|---|---|---|---|---|
| 03/03/04 | 03/03/04 | | SEGALL | DATE 12/30/06 | RECEIVED DATE MAR 19 2004 | |

| CHARGES AND CODES | | CHARGES AND CODES | |
|---|---|---|---|
| 1.   PETTY THEFT W/PRIORS (670) | | 4. | |
| 2.   POSSESSION OF STOLEN PROPERTY (676) | | 5. | |
| 3. | | 6. | |

MAR 19 2004

RECEIVED
REVOCATION UNIT

| REASON FOR RETAINING PAROLE HOLD:  PAROLEE DANGER TO: | DATE COPY SENT TO PAROLEE | INITIALS OF PERSON SENDING |
|---|---|---|
| ABSCOND ☐   SELF ☐   ☒ PROPERTY-OTHERS   ☒ SAFETY-OTHERS | | |

**DISABILITY CONCERNS:**
**Psychological:** No psychological disability concerns noted in field file
**Physical:** No physical disability concerns noted in field file
**Developmental:** No information available in field file

**SUPPORTING EVIDENCE:**
**CHARGE 1 & 2:** On 03/02/04, Officer Muncy of the Santa Clara Co. Sheriff's Department, was dispatched to make contact with a theft victim at her residence in Saratoga.

The victim, E. Johnston, stated that her purse was stolen from her residence. Johnston stated that she last saw her purse at approximately 12:30 p.m., when she wrote a check to her gardener. Johnston noticed that her purse was missing at approximately 1:00 p.m.

Johnston stated that she had her front door open, but she had the screen door closed. Johnston stated that her gardener worked for her for 20 years, so she trusted him with his life.

Johnston did have some concerns about an individual who lived across the street from her that Officer Muncy should check out. This individual was identified by Johnston as McKenzie. Johnston stated she has seen McKenzie every now and then walking in the street with his hat on backwards.

Johnston believed that McKenzie was in some kind of recovery program, and has been to her house in the past asking to borrow money from her. Johnston said her purse was black and leather, with a beat up green wallet inside. Johnston also had keys to her residence and vehicle as well as two books of checks, ATM cards, and a credit card.

After Officer Muncy cleared Johnston's residence, he was advised by dispatch that a white male in his thirties was attempting to cash a check at the Bank of American on Big Basin. Officer Muncy, with the assistance of other units, circulated the area but was unable to locate any individual matching the suspect's description.

| PAROLEE'S NAME | CDC NUMBER |
|---|---|
| MCKENZIE, ISRAEL | T58501 |

On 03/03/04, Officer Muncy made contact with McKenzie at his residence. McKenzie admitted to being in Big Basin the day before, but did not go to any bank, and did not ask anyone to cash a check for him.

McKenzie said that he did find a white purse yesterday (03/02/04), at the end of Brookwood Lane. There was a driver's license and several credit cards inside the purse, and some checks laying loose inside the bag.

McKenzie admitted to asking a ``guy'' at the Bank of America ATM to cash a check for him. McKenzie stated that he put the purse in a mailbox located in front of a store. McKenzie clarified that the purse was black with a green coin purse inside.

McKenzie was taken into custody and asked to tell his side of the story. McKenzie stated that he knew he made a mistake by trying to cash a check that was not his.

Officer Rose made contact with the ATM witness (Ochinero) and conducted an infield show up. Ochiner was standing at the ATM at the Bank of America, when he noticed a male, later identified as McKenzie, standing behind him at the ATM machine. When Ochiner finished his transaction and attempted to walk away, McKenzie asked him to cash a check for him. Ochiner observed that McKenzie had a checkbook in his hand with the name of E. Johnston, and that McKenzie had a tattoo on the web of his hand.

Ochiner refused to cash the check then walked away. Ochinero thought this was strange and decided to call 911 and report it.

Officer Rose drove Ochinero to McKenzie's residence, where he identified him as the male who tried to get him to cash a check. Ochiner advised Officer Rose that McKenzie should have a ``star-like tattoo with lots of points on one of his hands between his thumb and index finger.'' Officer Rose observed that McKenzie did in fact have a star-like tattoo on his hand in this area. McKenzie was taken into custody and transported to Santa Clara Co. Jail for booking.

**PAROLEE STATEMENT:** AOR interviewed McKenzie via the telephone. McKenzie would only admit to trying to cash someone else's checks.

**WITNESSES:** Officer Muncy, and Officer Rose of the Santa Clara Co. Sheriff's Department Saratoga. E. Johnston, and A. Ochinero

**ATTACHMENT:** Santa Clara County Sheriff's report #04-062-0265S

| PAROLEE'S NAME | | CDC NUMBER |
|---|---|---|
| | MCKENZIE, ISRAEL | T58501 |

03/09/04  07:53 FAX 408 808 4730      SHERIFF:RECORD DIV.

| REPORT TYPE ☐ SUPPLEN  AL<br>4BB-PC- Petty Theft<br>496-PC-Possession of Stolen Property | Office of the Sheriff<br>Santa Clara County<br>NARRATIVE | C.<br>NO. | 04-062-0265S |
|---|---|---|---|
| LOCATION OF ORIGINAL EVENT (IF KNOWN)<br>Brookwood Lane / Saratoga / 95070 | VICTIM NAME (LAST, FIRST, MIDDLE (FIRM, IF BUSINESS))<br>Johnston          Evelyn | | |

## EXHIBIT A-3

1 days.

2

3 McKenzie said he was on big basin yesterday and he was wearing a white

4 tee-shirt and blue jeans. McKenzie said he did not go to any bank and

5 he did not ask anyone to cash a check for him.

6

7 McKenzie said he has not had any problems since being released from

8 prison. McKenzie said he did not enter any residence and did not

9 steal any purse. McKenzie again said he did not have any purse.

10

11 McKenzie said he did find a white purse yesterday at the end of

12 Brookwood Lane and SaratogaSunnyvale Road. McKenzie said he did find

13 a Driver's License and several credit cards inside the purse.

14 McKenzie said there were also checks laying loose inside the bag.

15

16 McKenzie said he took one of the checks and asked a guy that was at

17 the Bank Of America ATM and asked him to cash a check for him.

18 McKenzie said he did not write anything on the check and thinks he

19 was going to ask the guy to fill out the check for him.

20

21 McKenzie said he put the purse in a mailbox located in front of a

22 store on Big Basin. McKenzie thought the mail courier would return it

23 because it had all the information in it. McKenzie added that he

24 should have tried to return it.

25

26 Mckenzie described the purse as being black with a green coin purse in

27 it. McKenzie added that it was wrapped in a plastic bag.

28

29 INVESTIGATION CONTINUED:

30

| OFFICER'S NAME<br>K Muncy | ID NUMBER<br>1757 | DATE<br>03/03/04 1352 | SHIFT/DAYS OFF<br>II      SSM | SUPERVISORS REVIEW<br>Ray, Donald L. | ID NUMBER<br>1495 | DATE<br>03/04/04 1110 | PAGE<br>5 | OF<br>7 |

03/09/04  07:53 FAX 408 808 4730    SHERIFF:RECORD DIV.    ☑007

| REPORT TYPE | ☐ SUPPLE? | XL | Office of the Sheriff | L  ? | |
|---|---|---|---|---|---|
| 488-PC- Petty Theft | | | Santa Clara County | NO. | 04-062-0265S |
| 496-PC-Possession of Stolen Property | | | NARRATIVE | | |

| LOCATION OF ORIGINAL EVENT (IF KNOWN) | VICTIM NAME (LAST, FIRST, MIDDLE (FIRM, IF BUSINESS)) |
|---|---|
| Brookwood Lane / Saratoga / 95070 | Johnston        Evelyn |

1 I placed McKenzie under arrest and placed him in the back of my patrol

2 car. I then read McKenzie his Miranda Rights per my department issued

3 Miranda card. McKenzie answered out loud that he understood his

4 rights. When I asked McKenzie to tell me his side of the story he

5 made the following statement.

6

7 CONTINUED STATEMENT OF SUSPECT MCKENZIE:

8

9 McKenzie said, " that is basically what happened. I know I made a

10 mistake by trying to cash a check that was not mine."

11

12 INVESTIGATION CONTINUED:

13

14 County Communications advised McKenzie had no current wants for him.

15 County Communications did advise that McKenzie was on parole in the

16 state of California for burglary.

17

18 I contacted McKenzie's parole agent and she placed a 3056-PC hold on

19 McKenzie.

20

21 Dep. Torres searched McKenzie's room but was unable to locate the

22 purse, or any of the items in it.

23

24 Dep. Rose made contact with the ATM witness and conducted an infield

25 show up.

26

27 I booked McKenzie into the Santa Clara County Main Jail without

28 incident.

29

30 P.L.E.O'S

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISORS REVIEW | ID NUMBER | DATE | PAGE | OF |
|---|---|---|---|---|---|---|---|---|
| K Muncy | 1757 | 03/03/04 1352 | II    SSM | Ray, Donald L. | 1495 | 03/04/04 1110 | 6 | 7 |

| REPORT TYPE  ☑ SUPPLEM.  ` AL | Office of the Sheriff<br>Santa Clara County<br>NARRATIVE FORM | NO. | 04-062-0265S |
|---|---|---|---|
| 48B-PC- Petty Theft<br>496-PC-Possession of Stolen Property | | | |

| LOCATION OF ORIGINAL EVENT (IF KNOWN)<br>Brookwood Lane  / Saratoga / 95070 | VICTIM NAME (LAST, FIRST, MIDDLE (FIRM, IF BUSINESS))  ??? |
|---|---|
| | Johnston          Evelyn |

## EXHIBIT A-4

1 INVESTIGATION:

2

3 On 3/2/04, at approximately 1450 hours, I was standing in front of the

4 West Valley Substation when a radio broadcast came out of a possible

5 suspect on a prior burglary.  County communications advised a witness

6 had just been asked by a subject to cash a check.  The witness

7 described the subject as a white male, 6 feet tall with a white

8 tee-shirt and blue jeans and a star tattoo on the web of his hand.

9 The subject was now walking N/B on Big Basin Way.  I walked to the

10 area and was unable to locate the suspect.  I then asked county

11 communications for the witness contact number.  County communications

12 provided me with the number(650-218-3239).  I contacted witness

13 Arleigh Ochinero over the telephone and he provided me with the

14 following statement.

15

16 STATEMENT OF WITNESS ARLEIGH OCHINERO:

17

18 Ochinero was standing at the ATM machine at the Bank of America at

19 14476 Big Basin way, Saratoga.  Ochinero noticed a male standing

20 behind him at the ATM machine.  Ochinero finished his transaction and

21 turned to walk away when the subject asked him to cash a check for

22 him.   The suspect wanted to write Ochinero a check and have Ochinero

23 give him cash.  The suspect had a Bank of America check book in his

24 hand with the name of Evelyn Johnston.  Ochinero refused to cash the

25 check and walked away.  Ochinero thought this was strange and decided

26 to call 911 to report the subject.  Ochinero said he would be able to

27 identify the subject if he saw him again.

28

29 INVESTIGATION CONTINUED:

30

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISORS REVIEW | ID NUMBER | DATE | PAGE | OF |
|---|---|---|---|---|---|---|---|---|
| Novick | 1713 | 03/04/04 1749 | II   FSS | Atlas, Edward M. | 1363 | 03/04/04 1941 | · 2 | 3 |

| REPORT TYPE | ☑ SUPPLEM ☐ | Office of the Sheriff | NO. | 04-062-0265S |
|---|---|---|---|---|
| 488-PC- Petty Theft | | Santa Clara County | | |
| 496-PC-Possession of Stolen Property | | NARRATIVE FORM | | |

| LOCATION OF ORIGINAL EVENT (IF KNOWN) | VICTIM NAME (LAST, FIRST, MIDDLE (FIRM, IF BUSINESS)) | | 7/13/19 |
|---|---|---|---|
| Brookwood Lane / Saratoga / 95070 | Johnston | Evelyn | |

1 On 3/3/04, at approximately 900 hours, Deputy Muncy contacted the

2 suspect in a prior burglary.  I called the witness Ochinero and

3 explained that we had a possible suspect in the crime he had

4 witnessed and wanted to know if he would do a field identification.

5 Ochinero agreed to participate in a field show up.  For more

6 information about the field show up see Deputy Rose's #1837

7 supplemental report.

8

9 P.L.E.O'S

10

11 Deputy Novick #1713 Supplemental report

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | | SUPERVISORS REVIEW | ID NUMBER | DATE | PAGE | OF |
|---|---|---|---|---|---|---|---|---|---|
| Novick | 1713 | 03/04/04 1749 | II | FSS | Atlas, Edward M. | 1363 | 03/04/04 1941 | 3 | 3 |

Rev 12/95

EXHIBIT A-5

To Whom It May Concern:

I, Hiromi Higashi, am writing to declare that on March 2, 2004, Israel McKenzie had a purse in his possession and when I asked him where he got it, he stated he found it by the creek down the street from the cottage where he was staying in Saratoga. Unsure of what to do but wanting to get it back to the rightful owner, Israel asked if I could stop at the gas station on the corner of Big Basin Way and Saratoga-Sunnyvale-Los Gatos Road before going to Santa Cruz Bible Church so he could put the purse in a mail dropbox — I did and he did.

The next day, March 3, 2004, the Santa Clara County Sheriff came and picked Israel up on what they said was a parole violation.

I was available and willing to testify on Israel Noel McKenzie's behalf during his entire trial and made this known to the Public Defender. I was not contacted by either the Public Defender or District Attorney's Office to speak as an advocate for Israel McKenzie.

I, Hiromi Higashi, Declare under penalty of perjury that the foregoing is true.

Executed on March 1, 2007

Hiromi Higashi
Hiromi Higashi

831-234-8736 (best # to reach me)

963 Berkshire Ave. Sunnyvale, CA  94087

1  MR. OCHINERO.

2         IT'S ABOUT MONEY.  AND IT MAY ALL SEEM PERHAPS A

3  LITTLE PATHETIC TO YOU FOLKS, BUT IT'S NO LESS A RESIDENTIAL

4  BURGLARY, AND IF I BACKED UP A U-HAUL TRUCK TO YOUR HOUSE

5  AND FILLED EVERYTHING IN YOUR HOUSE INTO MY U-HAUL TRUCK AND

6  DROVE IT AWAY.  THERE'S NO DIFFERENCE IN WHETHER OR NOT IT'S

7  A BURGLARY OR NOT.  AND THIS IS A RESIDENTIAL BURGLARY.

8  IT'S A FIRST DEGREE BURGLARY.

9         MR. MCKENZIE IS ALSO GUILTY OF A VIOLATION OF

10  PENAL CODE SECTION 496, POSSESSION OF STOLEN PROPERTY,

11  STOLEN PROPERTY BEING THE BANK OF AMERICA CHECKS.  AND THERE

12  IS NOBODY ELSE WHO HAD THIS PROPERTY.  AND NOBODY ELSE BUT

13  MCKENZIE UPTOWN SARATOGA.  NOBODY ELSE.  NOBODY.

14         AND WITH THAT, LADIES AND GENTLEMEN, I WILL

15  CONCLUDE MY CLOSING REMARKS.  AS I TOLD YOU BEFORE, I WILL

16  RETURN IN THE FORM OF A REBUTTAL CLOSING ARGUMENT AFTER THE

17  CONCLUSION OF THE DEFENSE REMARKS.  I WOULD ASK THAT YOU, AT

18  THE CONCLUSION OF ALL THE REMARKS, AND WHEN YOU RETURN TO

19  DELIBERATE AS A WHOLE THAT YOU RETURN VERDICTS OF GUILTY AS

20  TO BOTH COUNTS ONE AND TWO, THE RESIDENTIAL BURGLARY AND THE

21  POSSESSION OF STOLEN PROPERTY.

22         THANK YOU VERY MUCH FOR YOUR KIND ATTENTION.

23         THE COURT:  THANK YOU, COUNSEL.

24         LADIES AND GENTLEMEN, WE'LL TAKE THE AFTERNOON

25  RECESS AT THIS TIME FOR ABOUT FIFTEEN MINUTES.  DURING THE

26  RECESS PLEASE REMEMBER THE ADMONITION NOT TO DISCUSS THIS

27  CASE AMONG YOURSELVES OR WITH ANYONE ELSE OR FORM OR EXPRESS

28  ANY OPINION UNTIL THE CASE IS SUBMITTED TO YOU.

1    BUT DEFENSE COUNSEL DOESN'T WANT YOU TO CONSIDER

2    IT IN THAT LIGHT.  PUT IT IN ITS LITTLE BOX.  HE'S JUST A

3    GUY UPTOWN, HE HAS A BOOK OF CHECKS, IT DOESN'T MEAN

4    ANYTHING.  IT DOESN'T PROVE ANYTHING.  IT DOESN'T PROVE HE

5    ENTERED THE HOUSE.

6    I SUBMIT TO YOU, LADIES AND GENTLEMEN, THAT

7    EVIDENCE ALONE IN TERMS OF EVERYTHING YOU KNOW, BECAUSE

8    REMEMBER WHAT ONE OF THE INSTRUCTIONS, WHAT THE REASONABLE

9    DOUBT INSTRUCTION SAID TO YOU, AFTER THE ENTIRE COMPARISON

10   AND CONSIDERATION OF ALL OF THE EVIDENCE.

11   AND I SUBMIT TO YOU THAT HIS POSSESSION OF THESE

12   CHECKS UP IN SARATOGA, TRYING TO GET IT CASHED IS SUFFICIENT

13   CIRCUMSTANTIAL PROOF THAT HE'S THE PERSON WHO ENTERED HER

14   HOUSE, BECAUSE THERE AIN'T ANYBODY ELSE WHO HAS ANY OF THE

15   PROPERTY.  NOBODY ELSE.

16   AND THE FUNNY THING IS IS THAT EVERYTHING ELSE

17   CAME BACK EXCEPT FOR THE CHECKS AND EIGHT TO TEN DOLLARS IN

18   CASH.  SO COUNSEL WANTS TO SAY, WELL, YOU KNOW, THEY DID THE

19   SEARCH OF THE HOUSE, AND WHEN THEY SEARCHED MR. MCKENZIE

20   THEY DIDN'T FIND ANYTHING.  YEAH, BECAUSE THE PURSE ENDS UP

21   WITH ALL OF ITS CONTENTS IN THE MAIL BOX, AND THE ONLY THING

22   MISSING IS EIGHT TO TEN DOLLARS IN CASH AND A BOOK OF

23   CHECKS, AND GOD ONLY KNOWS WHERE HE DITCHED THOSE.  BUT IT

24   REALLY DOESN'T MAKE ANY DIFFERENCE BECAUSE YOU KNOW HE HAD

25   THOSE CHECKS AND TRIED TO GET OCHINERO TO PASS THE CHECKS.

26   THERE'S NO OTHER PERSON IT POINTS TO.

27   NOW THEY WANT TO SAY THAT, WELL, THERE IS A

28   REASONABLE DOUBT, SHE HAD TENANTS LIVING NEXT DOOR AND THEY

1  COULD HAVE DONE IT.

2          WE DIDN'T HEAR ANY EVIDENCE IN THIS CASE ABOUT A

3  TENANT WHO WAS IN POSSESSION OF ANYTHING IN TERMS OF WHAT

4  WAS IN THAT PURSE.  NOBODY.

5          THE GARDNER COULD HAVE DONE IT.  WELL, THERE WAS

6  NO EVIDENCE IN THIS CASE THAT THE GARDNER WAS IN POSSESSION

7  OF THE BANK OF AMERICA CHECKS OR ANY ITEM IN THE PURSE.

8          MAYBE IT WAS THE GARDNER'S HELPER WHO DID IT.  BUT

9  THERE'S NO EVIDENCE BEFORE YOU THAT THAT PERSON HAD ANY ITEM

10  OF THAT PERSON'S PURSE.

11          THEY WANT YOU TO THINK THAT THEY DID, OR COULD

12  HAVE.  BUT THAT'S NOT THE EVIDENCE THAT'S BEFORE YOU.  AND

13  THE ONLY EVIDENCE THAT'S BEFORE YOU IS THIS MAN RIGHT HERE,

14  WITH HER PROPERTY, VERY RECENTLY TAKEN.

15          AND, AGAIN, COUNSEL'S CORRECT IN TERMS OF THE

16  TIMING, THAT'S WHAT WE GAVE YOU, THE TIME.  YOU ARE THE

17  FACT-FINDERS ON THAT, BUT WE'RE NOT TALKING ABOUT DAYS AND

18  WEEKS AND MONTHS WHEN HE CERTAINLY SHOWS UP WITH THESE

19  CHECKS UP THERE.  IS IT AN HOUR?  IS IT TWO HOURS?  WE DON'T

20  REALLY KNOW.  BUT WE BROKE IT DOWN TO YOU AS CLOSE AS WE

21  CAN.  WHEN PHONE CALLS WERE MADE AND WHAT WITNESSES SAID

22  HAPPENED.  BUT WE'RE TALKING ABOUT A RELATIVELY SMALL AMOUNT

23  OF TIME HERE, IN A RELATIVELY SMALL SECTION OF SARATOGA

24  WHERE THE PURSE IS RECOVERED AND WHERE HE'S TRYING TO DO THE

25  CHECK.

26          MUCH OF WHAT COUNSEL DOES IN TERMS OF THE ARGUMENT

27  ABOUT THIS CERTAINTY AND THE ENVELOPE IS A SCARE TACTIC, IF

28  YOU WILL, TO MAKE YOU FEEL UNEASY ABOUT EVIDENCE, YOU KNOW,

```
 1        Q.   Did you search his person?
 2        A.   Did I search his person?
 3        Q.   Yes.
 4        A.   I did.
 5        Q.   You found no checks on his person; correct?
 6        A.   No, ma'am.
 7        Q.   You didn't find any -- you already stated he
 8   didn't have any cash on his person; correct?
 9        A.   No, ma'am.
10        Q.   Did you find anything else that might have
11   belonged to Evelyn Johnston on Mr. McKenzie's person?
12        A.   No, ma'am.
13             MS. GALLARDO:   Q.   Nothing further.
14             THE COURT:   Redirect?
15             MR. DUFFY:   Thank you.
16             REDIRECT EXAMINATION BY MR. DUFFY (Prosecutor)
17        Q.   Deputy, to your knowledge, are the tenants who
18   lived next to Mrs. Johnston still living at that -- those
19   addresses?
20        A.   I don't know.
21        Q.   Okay.  Do you have any information that they're
22   not living there?
23        A.   No.
24        Q.   Okay.  And so if you wanted to go back and
25   interview those people, you could go check it out
26   yourself; is that true?
27        A.   I could, sir.
28        Q.   Any defense attorney or investigator could do
```

```
 1 | the same thing?
 2 | Defense MS. GALLARDO:  Objection.  Burden shifting.
 3 |          THE COURT:  Overruled.
 4 | Prosecutor MR. DUFFY:  You can answer the question.
 5 |          THE WITNESS:  Yes, sir.
 6 |          BY MR. DUFFY:  Q.  They can; can't they?
 7 |      A.  Yes, sir.
 8 |          MR. DUFFY:  Nothing further.
 9 |          THE COURT:  Recross?
10 |          MS. GALLARDO:  No, thank you.
11 |          THE COURT:  Thank you.  You may step down.  Is
12 | this witness excused?
13 |          MR. DUFFY:  He is.
14 |          THE COURT:  Thank you.  You're excused.
15 |          THE WITNESS:  Thank you, Your Honor.
16 |          MR. DUFFY:  Your Honor, at this time the people
17 | would move People's Number 1 and 2 into evidence.
18 |          MS. GALLARDO:  Any objection?
19 |          MS. GALLARDO:  None.
20 |          THE COURT:  Received as People's 1 and 2.
21 |          MR. DUFFY:  Thank you.  If I could have just one
22 | moment.
23 |          Your Honor, with the exhibits in evidence, the
24 | people have no further witnesses and would rest at this
25 | time.
26 |          THE COURT:  People rest.
27 |          Do you wish to make an opening statement at this
28 | time?
```

**223**

```
1            MS. GALLARDO:  No, Your Honor, not at this time.
2            THE COURT:  All right.  Any witnesses?
3            MS. GALLARDO:  No, Your Honor.
4            THE COURT:  All right.  Counsel approach the
5   bench for a moment, please?
6            (Whereupon a bench conference was held off the
7   record.)
8            THE COURT:  All right, ladies and gentlemen,
9   that is the evidence in the case.  But as I indicated --
10  Thursday?  Whenever jury selection was -- we have to have
11  a jury instruction conference to make sure the
12  instructions are all there and appropriate for the case.
13  What we'll do is release you for lunch now, or brunch,
14  and have you come back at 1:30.  Between now and then,
15  we'll have the conference and get the instructions
16  prepared.  I'll instruct you at 1:30.  Then the attorneys
17  will argue the case to you.  And more than likely, you
18  can begin deliberation this afternoon.  Okay?
19           So with that, please remember the admonition not
20  to discuss this case among yourselves or with anyone else
21  or form or express any opinion until the case is
22  submitted to you.  We'll see you at 1:30 in the jury
23  assembly room.  Okay?  Thank you.
24           The record will show the jury has left.  We're
25  here for the jury instruction conference.
26           MR. DUFFY:  Judge, I have included a number of
27  instructions in anticipation of a number of things.  So
28  to alert you, I believe a number of the instructions that
```



224

*[handwritten: EXHIBIT 4]*  *[handwritten: A-12]*

12

1 | the police officers (regarding anything her client may have
2 | said to the police, as it is hearsay and it is not
3 | admissible. *[handwritten: WHY ARE MY STATEMENTS TO THE ARRESTING OFFICER HEARSAY?]*
4 |         THE COURT:  That's true.  I don't think Counsel
5 | will do that.
6 | *[handwritten: Defense Counsel]* MS. GALLARDO:  Yes, your Honor.
7 | *[handwritten: Prosecutor]* MR. DUFFY:  Also, might I add, again,
8 | on statements --
9 |         (THE COURT:  Whose motions are these?)  Are we on
10 | defense motions?
11 |         I'm just giving you a bad time.
12 |         MR. DUFFY:  I think, partially, to save time, your
13 | Honor, and I'm still addressing the same issue.
14 |         One of the concerns, also, that I have in regard
15 | to statements which are hearsay is that in -- unless the
16 | defendant is going to testify and that representation is
17 | made, (that the defense be precluded from making any
18 | statement in their opening statement about what the
19 | defendant told the police. ✓ *[handwritten: WHY?]*
20 |         THE COURT:  Well, it's all inadmissible.)  So at
21 | this time it's all inadmissible unless the People attempt to
22 | get it in.  They say they're not going to get it in, so
23 | we're not going to have a 402 hearing.  So it's not coming
24 | in.
25 |         (MS. GALLARDO:  That's clear, your Honor.)
26 |         MR. DUFFY:  Thank you.
27 |         THE COURT:  Okay.  Roman numeral No. 6, felony
28 | priors for impeachment.  This was the -- he has two

[EXHIBIT A-13]

# DECLARATION    6-04-08

ISRAEL N. MCKENZIE
T-58501, C.S.P. CORCORAN
3B03 #203, P.O. BOX 3466
CORCORAN, CA 93212

I, ISRAEL NOEL MCKENZIE, PETITIONER IN THE INSTANT MATTER, HEREBY STATE THAT:

1) I, AT ALL STAGES OF THE CRIMINAL PROCEEDINGS LEADING UP TO MY TRIAL, MADE KNOWN TO MY LAWYER THAT MY FRIEND HIROMI HIGASHI, WANTED TO TESTIFY ON MY BEHALF TO HELP ME EXPLAIN WHY I WAS IN POSSESSION OF STOLEN PROPERTY; (SEE HIGASHI'S ATTACHED DECLARATION)

2) I TOLD MY TRIAL COUNSEL (IRMA GALLARDO) TO GET EITHER DEPUTY KEVIN MUNCY'S TESTIMONY ADMITTED AT TRIAL, OR HAVE THE ORIGINAL POLICE REPORT INTRODUCED EITHER OF WHICH WILL CONFIRM THAT I'VE ALWAYS SAID I FOUND THE PURSE IN QUESTION.

3) I REPEATEDLY REQUESTED THAT MY TRIAL COUNSEL/LAWYER SUBPENA WITNESSES IN THE TIGHT-KNIT NEIGHBORHOOD THAT COULD TESTIFY THAT THEY DIDN'T SEE ME AROUND, NEARBY, MS. JOHNSTON'S HOUSE, OR ANYWHERE AT ALL THAT DAY/HOUR IN QUESTION.

4) LASTLY, I PLEADED WITH MY COUNSEL TO PUT ME ON THE STAND, TO AT LEAST HEAR MY EXPLAINATION OF WHY I WAS IN POSSESSION OF CHECKS/PURSE, AND HOW AS AN ADDICT/ALCOHOLIC MY JUDGMENT WAS IMPAIRED.

[EXHIBIT A-13]

# DECLARATION    6-04-08

ISRAEL N. MCKENZIE
T-58501 C.S.P. CORCORAN
3B03 #203, P.O. BOX 3466
CORCORAN, CA-93212

I, ISRAEL NOEL MCKENZIE, PETITIONER IN THE INSTANT MATTER, HEREBY STATE THAT;

1) I, AT ALL STAGES OF THE CRIMINAL PROCEEDINGS LEADING UP TO MY TRIAL, MADE KNOWN TO MY LAWYER THAT MY FRIEND HIROMI HIGASHI, WANTED TO TESTIFY ON MY BEHALF TO HELP ME EXPLAIN WHY I WAS IN POSSESSION OF STOLEN PROPEATY, (SEE HIGASHIS ATTACHED DECLARATION)

2) I TOLD MY TRIAL COUNSEL (IRMA GALLARDO) TO GET EITHER DEPUTY KEVIN MUNCY'S TESTIMONY ADMITTED AT TRIAL, OR HAVE THE ORIGINAL POLICE REPORT INTRODUCED *EITHER OF WHICH WILL CONFIRM THAT I'VE ALWAYS SAID I* FOUND THE PURSE IN QUESTION

3) I REPEATEDLY REQUESTED THAT MY TRIAL COUNSEL/LAWYER SUBPENA WITNESSES IN THE TIGHT-KNIT NEIGHBORHOOD THAT COULD TESTIFY THAT THEY DIDN'T SEE ME AROUND, NEARBY, MS. JOHNSTONS HOUSE, OR ANYWHERE AT ALL THAT DAY/HOUR IN QUESTION.

4) LASTLY, I PLEADED WITH MY COUNSEL TO PUT ME ON THE STAND, TO AT LEAST HEAR MY EXPLAINATION OF WHY I WAS IN POSSESSION OF CHECKS/PURSE, AND HOW AS AN ADDICT/ALCOHOLIC MY JUDGMENT WAS IMPAIRED.

| REPORT TYPE | ☐ SUPPLEI AL | Office of the Sheriff Santa Clara County | NO. | 04-062-0265S |
|---|---|---|---|---|
| 488-PC- Petty Theft 496-PC-Possession of Stolen Property | | NARRATIVE | | |

| LOCATION OF ORIGINAL EVENT (IF KNOWN) | VICTIM NAME (LAST, FIRST, MIDDLE (FIRM, IF BUSINESS)) |
|---|---|
| Brookwood Lane / Saratoga / 95070 | Johnston          Evelyn |

## EXHIBIT B-1

1 NOTIFICATION:

2

3 I was dispatched to make contact with a theft victim at her residence

4 in Saratoga. When I arrived I made contact with V-Johnston who gave

5 me the following information.

6

7 STATEMENT OF VICTIM JOHNSTON:

8

9 Johnston said she last saw her purse at 1230 hours when she wrote a

10 check to her gardener. Johnston said she went into the kitchen and

11 was making soup until approximately 1400 hours. Johnston said she

12 came out of the kitchen and noticed her purse was missing.

13

14 Johnston said her gardner Ramon has been working for her for 20 years.

15 Johnston said she trusts Ramon with her life. Johnston said Ramon did

16 have a helper but she does not believe he would have come in and

17 taken her purse. Johnston said Ramon is a very honest person and has

18 never had a problem with him or any of his employees.

19

20 Johnston said she left her front door open because it was such a nice

21 day. Johnston said she had a screen door that was closed. Johnston

22 said she usually puts her purse in her room out of sight but today

23 she left it on the dining room table. Johnston knows she left her

24 purse on the table after she wrote the check to her gardner.

25

26 Johnston said there was an individual that lived across the street

27 from her that I should check out. Johnston said there was a white

28 male adult in his thirties that was living across the street from

29 her. Johnston added that she sees him every now and then walking in

30 the street and he usually has a hat on backwards. Johnston said that

| OFFICER'S NAME | ID NUMBER | DATE | SHIFT/DAYS OFF | SUPERVISORS REVIEW | ID NUMBER | DATE | PAGE | OF |
|---|---|---|---|---|---|---|---|---|
| K Muncy | 1757 | 03/03/04 1352 | II    SSM | Ray, Donald L. | 1495 | 03/04/04 1110 | 3 | 7 |

1    A.    Perhaps not all the calls, but all of the
2    pertinent incidences that -- of burglary and various crimes.

3    Q.    And in your years of living in Saratoga and
4    reading that paper, is it your opinion that you've seen more
5    and more of it?

6    A.    Oh, definitely.

7    Q.    Now, when you went out to the dining room, was the
8    purse there?

9    A.    No.

10   Q.    And what did you do first when you saw the purse
11   was not on the dining room table?

12   A.    I searched the house to make certain that I hadn't
13   set it down elsewhere.

14   Q.    And did you find it anywhere else in the house?

15   A.    No.

16   Q.    On that day, ma'am, what was in the purse?

17   A.    My car keys, my home keys.

18   Q.    Are they on the same ring?

19   A.    Yes.

20   Q.    Anything else?

21   A.    Perhaps keys to the museum and my little beach
22   cottage; my wallet; couple of Visas for the Bank of America
23   and an ATM from Wells Fargo; two checkbooks, one from Wells
24   Fargo and one from Bank of America; and some notes to
25   myself, perhaps doctors' appointments.  I'm not sure
26   exactly.

27   Q.    Any cash?

28   A.    Eight to ten dollars.

KELLY A. McCARTHY, CSR, RPR, CRR   CERTIFICATE NO. CSR 11651

52

1            THE COURT:  Overruled.

2            MR. DUFFY:  Q.  Why did you tell Deputy Muncy

3   about Mr. McKenzie?  What was your concern?

4       A.    That the prior incident suggested that he might

5   indeed be the perpetrator of this loss.

6            MS. GALLARDO:  Your Honor, I'm going to object as

7   to speculation.

8            THE COURT:  It goes to why she made the report.

9   Overruled.

10           MR. DUFFY:  Q.  Now, when you came home that day

11  from grocery shopping and were now in the kitchen, did you

12  see Mr. McKenzie at all that day?

13       A.    No.

14       Q.    When the sheriff's office -- officer was there

15  taking the statement from you, did you see Mr. McKenzie out

16  around that rental property across the street?

17       A.    No.

18       Q.    Do you recall seeing Mr. McKenzie at all that day,

19  March the 2nd?

20       A.    No.

21       Q.    Now, did you ever give Mr. McKenzie permission to

22  enter your home and take your purse and the contents?

23       A.    No.

24       Q.    Did you ever give Mr. McKenzie permission to have

25  your Bank of America checks?

26       A.    No.

27       Q.    Now, sometime on the morning of Thursday, March

28  the 4th, did a deputy sheriff come to your house with your

B-4

53

```
1   purse?
2       A.    Yes.
3       Q.    And the purse that you've brought to court with
4   you today, is that the purse that was brought back to you?
5       A.    Yes.
6       Q.    And when you got the purse back, ma'am, did you
7   look through the purse to see what, if anything, was
8   missing?
9       A.    Yes.
10      Q.    Can you tell me what, if anything, was missing
11  from the purse?
12      A.    The Bank of America checks and the small amount of
13  cash that was in the purse.
14      Q.    Was everything else that you described that had
15  been in your purse still in your purse?
16      A.    Yes.
17      Q.    With the exception of the Bank of America checks
18  and the small amount of cash.
19      A.    Yes.
20            MR. DUFFY:  Your Honor, at this time I have a
21  photograph that contains four individual digital
22  photographs.  I'd like to have that marked as People's No. 2
23  for identification.
24            THE COURT:  People's 2.
25            (Whereupon, People's Exhibit 2 was marked for
26  identification.)
27            MR. DUFFY:  Q.  Ma'am, I'm going to show you an
28  item we've now marked as People's No. 2 for identification.
```

54

```
 1   I'm going to have you take a look at that item.  First of
 2   all, can you see the item, People's No. 2?  You can pick it
 3   up if you'd like.  Can you see that, ma'am?
 4       A.   Yes.
 5       Q.   Okay.  Does that exhibit, People's No. 2, show
 6   four photographs of your purse and some of the contents?
 7       A.   Yes.
 8       Q.   I want to talk about your purse that you brought
 9   to court with us today that's now pictured here in People's
10   No. 2.  When you got this purse back, did you have an
11   opportunity to examine it, touch it, hold it, look through
12   it?
13       A.   Yes.
14       Q.   Did that purse have any kind of damage to it?
15       A.   No.  It was clean.  It looked just like it had
16   been.
17       Q.   Did that purse have any damage to it that looked
18   as though it had been left out in the road?
19       A.   Not at all.
20       Q.   Did that purse look like it had any damage like it
21   had been, you know, thrown into the creek?
22       A.   No.
23       Q.   Did that purse look like it had any damage like it
24   had been thrown into the brush or one of those oak trees?
25       A.   No.
26       Q.   Did you note any kind of additional markings,
27   damage, that weren't there prior to March the 2nd?
28       A.   No.
```

[EXHIBIT B-6]

1    no.

2            2.09?

3            MR. DUFFY:  Well, Your Honor, I put that in here

4    in respect to the placing of the purse in the mailbox.

5            THE COURT:  No.  Not gonna fly.  2.09 I'll give.

6    2.11 I'll give.  2.13, there's been no evidence of

7    consistent or inconsistent statements; correct?

8            MS. GALLARDO:  Right.  There isn't.

9            MR. DUFFY:  There was only one thing that came

10   on cross examination of the officer.  The witness Evelyn

11   Johnston stated that she left her door ajar.  However, I

12   don't think there was any question to her, did you tell a

13   police officer that you left it ajar?  And the officer

14   testified that she never said that she left her door

15   ajar.  So I'm not sure this is really an inconsistent

16   statement.  I don't have a recollection of Ms. Johnston

17   saying I never told -- I told a police officer I left the

18   door open.

19           THE COURT:  I won't give it.

20           2.15 no.

21           MR. DUFFY:  Yes.  Actually, judge, 2.15 is an

22   appropriate instruction because this is the instruction

23   of recently -- recent possession of stolen property.

24           THE COURT:  Because of when the evidence -- when

25   the witness said the defendant tried to have him cash a

26   check?

27           MR. DUFFY:  Yes, in terms of when the crime

28   occurred.



[EXHIBIT B-187]

(Exhibit ~~B-25 (as)~~ ))

~~(xxxx)~~ (jury instruction that was never ~~xxxx~~ ~~xxxx~~ admitted.)

INSTRUCTION NO.:_____

(Evidence that at some other time a witness made a [statement] [or] [statements] that [is] [or] [are] inconsistent [or consistent] with [his] [or] [her] testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion. )

[If you disbelieve a witness' testimony that [he] [or] [she] no longer remembers a certain event, that testimony is inconsistent with a prior statement or statements by [him] [or] [her] describing that event.]



2.13

← Refused

86

1    Q.    Before March 2nd, 2004, ma'am, how long had you
2    had that purse?
3    A.    Oh, for perhaps five years.
4    Q.    And what did you do with the purse when you came
5    into your house with the groceries and such?
6    A.    I set it on the dining room table.
7    Q.    Let's talk about your house for a moment.  If I
8    came to your front door and the main door was open, but the
9    screen door was closed, could I see your dining room table
10   from your front door looking through the screen?
11   A.    Easily, yes.
12   Q.    Would I be able to see your purse on the dining
13   room table?
14   A.    Yes.
15   Q.    Now, when you went into the kitchen, did you
16   immediately begin cooking?
17   A.    Yes.
18   Q.    Do you remember whether or not you had a blower or
19   fan going?
20   A.    Yes.
21   Q.    Yes, you did?
22   A.    Yes, I had a blower going.
23   Q.    Did you have any music on or television on?
24   A.    No.
25   Q.    Was there anyone else home in your house when you
26   were doing the cooking?
27   A.    No.
28   Q.    How long would you say that you were cooking for?

EX. B-9

```
1              MR. DUFFY:  Thank you.  I have nothing further.
2              THE COURT:  Anything further?
3              MS. JURADO:  Just briefly.
4                         RECROSS-EXAMINATION
5   Q.  (BY MS. JURADO)  Mr. Ochinero, did you notice any other
6   tattoos?
7   A.  No, I did not.
8   Q.  Just that one tattoo?
9   A.  Yes.
10  Q.  You were able to see his hands?
11  A.  Yes, I was.  His left hand.
12             MS. JURADO:  Nothing further.
13             THE COURT:  All right.
14             MR. DUFFY:  Nothing further.
15             THE COURT:  You are excused.  Thank you.
16             MR. DUFFY:  Your Honor, at this time the People would
17  ask that People's No. 1 be moved into evidence.
18             THE COURT:  Any objection?
19             MS. JURADO:  None, Your Honor.
20             THE COURT:  In evidence.
21             (WHEREUPON, People's Exhibit No. 1, previously marked
22  for identification, was moved into evidence.)
23             MR. DUFFY:  The People have no further witnesses at
24  this time, Your Honor.  The People would rest.
25             THE COURT:  All right.  You wish to present affirmative
26  evidence?
27             MS. JURADO:  Not at this time, Your Honor.  Thank you.
28             THE COURT:  Argument.
```

Case 3:08-cv-00551-PJH   Document [illegible]   Filed 02/25/2009   Page 65 of 85

1    Q.   What was the reason that you left your office?

2    A.   I had a client appointment.

3    Q.   And do you recall what time that appointment was?

4    A.   It was in the 3 o'clock hour.      *PURSE WENT MISSING*
                                             *AROUND ROOM OR SO*

5    Q.   And was that appointment in the city of Saratoga

6    or somewhere else?

7    A.   In the city of San Jose.

8    Q.   And how were you planning on getting to that

9    appointment?

10   A.   By motor vehicle.

11   Q.   Now, on your way to this appointment, did you make

12   any stops?

13   A.   I did.

14   Q.   And where did you make a stop or stops?

15   A.   At the Bank of America, in downtown Saratoga, on

16   Big Basin Way.

17   Q.   Again returning to our diagram, People's No. 1 --

18   I should say aerial photograph.  I'm dating myself.  Do you

19   see the Bank of America there pictured on People's No. 1?

20   A.   I know it's there somewhere.

21   Q.   Okay.  Well, are you familiar with the

22   supermarket?

23   A.   Yes.

24   Q.   I guess it's a Buy and Save.

25   A.   Yes.  Okay.  I do see it now.

26   Q.   Okay.  Do you recognize the --

27   A.   Yes.

28   Q.   -- Bank of America parking lot?

[EX. B-9]

34

```
 1          MR. DUFFY:  Thank you.  I have nothing further.
 2          THE COURT:  Anything further?
 3          MS. JURADO:  Just briefly.
 4                     RECROSS-EXAMINATION
 5  Q.  (BY MS. JURADO)  Mr. Ochinero, did you notice any other
 6  tattoos?
 7  A.  No, I did not.
 8  Q.  Just that one tattoo?
 9  A.  Yes.
10  Q.  You were able to see his hands?
11  A.  Yes, I was.  His left hand.
12          MS. JURADO:  Nothing further.
13          THE COURT:  All right.
14          MR. DUFFY:  Nothing further.
15          THE COURT:  You are excused.  Thank you.
16          MR. DUFFY:  Your Honor, at this time the People would
17  ask that People's No. 1 be moved into evidence.
18          THE COURT:  Any objection?
19          MS. JURADO:  None, Your Honor.
20          THE COURT:  In evidence.
21          (WHEREUPON, People's Exhibit No. 1, previously marked
22  for identification, was moved into evidence.)
23          MR. DUFFY:  The People have no further witnesses at
24  this time, Your Honor.  The People would rest.
25          THE COURT:  All right.  You wish to present affirmative
26  evidence?
27          MS. JURADO:  Not at this time, Your Honor.  Thank you.
28          THE COURT:  Argument.
```



(Exhibit ~~B-4~~ (~~10~~)) [EXHIBIT B-10]

(Victim at Prelim. Hearing)

10

1 from the store did you have that purse that day?

2 A.  Yes.

3 Q.  Did you put that purse down on the dining room table after

4 you entered your house?

5 A.  Yes.

6 Q.  At some point, ma'am, did you notice that purse was missing?

7 A.  Yes.

8 Q.  When did you notice it was missing, ma'am?

9 A.  It occurred to me while I was cooking that I had left it

10 there, and it was about an hour after a half after I had arrived

11 home from the store.  I ran back in the dining room, and it was

12 gone.

13 Q.  While you were in your kitchen did you hear any noises in

14 the dining room area or front door area?

15 A.  None.

16 Q.  Did you have any music on, television?

17 A.  No.

18 Q.  Were you cooking?

19 A.  Yes.

20 Q.  Did you have any fans on in the kitchen?

21 A.  I may have.  I don't know.

22 Q.  How is your hearing, ma'am?

23 A.  It's very good.

24 Q.  Now when you came out, did you search for the purse?

25 A.  Indeed.

26 Q.  Did you ever locate it inside the house?

27 A.  No.  I was apprehensive about it.  I thought, oh my gosh,

28 you forgot all about your purse.  You left it on the table and



*Exhibit 8M (8 of 9)* $B-11$

*Witness at Prelim. Hearing*

29

```
 1  Mr. McKenzie lasted?
 2  A.  My transaction with Mr. McKenzie?  What do you mean?
 3  Q.  The contact you had with Mr. McKenzie on March 2nd, '04, how
 4  long did that last?
 5  A.  I'd say approximately one minute.
 6  Q.  One minute.  Then you immediately called the police; is that
 7  correct?
 8  A.  Yes, I did.
 9  Q.  You spoke to them approximately how long, the police, the
10  sheriffs?
11  A.  Directly, three, four minutes.
12  Q.  Let me ask you this:  How do you know it was closer to 2:00
13  p.m. and not 3:00 p.m.?
14  A.  Because I had a 2:30 appointment.         3:00 o'clock App.
15  Q.  Did you make that 2:30 appointment?
16  A.  Absolutely.
17  Q.  You were not late?
18  A.  Nope.
19  Q.  Now, you indicated that when you were walking to your car,
20  that's when you noticed somebody approaching you, correct?
21  A.  That's correct.
22  Q.  Are you walking towards your car or were you already at your
23  car opening your car door when you noticed somebody walking
24  towards you?
25  A.  As I stated previously, I was standing at my car.  I was
26  getting my papers together.  That would be my ATM slip and my
27  card.
28  Q.  What kind of work do you do, Mr. Ochinero?
```

witness at trial

| | | |
|---|---|---|
| 1 | Q. | What was the reason that you left your office? |
| 2 | A. | I had a client appointment. |
| 3 | Q. | And do you recall what time that appointment was? |
| 4 | A. | It was in the 3 o'clock hour. |
| 5 | Q. | And was that appointment in the city of Saratoga |
| 6 | | or somewhere else? |
| 7 | A. | In the city of San Jose. |
| 8 | Q. | And how were you planning on getting to that |
| 9 | | appointment? |
| 10 | A. | By motor vehicle. |
| 11 | Q. | Now, on your way to this appointment, did you make |
| 12 | | any stops? |
| 13 | A. | I did. |
| 14 | Q. | And where did you make a stop or stops? |
| 15 | A. | At the Bank of America, in downtown Saratoga, on |
| 16 | | Big Basin Way. |
| 17 | Q. | Again returning to our diagram, People's No. 1 -- |
| 18 | | I should say aerial photograph. I'm dating myself. Do you |
| 19 | | see the Bank of America there pictured on People's No. 1? |
| 20 | A. | I know it's there somewhere. |
| 21 | Q. | Okay. Well, are you familiar with the |
| 22 | | supermarket? |
| 23 | A. | Yes. |
| 24 | Q. | I guess it's a Buy and Save. |
| 25 | A. | Yes. Okay. I do see it now. |
| 26 | Q. | Okay. Do you recognize the -- |
| 27 | A. | Yes. |
| 28 | Q. | -- Bank of America parking lot? |

PURSE WENT MISSING AROUND NOON OR SO

KELLY A. McCARTHY, CSR, RPR, CRR   CERTIFICATE NO. CSR 11651

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA
## SUMMARY OF REVOCATION DECISION; HEARING WAIVED / SCREENING OFFER

### III. SUMMARY OF FINDINGS AND DISPOSITION

A. Reports and Documents Considered:

    [X] Parole Violation            [ ] Police Report - Date:

    [ ] CDC Rules Violation            Agency:

    [ ] Other (specify):

B. Findings

| Charge Number | Code Number | Charge Specified | Findings | Evidence Considered/ Relied Upon | Other (specify) | Rev Ext |
|---|---|---|---|---|---|---|
| 1. | 670 | Petty theft with a prior | DISMISS | INSUFFICIENT EVIDENCE | | |
| 2. | 676 | Receiving/possession of stolen property | GOOD CAUSE | 3 | | |

1. Court Conviction      3. Agent's Statements      5. Witnesses' Statements      7. Laboratory Analysis
2. Parolee Admits      4. Physical Evidence      6. Victim's Statements      8. Other (specify)

C. Reasons for Disposition and Documents Considered

[X] Summary of Adjustment    [ ] C-File    [ ] POR    [ ] CII/FBI    [ ] Other:

Need for Reconfinement Based Upon the Following Factors:

    [ ] Return to Drugs - Readdiction - Need for Dry-Out - Detoxification

    [ ] Involved in Felonious Behavior that Mandates a Substantial RTC

    [ ] Continuation of Same Behavior that Caused Parolee's Prison Confinement

    [X] Inability/Unwillingness to Conform to the Expectations and Requirements of Parole/CDC

    [ ] Parolee's Involvement in Distribution and/or Sales of Controlled Substances

    [ ] Parolee's Unlawful Behavior and/or Activity Makes Him/Her a Liability to the Community

    [ ] Parolee's Behavior and Conduct Requires Treatment in a Controlled Environment

    [ ] Other Reasons/Comments

| NAME | CDC NUMBER | INST/REGION / AGENT | SCREEN DATE |
|---|---|---|---|
| MCKENZIE, ISRAEL | T58501 | SANTA CRUZ / 2 SEGALL, DANE | 26-MAR-2004 |

29-MAR-2004 11:56 AM


EXHIBIT (E) [EX-C1]

BOARD OF PRISON TERMS
STATE OF CALIFORNIA

*Records Office Use Only*

Projected Revocation Release Date

**SUMMARY OF REVOCATION DECISION:**
**HEARING WAIVED / SCREENING OFFER**

Revocation Release Date

Controlling Discharge Date

Discharge Review Date

**I. PRELIMINARY INFORMATION**

**A. Type of Hearing**
REVOCATION

**B. Basis for Charges**
Parole Violation Report, Dated: 11-MAR-2004
CDC Rules Violation Report, Dated:
Other                    Dated: 02-MAR-2004
SANTA CLARA SHERIFF'S#04-062-0265S

**C. Admissions/Denials**
Date Signed by Parolee:
Date of BPT Action:26-MAR-2004
Assessment: 9E

**D. Legal Data**
Arrest Date:05-MAR-2004    Hold Date: 05-MAR-2004

**II. DECISION**

| A. | X | Hold Status - RETAIN |
| B. | | SATCU/SATU: Approved Denied |
| C. | | Continue on Parole Dismiss Prop36 |
| D. | | Schedule for Revocation Proceedings |
| E. | | Schedule for Revocation Extension Proceedings |

F. Miscellaneous Action

G. | X | Parole Revoked-Return to Custody: 9 months
    Serve Concurrently
    Revocation Period Extended:0 days
    Time Served:          to

H. Attorney    Conduct Determination    Assignment
    Reason

X Eligible  **3057 Credits**   Prior Criminal History
  Ineligible 3057d-1          Circumstances & Gravity of
  Ineligible 3057(d)(2)(E)    Parole Violation
  Parole Violation
  Commitment Offense
  Specify Reason

H. Special Cond. of Parole:  Noted  Reaffirmed  Amended

| | Add/Mod/Del | Reason |
|---|---|---|
| No Alcohol | ------ | |
| ANT | ------ | |
| POC for Eval | ------ | |

Other Special Condition

Reason

I. Instructions to CDC or P&CSD Staff

Commissioner/Deputy Commissioner Signature
*Filangeri*

Date
26-MAR-2004

**PAROLEE ACKNOWLEDGEMENT**

1. I accept the above return to custody order (Section F) and unconditionally waive my rights to contest the charges against me or have a hearing.

2. I reject the above order (Section F) and request a revocation hearing.

3. I accept the above order and optionally waive my right to a hearing.

Parolee Signature                                        Date

Witness Signature                                        Date

**NAME**
MCKENZIE, ISRAEL

**CDC NUMBER**
T58501

**INST/REGION / AGENT**
SANTA CRUZ / 2
SEGALL, DANE

**SCREEN DATE**
26-MAR-2004

29-MAR-2004 11:56 AM

EXHIBIT C-2

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**THE PEOPLE OF THE STATE OF CALIFORNIA,**

Plaintiff and Respondent,

v.

**ISRAEL McKENZIE,**

Defendant and Appellant.

H028695

## STATEMENT OF THE CASE

On July 23, 2004, the Santa Clara County District Attorney filed an information charging appellant with one count of burglary (Pen. Code, §§ 459, 460 - count one) and one count of receiving stolen property (Pen. Code, § 496, subd. (a) – count two). The district attorney also alleged that appellant suffered six prior strike convictions (Pen. Code, §§ 667, subds. (b)-(i); 1170.12). The district attorney also alleged one prior serious felony conviction (Pen. Code, § 667, subd.(a)) and one prior prison term (Pen. Code, § 667.5, subd. (b)). (CT 43-47.)

Jury trial began on December 9, 2004. (CT 71.)

On December 14, 2004, the jury found appellant guilty on counts one and two. (CT 147-148, 166.) On that date, the court found that all the allegations of the priors were true. (CT 167.)

On April 1, 2005, the court imposed a term of 25 years to life. (CT 258-259.)

On April 13, 2005, appellant filed a notice of appeal. (CT 261.)

1

1   SAN MARTIN, CALIFORNIA                    APRIL 1, 2005

2                              (Exhibit 22 ) C-3]

3

4               T H E   P R O C E E D I N G S

5

6          THE COURT:  IS FORMAL ARRAIGNMENT IS WAIVED?

7          MS. GALLARDO:  YES.

8          THE COURT:  AND ANY LEGAL CAUSE?

9          MS. GALLARDO:  NONE.

10         THE COURT:  ALL RIGHT.

11      IN THIS MATTER THE DEFENDANT BEING INELIGIBLE FOR

12  PROBATION.  PROBATION IS DENIED.  AS TO COUNT ONE THE

13  VIOLATION OF SECTION 459/460A FIRST DEGREE BURGLARY, THE

14  DEFENDANT IS ORDERED TO SERVE A PRISON COMMITMENT OF 25

15  YEARS TO LIFE.

16      AS TO COUNT TWO, A VIOLATION OF SECTION 496 THE

17  DEFENDANT IS ALSO ORDERED TO SERVE A PRISON COMMITMENT OF 25

18  YEARS TO LIFE, HOWEVER, THAT IS STAYED PURSUANT TO SECTION

19  654.  THE SERIOUS PRIOR FELONY UNDER 667A AND THE ONE YEAR

20  ENHANCEMENT UNDER 667B, 667.5B THE PRISON PRIOR THE

21  PUNISHMENT FOR THOSE TWO PRIORS IS STRICKEN AT THIS TIME

22  PURSUANT TO 1385 FOR A TOTAL OF PRISON COMMITMENT OF 25

23  YEARS TO LIFE.

24          MR. DUFFY:  YOUR HONOR, YOU CAN'T STRIKE THE PROP

25  8 PRIOR.  YOU CAN'T STRIKE THE PUNISHMENT OF THE PROP 8

26  PRIOR.  YOU MUST IMPOSE THE PUNISHMENT.  YOU CANNOT STRIKE

27  THAT PURSUANT TO 1385.

28          THE COURT:  WELL I CAN GO DOWN TO 18 YEARS.

1      MR. DUFFY:  I UNDERSTAND THAT.

2            THE COURT:  WHAT WOULD YOU LIKE ME TO DO?

3            MR. DUFFY:  I AM JUST SAYING LEGALLY YOU CAN'T

4   STRIKE THE PROP EIGHT PRIOR.  I DON'T WANT YOU TO GO DOWN TO

5   18 YEARS.  I AM JUST TELLING YOU THAT YOU CAN'T STRIKE IT

6   PURSUANT TO THE 1385.  THEY WILL SEND IT BACK.  NOW THE

7   PRISON PRIOR, YOU CAN STRIKE THE PRISON PRIOR, BUT NOT THE

8   PROP EIGHT.

9            THE COURT:  YOU CAN'T DEFLECT THE PUNISHMENT?

10           MS. GALLARDO:  NOT ON THE PROP EIGHT.

11           MR. DUFFY:  YOU MUST IMPOSE THE FIVE YEARS.

12   LEGALLY, YOU CAN'T STRIKE THE PUNISHMENT ON PROP EIGHT

13   PRIOR.

14           THE COURT:  ALL RIGHT.

15       THE PUNISHMENT FOR THE ONE YEAR PRIOR WILL BE

16   STRICKEN.  I WILL IMPOSE THE FIVE YEARS BECAUSE I'M FORCED

17   TO.  IF THERE IS SOME WAY IT CAN BE WORKED AROUND THAT I

18   THINK THAT IS WHAT SHOULD HAPPEN.  I WILL IMPOSE THE FIVE

19   YEARS, UNFORTUNATELY.

20       ALL RIGHT.  SO MR. MCKENZIE WOULD THEN BE RELEASED ON

21   PAROLE.  THE PAROLE COULD BE UP TO THREE YEARS.  AND IF YOU

22   VIOLATE THE TERMS OF YOUR PAROLE YOU COULD BE BACK TO PRISON

23   FOR ONE YEAR FOR EACH PAROLE VIOLATION.

24       AND YOU ALSO MAY HAVE CERTAIN APPELLATE RIGHTS AND

25   INCLUDING A RIGHT TO FILE AN APPEAL WITHIN SIXTY DAYS OF

26   TODAY'S DATE.

27       YOU ARE ALSO ORDERED TO MAKE A GENERAL ORDER OF

28   RESTITUTION.  THE DEFENDANT IS NOT TO POSSESS OR OWN A

```
 1    THE COURT TO FOLLOW THE RECOMMENDATION OF THE PROBATION
 2    DEPARTMENT.
 3              THE COURT:  ALL RIGHT.
 4         ANYTHING FURTHER?
 5              MS. GALLARDO:  NO YOUR HONOR.
 6              THE COURT:  SUBMITTED.
 7              MS. GALLARDO:  I AM SORRY.  ONE LAST THING.
 8              THE COURT:  CERTAINLY.
 9              MS. GALLARDO:  DID I HAND TWO LETTERS THIS
10    MORNING TO YOUR CLERK ONE IS FROM THE SUBSTANCE ABUSE
11    PROGRAM THAT MR. MCKENZIE IS CURRENTLY ATTENDINGING AT LIFE
12    HONOR PROGRAM AND THE HE WROTE COPIES, HAVE BEEN PROVIDED TO
13    PROBATION AND MR. DUFFY AS WELL.
14              MR. DUFFY:  THAT'S CORRECT I RECEIVED BOTH OF
15    THOSE ITEMS.
16         AND ALSO YOUR CLERK HANDED BOTH MISS GALLARDO AND
17    MYSELF A LETTER DATED MARCH 18, 2005 FROM STEVE JOHNSON A
18    TYPE WRITTEN LETTER THAT WAS ADDRESSED TO YOUR HONOR.
19              THE COURT:  ALL RIGHT.
20         WELL I READ AND CONSIDERED THE PROBATION REPORT
21    CONSISTING OF THIRTEEN PAGES AND THE COPIES THERE TO AND THE
22    LETTERS AND EXAMINED THE 1385 MOTION, AND THE ROMERO FILED
23    BY THE DEFENSE.  AND I AGREE THAT FIRST DEGREE BURGLARY IS
24    NOT A VIOLENT FELONY FOR OBVIOUS NATURE)  I SUPPOSE IT COULD
25    TURN-OUT TO BE ONE IF THE VICTIM WAS HOME, AND THERE WAS
26    CONFRONTATION.  AND THE DEFENDANT'S THE PRIOR VICTIMS WERE
27    NOT HOME.  AND IN THIS CASE THE VICTIM WAS HOME BUT DID NOT
28    KNOW ABOUT THE ENTRY, IN FACT, UNTIL A SHORT WHILE AFTER IT
```

1    TOOK PLACE SO THERE WAS NO CONFRONTATION.  I DO NOTE HOWEVER

2    THAT THE VICTIM WAS 81 YEARS OLD.  AND I ALSO WOULD NOTE

3    THAT THE SIX PRIORS WERE ALL STEMMED FROM THE SAME

4    INFORMATION THAT IS THE STRIKE PRIORS HOWEVER THEY OCCUR ON

5    DIFFERENT DATES. BUT THE PURPOSE OF THE BURGLARY OF ALL SIX

6    THOSE BURGLARIES AND THE CURRENT ONE ARE ALL THE SAME TO BUY

7    DRUGS, AS IS THE PURPOSE IN THIS CASE AS WELL.

8          THE COURT FINDS THAT THERE IS NO CIRCUMSTANCES THAT

9    SHOULD TAKE THIS CASE OUT OF THE PERVIEW OF THE THREE

10   STRIKES LAW.  SO THE DEFENSE MOTION TO STRIKE ANY AND ALL OF

11   THE PRIORS IS DENIED AT THIS TIME.

12

13                 (A SHORT BREAK WAS TAKEN OFF THE RECORD.)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    TRYING TO GET THIS ONE CHECK CASHED.  MR. OCHINERO SAYS NO.

2            BUT IF YOU ARE TO BELIEVE THAT MR. MCKENZIE HAD

3    MS. JOHNSTON'S PURSE YOU KNOW THERE WAS ANOTHER CHECKBOOK IN

4    THERE, IT WAS A WELLS FARGO BANK, AND YOU ALSO HEARD THAT

5    THE WELLS FARGO BANK WAS RIGHT NEXT DOOR TO THE BANK OF

6    AMERICA, IF HE WAS SO DESPERATE TO GET MONEY WHY NOT JUST GO

7    NEXT DOOR AND TRY THERE?

8            NOW, AS I TOLD YOU EARLIER THIS IS A VERY SHORT

9    CASE AND THAT'S BECAUSE THERE IS VERY LITTLE EVIDENCE.

10            IN SOME BURGLARY CASES THERE ARE WITNESSES WHO

11    WOULD COME FORWARD AND THEY SAW SOMEBODY ENTER THE HOUSE OR

12    BE NEAR THE HOUSE.  YOU DON'T HAVE THAT HERE.

13            THE GARDNER AND HIS HELPER WERE NEAR THE HOUSE BUT

14    THEY WERE NEVER QUESTIONED AS TO WHETHER THEY SAW ANYBODY

15    ENTER THE HOUSE.  AND IN FACT I BELIEVE DEPUTY MUNCY TOLD

16    YOU THAT EVELYN JOHNSTON DIDN'T EVEN KNOW THE NAME OF THE

17    HELPER SO HE DOESN'T ASK DEPUTY MUNCY, COULDN'T ASK WHETHER

18    OR NOT THEY SAW ANYBODY ELSE AROUND THE HOUSE.

19            I ALSO HAVE NO FINGERPRINTS.  YOU HEARD ME ASK,

20    DID YOU DUST THE DOOR HANDLE OF THE SCREEN DOOR FOR

21    FINGERPRINTS?  NONE WERE LIFTED.  NONE WERE LIFTED FROM

22    EITHER THE DOOR OR ANYWHERE ELSE IN THE HOUSE.  SO YOU DON'T

23    HAVE THAT IN THIS CASE.

24            IN SOME BURGLARY CASES THERE ARE FOOTPRINTS AND

25    THAT'S WHY I KEPT ASKING ABOUT THAT.  USUALLY WHAT HAPPENS

26    IS THEY WILL TAKE A FOOTPRINT AND THEY WOULD GIVE YOU AN

27    APPROXIMATE SIZE OF IT.

28            MR. DUFFY:  YOUR HONOR, I'M GOING TO OBJECT AS

```
 1   COUNSEL IS ARGUING EVIDENCE THAT'S NOT IN THE RECORD.

 2               THE COURT:  SUSTAINED.

 3               MS. JURADO:  MY ARGUMENT IS THAT THERE IS NO SUCH

 4   EVIDENCE HERE.

 5               THE COURT:  SUSTAINED.  SPECULATION.

 6               MS. JURADO:  NOW, IN THIS CASE I ASKED

 7   MS. JOHNSTON IF IT HAD BEEN RAINING AND SHE SAID IT WAS THE

 8   DAY BEFORE.  AND THEN SHE ALSO TOLD YOU THAT HER CARPET WAS

 9   LIGHT BLUE, BUT THERE WAS NO EVIDENCE OF ANY FOOTPRINTS IN

10   THE HOUSE, SO YOU DON'T HAVE THAT HERE.

11               NOW, ANOTHER PIECE OF EVIDENCE JURORS USUALLY HAVE

12   IN A BURGLARY CASE, AND ALSO IN RECEIVING CONCEALING OR

13   WITHHOLDING STOLEN PROPERTY, IS THAT THE OFFICERS USUALLY

14   FIND EITHER ON THE PERSON OR HIS OR HER PROPERTY, SOME OF

15   THAT.

16               MR. DUFFY:  YOUR HONOR, AGAIN I'M GOING TO OBJECT.

17   COUNSEL IS ARGUING ABOUT FACTS NOT IN THIS RECORD.

18               THE COURT:  SUSTAINED.  SPECULATION.

19               MS. JURADO:  NOW, IN THIS CASE, I ASKED DEPUTY

20   MUNCY WHETHER OR NOT HE HAD FOUND ANY OF MS. JOHNSTON'S

21   PROPERTY IN MR. MCKENZIE'S RESIDENCE AND HE SAID NO.  AND

22   THEN ALSO YOU HEARD THAT DEPUTY TORRES SEARCHED

23   MR. MCKENZIE'S, I'M SORRY, DEPUTY TORRES IS THE ONE WHO

24   SEARCHED MR. MCKENZIE'S RESIDENCE AND HE FOUND NO PROPERTY

25   THERE.  HE DIDN'T FIND ANY CHECKS.  HE DIDN'T FIND ANY ITEM

26   BELONGING TO EVELYN JOHNSTON ON THE RESIDENCE.  AND DEPUTY

27   MUNCY SEARCHED MR. MCKENZIE'S PERSON AND HE ALSO DID NOT

28   FIND ANYTHING ON HIM.
```

```
 1              SO WHAT YOU HAVE IS MR. MCKENZIE ASKING
 2    MR. OCHINERO TO CASH A CHECK WITH THE NAME OF EVELYN
 3    JOHNSTON ON IT.  AND THAT, LADIES AND GENTLEMEN, IS NOT
 4    EVIDENCE FOR BURGLARY, COUNT ONE, SORRY, COUNT ONE; COUNT
 5    TWO, ELEMENT ONE, IT'S NOT EVIDENCE FOR A BURGLARY.
 6              NOW, HOW DO YOU REACH A VERDICT IN A CASE WHERE
 7    THERE IS VERY LITTLE EVIDENCE?   .
 8              MOST OF YOU WOULD FIND YOURSELF IN ONE OF THESE
 9    THREE BOXES DURING YOUR DELIBERATIONS.  YOU ARE EITHER GOING
10    TO FEEL HE'S GUILTY, NOT GUILTY, OR YOU ARE GOING TO FEEL
11    YOU NEED MORE EVIDENCE.
12              NOW, IF YOU FEEL CERTAIN THAT HE'S GUILTY OF BOTH
13    OF THESE CHARGES THEN YOU HAVE TO COME BACK WITH A VERDICT
14    OF GUILTY.
15              IF YOU ARE CERTAIN THAT HE IS NOT GUILTY OF ONE OR
16    THE OTHER OR BOTH OF THESE CHARGES, YOU HAVE TO RETURN A
17    VERDICT OF NOT GUILTY.
18              BUT WHAT HAPPENS IF YOU DON'T KNOW.
19              WHAT HAPPENS IF YOU FEEL THAT YOU NEED MORE
20    EVIDENCE BEFORE YOU CAN REACH YOUR DECISION.
21              WELL, WHEN YOU'RE BACK IN THE DELIBERATING ROOM,
22    YOU'RE GOING TO GET A VERDICT FORM AND ON THAT FORM YOU CAN
23    EITHER WRITE IN GUILTY OR YOU CAN WRITE IN NOT GUILTY, BUT
24    THERE IS NO BOX THAT YOU CAN CHECK AND SAY I NEED MORE
25    EVIDENCE.
26              WHAT YOU DO, LADIES AND GENTLEMEN, IF YOU FEEL YOU
27    NEED MORE EVIDENCE THEN YOU HAVE TO VOTE NOT GUILTY.  THAT'S
28    THE LAW.
```

1    NOW, IF YOU FEEL YOU NEED MORE EVIDENCE) BEFORE YOU

2    CAN REACH A FAIR, INTELLIGENT, AND RATIONAL DECISION, YOU

3    ARE REQUIRED TO VOTE NOT GUILTY BECAUSE WHAT THAT MEANS IS

4    THAT THE CASE HAS NOT BEEN PROVEN TO YOU BEYOND A REASONABLE

5    DOUBT.

6    NOW, IF YOU'RE BACK THERE DELIBERATING AND YOU

7    GUYS ARE ALL DISCUSSING THE FACTS AND ARE LOOKING AT JURY

8    INSTRUCTIONS AND YOU FEEL THAT MAYBE HE COULD HAVE DONE IT,

9    PROBABLY HE COULD HAVE DONE IT, POSSIBLY, THOSE ARE NOT

10   ENOUGH.

11   YOU HAVE TO KNOW IN YOUR HEART AND IN YOUR MIND

12   THAT MR. MCKENZIE'S GUILTY BEYOND A REASONABLE DOUBT OF BOTH

13   OF THESE CHARGES.

14   LET ME GIVE YOU AN EXAMPLE OF WHAT THAT ENTAILS.

15   IF I WAS TO TELL YOU THAT THE DEPUTY OVER THERE

16   HAD AN ENVELOPE IN HIS DESK THAT HAS NOT BEEN OPENED BY

17   ANYBODY.  IT'S SEALED.  AND ON IT IT TELLS YOU WHAT

18   HAPPENED.  IT TELLS YOU WHETHER OR NOT MR. MCKENZIE IS

19   GUILTY OR NOT GUILTY OF THESE CHARGES.  IT'S THE ABSOLUTE

20   TRUTH.  IT'S BASICALLY AN ANSWER SHEET FOR THIS CASE.

21   AND AFTER YOU ARE DONE WITH YOUR DELIBERATION,

22   YOUR VERDICT HAD BEEN READ.  YOU HAD BEEN EXCUSED AS A

23   JUROR.  IF YOU COULD, WOULD YOU STOP BY AND LOOK IN THAT

24   ENVELOPE?  IF YOUR ANSWER IS YES, THEN THE CASE WAS NOT

25   PROVEN TO YOU BEYOND A REASONABLE DOUBT.

26   IF YOU ARE NOT SURE, IF YOU WANT TO HEAR FROM MORE

27   PARTIES, IF YOU NEED MORE EVIDENCE, THAT'S THE SAME AS NOT

28   GUILTY.

1    NOW, THE PROSECUTOR HAS MENTIONED THAT HE GETS
2  ANOTHER CHANCE TO TALK TO YOU AFTER I'M DONE.  I DON'T GET A
3  SECOND CHANCE, AND YOU ALSO DON'T GET A SECOND CHANCE IN
4  MAKING YOUR DECISION IN THIS CASE.
5    YOU CAN'T CALL HERE THE NEXT WEEK AND SAY HEY,
6  GUESS WHAT, I WAS A JUROR IN THE MCKENZIE CASE, I'VE BEEN
7  THINKING ABOUT IT, I THOUGHT ABOUT IT OVER THE WEEKEND, I
8  WANT TO CHANGE MY VOTE.  YOU DON'T GET TO DO THAT.  IT'S A
9  FINAL DECISION.  AND I KNOW THAT YOU WON'T TAKE THIS
10  LIGHTLY.
11    I WANT TO THANK YOU ON BEHALF OF MR. MCKENZIE FOR
12  ALL YOUR TIME AND ATTENTION YOU HAVE GIVEN US HERE.  WE ALL
13  REALLY APPRECIATE YOUR PARTICIPATION IN THIS CASE.  AND I
14  STRONGLY URGE YOU THAT GIVEN THE INSUFFICIENCY OF EVIDENCE
15  PRESENTED TO YOU TO RETURN VERDICTS OF NOT GUILTY.
16    THANK YOU.
17    THE COURT:  THANK YOU, COUNSEL.
18    MS. JURADO:  THANK YOU.
19    MR. DUFFY:  THANK YOU.
20    THANK YOU, AGAIN, LADIES AND GENTLEMEN, FOR YOUR
21  KIND ATTENTION THIS AFTERNOON.
22    AS I TOLD YOU BEFORE I WOULD HAVE A SECOND
23  OPPORTUNITY TO ADDRESS YOU IN THE FORM OF A REBUTTAL
24  ARGUMENT.
25    IT WILL NOT BE ANYWHERE THE LENGTH OF THE ORIGINAL
26  OPENING STATEMENT, ALTHOUGH THAT FRANKLY IS RATHER SHORT
27  COMPARED TO SOME OTHER CASES.
28    I FEEL COMPELLED TO ADDRESS SOME OF THE STATEMENTS

Exhibit +

prosecutors closing

1   INHABITED DWELLING HOUSE.  THIS IS A BURGLARY OF THE FIRST

2   DEGREE.  THAT'S WHAT THIS IS.

3            SO IF YOU FIND THE DEFENDANT GUILTY OF BURGLARY,

4   THEN YOU SET THE DEGREE AS A FIRST DEGREE BURGLARY BECAUSE

5   THAT'S WHAT THIS IS.

6            SO THAT'S THE DEFINITION OF BURGLARY THAT WE'RE

7   TALKING ABOUT TODAY.

8            THERE IS ALSO ANOTHER INSTRUCTION 2.15 THAT

9   APPLIES TO THE EVIDENCE IN THIS CASE AS IT RELATES TO

10  BURGLARY.

11           IF YOU FIND THAT A DEFENDANT WAS IN POSSESSION OF

12  RECENTLY STOLEN PROPERTY, THE FACT OF THAT POSSESSION IS NOT

13  BY ITSELF SUFFICIENT TO PERMIT AN INFERENCE THAT THE

14  DEFENDANT IS GUILTY OF THE CRIME OF RESIDENTIAL BURGLARY.

15           BEFORE GUILT MAY BE INFERRED, THERE MUST BE A --

16  THERE MUST BE CORROBORATING EVIDENCE TENDING TO PROVE THE

17  DEFENDANT'S GUILT.  HOWEVER, THIS CORROBORATING EVIDENCE

18  NEED ONLY BE SLIGHT, AND NEED NOT -- EXCUSE ME, AND NEED NOT

19  BY ITSELF BE SUFFICIENT TO WARRANT AN INFERENCE OF GUILT.

20           AS CORROBORATION, YOU MAY CONSIDER THE FOLLOWING.

21           AND CORROBORATION MEANS THE POSSESSION OF THE

22  STOLEN PROPERTY AS IT RELATES TO THE BURGLARY;

23           THE ATTRIBUTES OF POSSESSION, TIME, PLACE AND

24  MANNER;

25           THAT THE DEFENDANT HAD AN OPPORTUNITY TO COMMIT

26  THE CRIME CHARGED;

27           THE DEFENDANT'S CONDUCT;

28           OTHER STATEMENTS HE MAY HAVE MADE WITH REFERENCE

EXHIBIT

Prosecutor closing

277

[EXHIBIT C-13]

1   TO THE PROPERTY;

2            A FALSE ACCOUNT OF HOW HE ACQUIRED POSSESSION OF

3   THE STOLEN PROPERTY;

4            AND ANY OTHER EVIDENCE WHICH TENDS TO CONNECT THE

5   DEFENDANT WITH THE CRIME CHARGED.

6            ( SO LET'S TALK ABOUT THIS BURGLARY IN THAT CONTEXT,

7   IF WE CAN, IN LIGHT OF THE EVIDENCE THAT WE HEARD IN THIS

8   CASE.

9            SO NOW YOU HAVE AN UNDERSTANDING OF RESIDENTIAL

10  BURGLARY AND WHAT IS REQUIRED IN ORDER TO PROVE THAT.  AND

11  DIRECT AND CIRCUMSTANTIAL EVIDENCE BECAUSE THEY ALL COME

12  INTO PLAY IN YOUR ANALYSIS.

13           YOU KNOW, LADIES AND GENTLEMEN, VERY SIMPLY BACK

14  ON TUESDAY, MARCH 2ND, 2004, HERE IN THE CITY OF SARATOGA,

15  EVELYN JOHNSTON LIVED ON BROOKWOOD LANE WHERE HER HOME IS

16  LOCATED.

17           ( YOU ALSO KNOW FROM THE EVIDENCE THAT THE

18  DEFENDANT, MR. MCKENZIE, WAS A RESIDENT IN A PIECE OF RENTAL

19  PROPERTY OWNED BY MRS. JOHNSTON'S SON, AND THAT

20  MRS. JOHNSTON'S SON WAS RENTING THAT PROPERTY TO A

21  MS. HIGASHI, A JAPANESE WOMAN, AND IT APPEARS THAT

22  MR. MCKENZIE WAS STAYING THERE AS WELL.

23           YOU ALSO KNOW THAT MR. MCKENZIE HAS HAD AT LEAST,

24  ON TWO PREVIOUS OCCASIONS, CONTACT WITH MRS. JOHNSTON.  HE

25  KNOWS MRS. JOHNSTON WELL.  HE MAY NOT KNOW HER LIKE A GOOD

26  FRIEND AND THEY GET TOGETHER AND GO TO DINNER AND MOVIES,

27  BUT HE KNOWS HER FROM THE NEIGHBORHOOD.  AND KNOWS HER SO

28  WELL THAT ON ONE OCCASION HE CAME, IF YOU WILL) BEGGING FOR

**ERIC WEAVER**
ATTORNEY AT LAW
CALIFORNIA BAR NO. 115208
POST OFFICE BOX 6294
ALBANY, CALIFORNIA 94706
TELEPHONE: (510) 524-2355
FAX: (510) 527-1450

EXHIBIT D-1

May 10, 2006

Israel Noel McKenzie
T-58501
C.S.P. Solano
P.P. Box 4000
Vacaville, CA 95696

Re:    *People v. McKenzie*, No. H028695

Dear Mr. McKenzie:

I have enclosed the Court of Appeal's decision in your case. You will note that the Court of Appeal has rejected all of your claims except the claim that you are not required to undergo AIDS testing. The decision is interesting to me however for the following reasons. All three of the judges (who are very conservative) agree that your sentence is excessive. However, they feel constrained by the current law to uphold the sentence. In addition, although Justice Premo criticizes me for even raising the cruel and unusual punishment issue given the current state of the law, he nevertheless implicitly agrees that the three strikes law results in overkill in a case like yours.

I realize that all of this is scant comfort to you in view of the outcome. However, it does raise a small hope that in the event that the Legislature ever decides to review the three strikes law, your case is one of the cases that might be reconsidered.

I plan to file a Petition for Review in the California Supreme Court. The California Supreme Court will likely deny your petition but this is a necessary step for you to be able to file a Petition for Writ of Habeas Corpus in Federal Court. For your information, the Petition for Review must be filed no earlier than June 3, 2006 and no later than June 10, 2006.

You do not need to take any steps at this time to exhaust your remedies with respect to your direct appeal. I will do what is necessary at this stage of your case. I am sorry that I

## EXHIBIT D-2

1   Q.  Did you transport him from the scene?

2   A.  I did, sir.

3   Q.  Did you take him to the Santa Clara County jail?

4   A.  I did, sir.

5   Q.  When you booked -- had Mr. McKenzie booked at

6   the Santa Clara County jail, did he have any money?

7   A.  He did not, sir.

8   MR. DUFFY:  Thank you.  I have nothing further

9   at this time.

10  THE COURT:  Cross examination?

11  MS. GALLARDO:  Thank you.

12  BY MS. GALLARDO:  Q.  Deputy, what time did you

13  receive the dispatch call to Evelyn Johnston's house?

14  A.  I believe it was about 1400 hours, ma'am.

15  Q.  That's 2 o'clock, approximately?

16  A.  It is.

17  Q.  What time did you arrive at her house?

18  A.  I don't have the time written down, but it

19  usually takes about six to seven minutes.

20  Q.  Were you at the substation when you received the

21  call?

22  A.  I was not.

23  Q.  Now, you indicated that you entered through her

24  front door.

25  A.  I'm sorry?

26  Q.  Entered through the front door?

27  A.  I did.

28  Q.  She told you her front door was open?

D-3

```
 1        A.   It was open.
 2        Q.   Did she tell you the screen door was slightly
 3   ajar?
 4        A.   No, she did not.
 5        Q.   Did you dust the screen door handle for
 6   fingerprints?
 7        A    I did not.
 8        Q.   Did anybody dust the door handle for
 9   fingerprints?
10        A.   I don't believe so.
11        Q.   If that had happened, it would have been
12   indicateed in your report; correct?
13        A.   Yes
14        Q.   That's not indicated in your report; correct?
15        A.   Correct
16        Q.   You also said that you looked around the carpet
17   and flooring to see if there was any footprints.  Did you
18   do that yourself?
19        A.   When I walked in, I noticed inside the
20   residence.
21        Q.   Were you actively looking to see if you found
22   footprints, or it was just something that you saw as you
23   walked --
24        A.   Just as I walked in.
25        Q.   Did you think about looking for any footprints
26   inside the house?
27        A.   Specifically?
28        Q.   Yes.
```

D-4

```
 1        A.   No, ma'am.

 2        Q.   So you weren't actively looking for that;

 3   correct?

 4        A.   No, ma'am.

 5        Q.   Now, you indicated you were at her house 45 to

 6   50 minutes; is that right?

 7        A.   I believe so, ma'am.

 8        Q.   You went looking through the exterior of her

 9   house; is that right?

10        A.   My partner did.

11        Q.   Your partner did.   Who was that?

12        A.   Deputy Wyman.

13        Q.   And that's to look to see if there was any

14   forced entry into the house; is that right?

15        A.   Correct, anything out of the ordinary.

16        Q.   He did not find anything; right?

17        A.   He did not, ma'am.

18        Q.   Did he tell you whether or not he saw any other

19   individuals around the perimeter of the house when he

20   went looking out there?

21        A.   He did not.

22        Q.   He did not see anybody, or he did not tell you?

23        A.   He did not tell me, ma'am.

24        Q.   If he had found anybody around the house, he

25   would have told you?

26        A.   Yes, ma'am.

27        Q.   Now, did Ms. Johnston tell you that her gardener

28   was at her house?
```

( Exhibit )

[EXHIBIT D-5]                                    12

1   the police officers (regarding anything her client may have

2   said to the police, as it is hearsay and it is not

3   admissible. WHY ARE MY STATEMENTS TO THE ARRESTING OFFICER HEARSAY?

4          THE COURT:  That's true.  I don't think Counsel

5   will do that.

6   Defense Counsel MS. GALLARDO:  Yes, your Honor.

7   Prosecutor MR. DUFFY:  Also, might I add, again,)

8   on statements --

9          (THE COURT:  Whose motions are these?) Are we on

10  defense motions?

11         I'm just giving you a bad time.

12         MR. DUFFY:  I think, partially, to save time, your

13  Honor, and I'm still addressing the same issue.

14         One of the concerns, also, that I have in regard

15  to statements which are hearsay is that in -- unless the

16  defendant is going to testify and that representation is

17  made, (that the defense be precluded from making any

18  statement in their opening statement about what the

19  defendant told the police. √ WHY?,

20         THE COURT:  Well, it's all inadmissible.) So at

21  this time it's all inadmissible unless the People attempt to

22  get it in.  They say they're not going to get it in, so

23  we're not going to have a 402 hearing.  So it's not coming

24  in.

25         (MS. GALLARDO:  That's clear, your Honor.)

26         MR. DUFFY:  Thank you.

27         THE COURT:  Okay.  Roman numeral No. 6, felony

28  priors for impeachment.  This was the -- he has two

(Exhibit ~~8-8 (220)~~)
[EXHIBIT D-6]

1  the same thing?

2          MS. GALLARDO:  Objection.  Burden shifting.

3          THE COURT:  Overruled.

4          MR. DUFFY:  You can answer the question.

5          THE WITNESS:  Yes, sir.

6          BY MR. DUFFY:  Q.  They can; can't they?

7      A.  Yes, sir.

8          MR. DUFFY:  Nothing further.

9          THE COURT:  Recross?

10         MS. GALLARDO:  No, thank you.

11         THE COURT:  Thank you.  You may step down.  Is

12 this witness excused?

13         MR. DUFFY:  He is.

14         THE COURT:  Thank you.  You're excused.

15         THE WITNESS:  Thank you, Your Honor.

16         MR. DUFFY:  Your Honor, at this time the people

17 would move People's Number 1 and 2 into evidence.

18         MS. GALLARDO:  Any objection?

19         MS. GALLARDO:  None.

20         THE COURT:  Received as People's 1 and 2.

21         MR. DUFFY:  Thank you.  If I could have just one

22 moment.

23         Your Honor, with the exhibits in evidence, the

24 people have no further witnesses and would rest at this

25 time.

26         THE COURT:  People rest.

27         Do you wish to make an opening statement at this

28 time?

223

(Exhibit) [EXHIBIT D-7]

1    MS. GALLARDO:  No, Your Honor, not at this time.

2    THE COURT:  All right.  Any witnesses?

3    MS. GALLARDO:  No, Your Honor.

4    THE COURT:  All right)  Counsel approach the

5  bench for a moment, please?

6    (Whereupon a bench conference was held off the

7  record.)

8    (THE COURT:  All right, ladies and gentlemen,

9  that is the evidence in the case.) But as I indicated --

10  Thursday?  Whenever jury selection was -- we have to have

11  a jury instruction conference to make sure the

12  instructions are all there and appropriate for the case.

13  What we'll do is release you for lunch now, or brunch,

14  and have you come back at 1:30.  Between now and then,

15  we'll have the conference and get the instructions

16  prepared.  I'll instruct you at 1:30.  Then the attorneys

17  will argue the case to you.  And more than likely, you

18  can begin deliberation this afternoon.  Okay?

19    So with that, please remember the admonition not

20  to discuss this case among yourselves or with anyone else

21  or form or express any opinion until the case is

22  submitted to you.  We'll see you at 1:30 in the jury

23  assembly room.  Okay?  Thank you.

24    The record will show the jury has left.  We're

25  here for the jury instruction conference.

26    MR. DUFFY:  Judge, I have included a number of

27  instructions in anticipation of a number of things.  So

28  to alert you, I believe a number of the instructions that

**224**

```
 1   (TIME THAT MS. JOHNSTON HAD PUT HER PURSE DOWN IN THE DINING
 2   ROOM )AND THE TIME THAT MR. OCHINERO -- THE TIME THAT
 3   MR. OCHINERO ESTIMATES HE HAD CONTACT WITH MR. MCKENZIE DOWN
 4   · AT THE BANK OF AMERICA.
 5            AND I THINK WE'RE GOING TO DIFFER ON THE TIME
·6   FRAMES.  YOU HAVE HEARD THE EVIDENCE.  YOU WILL GET ALL THE
 7   INFORMATION THAT YOU HAVE RECEIVED TO DETERMINE WHAT THOSE
 8   TIMES ARE.
 9            (NOW, MS. JOHNSTON SAID THAT SHE PUT HER PURSE DOWN
10   IN THE DINING ROOM TABLE SOMEWHERE BETWEEN 11:30 AND NOON
11   WHEN SHE CAME INTO HER HOUSE.)
12            NOW, TO DETERMINE THE TIME THAT MR. OCHINERO WAS
13   APPROACHED BY MR. MCKENZIE WE NEED TO KIND OF GO BACK IN
14   TIME.  HE FIRST TELLS US -- OH, YOU HAVE HEARD THAT HE
15   CALLED THE SHERIFFS AT APPROXIMATELY 2:52 AND WE STIPULATED
16   TO THAT TIME.
17            HE TOLD YOU THAT HIS INTERACTION WITH MR. MCKENZIE
18   LASTED ABOUT THIRTY TO FORTY-FIVE SECONDS.  AND THAT HE THEN
19   GOT INTO HIS CAR AND IMMEDIATELY CALLED THE SHERIFFS.
20            SO YOU NEED TO TAKE BACK HOW MUCH TIME HE SPENT
21   WITH MR. MCKENZIE BEFORE HE CALLED THE SHERIFF'S STATION.
22            I'M SETTING THIS AT APPROXIMATELY 2:52 WAS THE
23   TIME THAT HE HAD THE CONTACT WITH MR. MCKENZIE.  SO IF YOU
24   TAKE 11:30 TO ABOUT 2:50 YOU HAVE APPROXIMATELY THREE HOURS
25   AND TWENTY MINUTES AT THE LONGEST, OR AT THE VERY MINIMUM
26   TWO HOURS AND FIFTY MINUTES.  THAT'S THE TIME BETWEEN THESE
27   TWO VERY SEPARATE INCIDENTS.
28            I BELIEVE THAT THE DISTRICT ATTORNEY SAID IN HIS
```

(victim testimony)    (Exhibit )

[EXHIBIT D-9]                                          50

1      A.    Perhaps not all the calls, but all of the

2  pertinent incidences that -- of burglary and various crimes.

3      Q.    And in your years of living in Saratoga and

4  reading that paper, is it your opinion that you've seen more

5  and more of it?

6      A.    Oh, definitely.

7      Q.    Now, when you went out to the dining room, was the

8  purse there?

9      A.    No.

10     Q.    And what did you do first when you saw the purse

11  was not on the dining room table?

12     A.    I searched the house to make certain that I hadn't

13  set it down elsewhere.

14     Q.    And did you find it anywhere else in the house?

15     A.    No.

16     Q.    On that day, ma'am, what was in the purse?

17     A.    My car keys, my home keys.

18     Q.    Are they on the same ring?

19     A.    Yes.

20     Q.    Anything else?

21     A.    Perhaps keys to the museum and my little beach

22  cottage; my wallet; couple of Visas for the Bank of America

23  and an ATM from Wells Fargo; two checkbooks, one from Wells

24  Fargo and one from Bank of America; and some notes to

25  myself, perhaps doctors' appointments.  I'm not sure

26  exactly.

27     Q.    Any cash?

28     A.    Eight to ten dollars.

# EXHIBIT E-1

1        A.   She did.

2        Q.   Did she tell you that his helper was at her

3   house as well?

4        A.   She did.

5        Q.   Did you get the gardener's name and contact

6   information?

7        A.   I believe I did.

8        Q.   Did you contact him to ask him with regards to

9   the incident?

10       A.   I don't believe I did.

11       Q.   Did you -- do you recall whether or not you

12   wrote down his name and address in your police report?

13       A.   No, ma'am.

14       Q.   You don't recall?

15       A.   I don't believe it's in my police report.

16       Q.   So you got information regarding a potential

17   witness, but you didn't write that in your report;

18   correct?

19       A.   I don't believe so, ma'am.

20       Q.   You also didn't write down any information with

21   regards to who the helper was; correct?

22       A.   No, ma'am.

23       Q.   Now, did you get the full name of the helper and

24   his contact information?

25       A.   I don't think she had that information, ma'am.

26       Q.   She didn't know who the helper was?

27       A.   I don't believe so.

28       Q.   Did you -- so you were not able to contact a

**216**

# E-2

```
 1  helper to determine whether or not he saw anybody around
 2  the house; correct?
 3       A.  Based on my recollection, she only had the phone
 4  number for her main gardener, and I don't believe I
 5  contacted him.
 6       Q.  Thank you.  Now, when Ms. Johnston told you --
 7  strike that.
 8            When you went to the house, Ms. Johnston gave
 9  you the name of Mr. McKenzie; correct?
10       A.  She did, ma'am.
11       Q.  Did she tell you he lived across the street?
12       A.  She did.
13       Q.  Did you go across the street at that time?
14       A.  I don't believe I did.
15       Q.  You didn't see Mr. McKenzie around the perimeter
16  of the house yourself; correct?
17       A.  No, ma'am.
18       Q.  Now, did you ask her with regards to who lived
19  on the left-hand side of her house?
20       A.  I believe she said that was her son's residence.
21       Q.  Did she tell you that they had tenants on that
22  house?
23       A.  Yes, ma'am.
24       Q.  What about on the right hand side of her house?
25  Did she inform you that there was tenants living there?
26       A.  I want to say that was -- I don't know for sure.
27  I want to say her son lived on that side of the house
28  when he was in the area.
```

## E-3

1   Q.   So you believe the house on the left was her
2   son's?
3      A.   The whole house belongs to her son.   The
4   residence on the left-hand side was being occupied by Mr.
5   McKenzie and Mrs. Hiroshi.   I do not know who lived on
6   the right-hand side.   I believe it was her son.
7         MS. GALLARDO:   If I can approach the diagram,
8   I'm going to --
9         THE COURT:   All right.
10         MS. GALLARDO:   Thank you.
11         BY MS. GALLARDO:   Q.   Ms. Johnston testified on
12   Friday.   She indicated that she lives here where she
13   circled with a J.   And across the street is where Mr.
14   McKenzie lives.   She indicated she has tenants on the
15   left-hand side of her.   And on the right-hand side, it's
16   these two properties.   Did she tell you that there was
17   tenants living on the left-hand side of her house?
18      A.   I misunderstood what you meant.   No.
19      Q.   What about on the right-hand side of her?
20      A.   No, ma'am.
21      Q.   Did she give you the tenants' names and contact
22   information?
23      A.   She did not.
24      Q.   So you never contacted any tenants with regards
25   to this investigation?
26      A.   I spoke with her neighbor that lived to the
27   right.
28      Q.   Did you take the neighbor's name and address and

E-4

```
 1   contact information?
 2        A.   I did not, ma'am.
 3        Q.   Did you have an extensive conversation with that
 4   tenant?
 5        A.   I believe she came over to the residence to drop
 6   off a card for her daughter to Mrs. Johnston, and she
 7   kind of asked what was going on.  I told her.  It was a
 8   brief conversation.  She said -- I don't recall her
 9   saying she had any information relating to the incident.
10        Q.   You didn't write any of this in your report?
11        A.   No, ma'am.
12        Q.   You never wrote that you you contacted the
13   neighbor to the right-hand side and spoke to her?
14        A    No, ma'am.
15             MR. DUFFY:   That misstates the evidence.  She
16   contacted him.
17             THE COURT:   Sustained.
18             BY MS. GALLARDO:   Q.   You didn't write that in
19   your report, that the neighbor on the right-hand side
20   contacted you with what you were doing at Evelyn
21   Johnston's house; correct?
22        A.   I'm sorry, can you repeat the question.
23        Q.   You didn't write in your report that the tenant
24   on the right-hand side contacted you with regards to what
25   you were doing at Evelyn Johnston's house; correct?
26        A.   Correct.
27        Q.   You didn't write down her name, contact
28   information in your report; correct?
```



**TABLE OF CONTENTS** (Exhibit E-5)

ARGUMENT ............................................................................................................................ 1

V.    IF THIS COURT CONCLUDES THAT TRIAL COUNSEL WAIVED
       APPELLANT'S CRUEL AND UNUSUAL PUNISHMENT CLAIM,
       COUNSEL WAS INEFFECTIVE IN DOING SO .................................................... 1

       A.  Appellant Is Entitled to Effective Assistance of Counsel ..................................... 2

       B.  Failure to Move To Reduce the Sentence on Cruel and Unusual Punishment
            Grounds Was Ineffective Assistance of Counsel ..................................................... 4

       C.  No Possible Tactical Consideration Justifies Counsel's Failure to Request
            the Motion ......................................................................................................... 5

       D.  The Failure of Counsel to Make a Cruel and Unusual Punishment
            Motion May Have Affected the Judge's Consideration of the Case ...................... 5

CONCLUSION ...................................................................................................................... 7

(In Light of the Case Law and Record, this argument is Bad.

(This is the jist of

Direct Appeal counsel's argument

in his Supplemental opening Brief.)

This whole speel about IAC & Cruel

+ Unusual Punishment is Not the

"Hallmark" of a competent Lawyer;

(Exhibit

[EXHIBIT E-6]                                    32

1   SAN JOSE, CALIFORNIA                        December 10, 2004

2

3                          PROCEEDINGS

4          (At 9:40 a.m., court reconvened and the following

5   proceedings were had:)

6          THE COURT:  All right.  We'll be on the record in

7   People versus McKenzie.  The record will show that all

8   jurors, counsel, and defendant are present.

9          You may proceed.

10         (An opening statement by Mr. Duffy was reported,

11  but not transcribed herein.)

12         (THE COURT:) All right.  Thank you, Mr. Duffy.

13         ( Ms. Gallardo, did you wish to make an opening

14  statement at this time or reserve it?

15         MS. GALLARDO:  Reserve, your Honor.  Thank you.)

16         THE COURT:  All right.  Thank you.

17         Then you may call your first witness.

18         MR. DUFFY:  Thank you.  We'd call Evelyn Johnston

19  to the stand.

20         THE COURT:  All right.  Thank you.

21         (Mr. Duffy leaves and re-enters the courtroom.)

22         THE CLERK:  Ms. Johnston, if you'd just come stand

23  near the table, face me, and raise your right hand, please.

24         MR. DUFFY:  If you would just stand right here,

25  raise your right hand, and face Cathy, our clerk.

26                    EVELYN JOHNSTON, √

27  called as a witness on behalf of the People, after having

28  been first duly sworn to tell the truth, testified as

66

1     Q.   Now, while you were cooking, were they still there

2  gardening at your house?

3     A.   For part of the time that I was cooking.

4     Q.   Did you -- while you were cooking, did you have a

5  constant visual of where the gardener and his assistant were

6  at all times?

7     A.   No.

8     Q.   Now, you said when you first walked into your

9  house on March 2nd, you never saw Mr. McKenzie outside;

10  correct?

11     A.   That's correct.

12     Q.   You told us about the items that were inside your

13  purse, and you said you had two checkbooks; correct?

14     A.   Correct.

15     Q.   One was in a checkbook holder, the Wells Fargo

16  one?

17     A.   Yes.

18     Q.   And the Bank of America checks were where in your

19  purse at that time?

20     A.   They were in my -- my wallet.

21     Q.   They were inside the wallet.

22     A.   The Wells Fargo checkbook was in a separate

23  leatherette folder.

24     Q.   And you said you had eight to ten dollars in cash?

25     A.   Correct.

26     Q.   And that's what was missing?

27     A.   Yes.

28     Q.   Along with the Bank of America checks?

67

1      A.    Yes.

2  ✳ Q.    You indicated that as far as you know none of the

3  checks were cashed; correct?

4      A.    Correct.

5      Q.    Your bank never contacted you to say your checks

6  are being cashed?

7      A.    That's correct.  I checked with the bank every

8  day.

9      Q.    You indicated you closed your account.  When did

10  you do that in relation to March 2nd?

11      A.    Probably the following day or the day after that.

12      Q.    Now, you also indicated you had an ATM card and a

13  credit card in your purse; is that right?

14      A.    Yes.

15      Q.    Were those ever used?

16      A.    No.

17      Q.    When you -- when the purse was returned to you on

18  March 4th by Deputy Novick, you indicated that it was not

19  damaged; right?

20      A.    Yes.

21      Q.    Now, did you inspect it at that time?

22      A.    Yes.

23      Q.    And it didn't have any tears that were not already

24  there?

25      A.    That's true.

26      Q.    You don't know how many people handled your purse

27  before it was returned to you; correct?

28      A.    I wouldn't know what happens in the sheriff's

$\lceil EX. F-3 \rceil$

On March 2, 2004, Johnson went shopping between noon and 2:00 p.m. (RT 44.) She returned home and started cooking. (RT 44.) Her front door was open to air out the house and her screen door may have been ajar. (RT 44-45.) She left her black purse on the dining room table. (RT 46.) She spent 60 to 90 minutes cooking. Although her hearing is good, she did not hear anything from the front of the house. (RT 47.)

Johnson became worried about her purse and went to the dining room and discovered that her purse was missing. (RT 50.) After searching the house for the purse for 20 minutes she called 911. (RT 51.) She gave a statement to the police saying that she suspected appellant. (RT 51-52.)

On March 4, 2004, her purse was returned. It was clean and undamaged. (RT 52, 54.) Her check book and a small amount of cash were the only things missing and were never returned. (RT 53.) The missing checks were never used. (RT 55.)

Arleigh Ochinero went to the Bank of America in Saratoga at about 3:00 p.m. on March 2, 2004. (RT 83, 85.) After he finished using the ATM, he was approached by appellant who asked him if he would cash a check for his grandmother. (RT 91-92.) Ochinero could see the name Evelyn Johnson printed on the checks. (RT 92.) Ochinero declined appellant's request. (RT 93.)

As Ochinero left the bank, he saw appellant walking down Big Basin Way. (RT 95.) Ochinero was suspicious, so he called 911. (RT 94.) He gave the operator a physical description that included a star shaped tattoo. (RT 98-99.) On March 2, 2004, Ochinero was picked up by deputies and taken to see appellant who was in custody. (RT 100.) Ochinero identified appellant as the person who approached him at the bank. (RT 101.)

3

screen door, she also could not carry her purse. Moreover, although she thought she wrote her gardener a check and took the check out to his vehicle, she could not say definitively that she did so.

In addition, her house was small and her hearing was good. Nevertheless, she did not hear the screen door open or anyone in the dining room a short distance away. There were no footprints on the carpet.

There was no evidence placing appellant at the scene. Ms. Johnson actually asked her gardener if he had seen anyone near the house. (RT 70.) However, the prosecutor successfully objected to any answer about what the gardener said on the basis of hearsay. (RT 70.) Thus, the only people known to be near the house were the gardener and his assistant.

Based on the foregoing evidence, it cannot be said that anyone actually entered Ms. Johnson's house. She could have left her purse in her car when she entered the house with her arms full of groceries. If she wrote her gardener a check, she could have left the purse outside. There was no evidence that anyone actually entered her house.

No evidence linked appellant to the house that day either. He was not seen outside the house. It is not even clear that the purse was inside the house. It only may have been in Ms. Johnson's car.

The state is entitled to try and convict appellant for conduct that he did commit. However, "[U]nder our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." (*Jackson v. Virginia, supra,* 443 U.S. at pp. 323-324.) Here, at most, appellant was guilty of receiving stolen property.

It is true that because this was a three strikes case, the receiving stolen property conviction was in itself sufficient to subject appellant to an indeterminate 25-year-to-life term. However, receiving stolen property

8

F-5                                                              103

```
 1      A.    Yes.

 2      Q.    Do you recall which stall you were in?

 3      A.    I was about the fifth one down, I believe.

 4      Q.    Okay.  And when you said you saw him coming around

 5   from the front of the Bank of America, you mean from the

 6   front of the street?

 7      A.    I saw him walk around the building into the

 8   parking lot.

 9      Q.    And that's while you're standing next to your car

10   looking at your paperwork?

11      A.    Well, I was also standing there.  I was -- my

12   paperwork was like this.  So if somebody approaches you from

13   the side, you can see, out of your peripheral vision,

14   somebody approaching.  And I did see that.

15      Q.    So you saw somebody go around the corner from Bank

16   of America and approach you.

17      A.    I saw him round the corner of the building and

18   come into the parking lot approaching me.  Yes.

19      Q.    Okay.  Now, he stopped, you said, 6 to 8 feet from

20   you; right?

21      A.    I would say so, yes.

22      Q.    And that's -- he was that far when he first

23   started speaking to you; right?

24      A.    Yes, he was.

25      Q.    Now, at any time did he hand you this check?

26      A.    No.

27      Q.    You never actually touched the check yourself?

28      A.    No.
```

KELLY A. McCARTHY, CSR, RPR, CRR   CERTIFICATE NO. CSR 11651

Exhibit F-1) F-7

```
 1    Q.   Did you see whether your car was still there?

 2    A.   Yes, my car was there.

 3    Q.   Were you ever able to find the purse?

 4    A.   No.

 5    Q.   Now, at about 1:55 did you make a call to 9-1-1?

 6    A.   Yes.

 7    Q.   How much time would you say passed between the

 8    time you first noticed the purse was missing off the dining

 9    room table and the time you made the phone call to 9-1-1?

10    Did you wait a half an hour, or was it one minute?

11    A.   Oh, perhaps more like 20 minutes; time to search

12    the house.

13    Q.   And did a -- after you called 9-1-1, did a police

14    officer come out to your residence on Brookwood Lane?

15    A.   Yes.  A sheriff's deputy came.

16    Q.   And did you give a statement to this sheriff's

17    deputy about your purse?

18    A.   Yes.  Mr. Muncy.

19    Q.   And that's Deputy Muncy?

20    A.   Yes.

21    Q.   Did he come in a sheriff's patrol car and wear a

22    sheriff's uniform?

23    A.   Yes.

24    Q.   And during your -- during the time that you were

25    with Deputy Muncy giving a statement to him, did you ever

26    tell Deputy Muncy about Mr. McKenzie?

27    A.   Yes.

28         MS. GALLARDO:  Objection.  Hearsay.
```

EXHIBIT G-1

70

```
 1        A.    He may have.
 2        Q.    Do you -- did you ask your gardener if they saw
 3   anybody around your house?
 4        A.    Yes.
 5        Q.    And what did they say?
 6              MR. DUFFY:  Objection.  Hearsay.
 7              THE COURT:  Sustained.
 8              THE WITNESS:  They did not --
 9              MR. DUFFY:  Ma'am, it's a sustained objection.
10   You don't have to answer.
11              MS. GALLARDO:  I have nothing further.  Move to
12   strike the answer, please.
13              THE COURT:  Which answer?
14              MS. GALLARDO:  I believe Ms. Johnston began
15   answering that question.
16              THE COURT:  That portion is stricken.
17              MS. GALLARDO:  Thank you.
18              MR. DUFFY:  Your Honor, I have no further
19   questions of Ms. Johnston.
20              THE COURT:  Is this witness excused?
21              MR. DUFFY:  She is.
22              MS. GALLARDO:  Yes.
23              THE COURT:  All right.  She's excused.
24              Thank you very much.  You're free to go.
25              All right.  Ladies and gentlemen, we'll take the
26   morning recess at this time for about 15 minutes.
27              During the recess please remember the admonition
28   not to discuss this case among yourselves or with anyone
```

KELLY A. McCARTHY, CSR, RPR, CRR   CERTIFICATE NO. CSR 11651

64

```
 1   room/dining room area?
 2        A.   I have a carpeted floor.  A 400-pound man could
 3   walk in the door, and you wouldn't hear him.
 4        Q.   What color is your carpet?
 5             MR. DUFFY:  Objection.  That's irrelevant.
 6             THE COURT:  Overruled.
 7             THE WITNESS:  What kind of carpet?
 8             MS. GALLARDO:  Q.  What color?
 9        A.   Light blue.
10        Q.   When you noticed that your purse was missing, did
11   you check to see if there was any footprints into your house
12   on the carpet?
13        A.   No.
14        Q.   You didn't check?
15        A.   No.  You would not see footprints on my carpet
16   unless you had a really muddy foot.
17        Q.   Now, you did not hear anything at all while you
18   were cooking; correct?
19        A.   No.
20        Q.   Now, there was somebody else near your house at
21   the time that you were cooking; correct?
22        A.   Yes.
23        Q.   That was your gardener?
24        A.   Yes.
25        Q.   And his assistant?
26        A.   Yes.
27        Q.   When you arrived home, was your gardener already
28   at your house?
```

G-3

65

1     A.   I can't remember now.  I can't say that for

2  certain, whether he had already arrived.  He probably had.

3     Q.   And was there just two people working on your

4  garden?

5     A.   Yes.

6     Q.   Now, you also paid the gardener --

7     A.   I wrote a check for him.

8     Q.   At what point did you do that?

9     A.   Well, I did it before he left and put it in his

10  car.  I always do that.  I stick -- write a check and set it

11  on his dash.

12     Q.   Did you -- can you tell us whether you wrote that

13  check when you first came into your house and put down your

14  purse?  Did you write the check then, or did you then -- or

15  did you first go cook and then come back and write out the

16  check?

17     A.   I think I wrote it when I first came in.

18     Q.   Then you went out to leave it on his car?

19     A.   Yes, I believe I did.

20     Q.   Did he know you were writing him a check?

21     A.   I think so.  I do it the first Tuesday of the

22  month.

23     Q.   Was he present when you brought the check to him?

24     A.   He was in the yard, either my yard or one of the

25  tenants on either side of me.

26     Q.   But he wasn't in the living room watching you

27  write the check.

28     A.   He has never come into my house.

G-4

```
 1        A.  She was reporting a theft.

 2        Q.  Did you take a statement from Miss Johnston?

 3        A.  I did.

 4        Q.  And were you made aware by Miss Johnston what

 5   had been stolen?

 6        A.  She told me.

 7        Q.  What was that?

 8        A.  It was her purse.

 9        Q.  Did you get a description of the purse and its

10   contents from her?

11        A.  I did, sir.

12        Q.  Now, while at Mrs. Johnston's home there on

13   Brookwood Lane, did you enter her house?

14        A.  I did, sir.

15        Q.  Did you enter the -- through the front door of

16   the house?

17        A.  I did.

18        Q.  Did she describe for you where her purse had

19   been?

20        A.  She did.

21        Q.  Did you have an opportunity to look around the

22   living room and dining room area of her house?

23        A.  I did.

24        Q.  Did you happen to look at the carpet or the

25   flooring inside her house?

26        A.  I did.

27        Q.  Did you notice any muddy footprints or anything

28   that would suggest someone with dirty shoes had walked
```

```
 1   across the carpet?
 2        A.   No, sir.
 3        Q.   Did you conduct any investigation around her
 4   house?
 5        A.   We did.
 6        Q.   What was that?
 7        A.   We walked around the exterior of the house
 8   looking for any types of forced entry.
 9        Q.   Now, during your contact with Miss Johnston, did
10   she direct you to contact or look at another individual?
11        A.   She did.
12        Q.   And did she give you that person's name?
13        A.   She did.
14        Q.   What was that name?
15        A.   Israel McKenzie.
16        Q.   Had you ever heard of Israel McKenzie prior to
17   March 2nd of '04?
18        A.   No, sir.
19        Q.   Do you see the defendant seated in the courtroom
20   in the cream-colored shirt to my left?
21        A.   I do.
22        Q.   Had you had any contact with this man, the
23   defendant, Israel McKenzie, before March 2nd of '04?
24        A.   No, sir.
25        Q.   How long were you at the Johnston residence that
26   afternoon?
27        A.   Approximately 45, 50 minutes.
28        Q.   Do you know approximately what time it was you
```

G-6

```
 1   clearing Mrs. Johnston's home, did you become aware of
 2   another call that came out?
 3        A.   I did, sir.
 4        Q.   What call was that?
 5        A.   There was a report of an individual walking on
 6   Big Basin at the Bank of America, attempting to cash a
 7   check.
 8        Q.   That check was in the name of Evelyn Johnston?
 9        A.   Yes, sir.
10             MS. GALLARDO:  Objection.  Hearsay.
11             MR. DUFFY:  It's not being offered for the
12   truth, simply to explain the subsequent conduct of this
13   witness.
14             THE COURT:  Not received for the truth.
15             MS. GALLARDO:  It's double hearsay.
16             THE COURT:  Still not received for the truth.
17             MR. DUFFY:  Thank you.
18             BY MR. DUFFY:  Q.  Based upon hearing that
19   information, what if anything did you do?
20        A.   I left the substation and drove towards Big
21   Basin.
22        Q.   When you say toward Big Basin, would that be
23   uptown Saratoga?
24        A.   I did.
25        Q.   Did you have a description?  Was a description
26   part of that radio traffic, of who you would be looking
27   for?
28        A.   Yes, sir.
```

6-7

1        Q.    And were you able to locate anybody who matched
2    that description, after you received that information?
3            A.    No, sir.
4        Q.    The defendant seated in court, did you see him
5    uptown when you took that drive up Big Basin that
6    afternoon?
7            A.    No, sir.
8        Q.    Now, the following day, on Wednesday, March 3rd,
9    2004 at approximately 8:30 a.m., did you return to
10    Brookwood Lane?
11            A.    I did, sir.
12        Q.    What was the reason you returned to Brookwood
13    Lane?
14        A.    In an attempt to make contact with Mr.
15    McKenzie.
16        Q.    Was this based upon the information that Ms.
17    Johnston had given to you?
18        A.    Yes, sir.
19        Q.    Did you, in fact, make contact with Mr.
20    McKenzie?
21        A.    I did.
22        Q.    Where did you make contact with Mr. McKenzie?
23        A.    At his residence.
24        Q.    Turning your attention back to People's Number 1
25    marked for identification.  Prior to coming to testify
26    this morning, did you have an opportunity to review this
27    aerial photograph?
28        A.    I did.

G-8

```
 1         A.   Correct.
 2         Q.   Now, you said after you cleared Evelyn
 3   Johnston's house, you then went to the substation;
 4   correct?
 5         A.   Correct.
 6         Q.   At that point or within ten minutes, I believe,
 7   you heard another call?
 8         A.   Yes, ma'am.
 9         Q.   It was regarding the individual at the Bank of
10   America; is that right?
11         A.   Correct.
12         Q.   Did you then drive towards the Bank of America
13   or walk?
14         A.   I drove, ma'am.
15         Q.   You drove.  Did you drive -- how long did it
16   take you to get to the Bank of America?
17         A.   A minute or two.
18         Q.   So that was a minute or two from when you
19   received the call regarding the Bank of America incident?
20         A.   From once I got inside my vehicle, it took about
21   a minute or two to get down to downtown Big Basin.
22         Q.   When you were driving up towards the Bank of
23   America, were you actively looking for somebody who fit
24   the description?
25         A.   I was, ma'am.
26         Q.   You did not see anybody; correct?
27         A.   No, ma'am.
28         Q.   Now, you indicated on the following day, March
```

```
 1    3rd, at 8 a.m., you went to Mr. McKenzie's residence;
 2    correct?
 3         A    Yes, ma'am.
 4         Q.   Did it appear to you he had just gotten out of
 5    bed?
 6              MR. DUFFY:   Objection.  Calls for speculation.
 7              THE COURT:   Overruled.
 8              THE WITNESS:   It appeared so.
 9              BY MS. GALLARDO:   Q.   Thank you.
10              You had an officer assisting you on March 3rd;
11    correct?  Officer Thomas?  I'm sorry, Officer Torres?
12         A.   He did arrive at the scene, ma'am.
13         Q.   And he conducted a search of Mr. Israel's house;
14    correct?
15         A.   Yes, ma'am.
16         Q.   And he was not able to locate any person on his
17    property; correct?
18              MR. DUFFY:   Objection.  Lack of foundation.
19    Hearsay.
20              THE COURT:   Sustained.
21              BY MS. GALLARDO:   Q.   Do you know whether or not
22    any property was located inside Mr. Israel's -- Israel
23    McKenzie's house that Ms. Johnston had described to you
24    had been missing from her house?
25         A.   No, ma'am.
26         Q.   As far as you know, no checks were found in his
27    room; correct?
28         A.   Correct.
```

```
 1          Q.   Did you search his person?

 2          A.   Did I search his person?

 3          Q.   Yes.

 4          A.   I did.

 5          Q.   You found no checks on his person; correct?

 6          A.   No, ma'am.

 7          Q.   You didn't find any -- you already stated he

 8     didn't have any cash on his person; correct?

 9          A.   No, ma'am.

10          Q.   Did you find anything else that might have

11     belonged to Evelyn Johnston on Mr. McKenzie's person?

12          A.   No, ma'am.

13          MS. GALLARDO:   Q.   Nothing further.

14          THE COURT:   Redirect?

15          MR. DUFFY:   Thank you.

16                REDIRECT EXAMINATION BY MR. DUFFY

17          Q.   Deputy, to your knowledge, are the tenants who

18     lived next to Mrs. Johnston still living at that -- those

19     addresses?

20          A.   I don't know.

21          Q.   Okay.  Do you have any information that they're

22     not living there?

23          A.   No.

24          Q.   Okay.  And so if you wanted to go back and

25     interview those people, you could go check it out

26     yourself; is that true?

27          A.   I could, sir.

28          Q.   Any defense attorney or investigator could do
```

222

[EXHIBIT H-1]

Dear Honorable Judge Mullin III,

There are many reasons why I want to change my life. I know that deep down I am a good person who has a heart for other people. I know my life is valuable to God, and I can't go on living a selfish life. I am definatly one of those types of people with a highly addictive personality. Ever since I could remember my first use of marajuana around the age of 13 I abused it, and from that point on, I never used anything in moderation. My experimenting with marajuana led to constant use, showing my lack of self-control, and it did not stop there. I gradually fell into a self made prison of addiction, and I could not see any way out. By the time I was in my late twenties I was experiencing hopelessness through using heroin for a good part of 7-8 years, and my life was in shambles. I've truely been struggleing over the last 4-5 years. I honestly believe that comeing back to jail has helped me to realize my potential in a big way. I have many talents, along with a strong desire to recover, and I'm learning to really appreciate everything, and all things that are positive in life. I consider it a blessing to be attending these classes here in M5-D and I can see a major improvement in my spiritual, emotional, and physical health, and I am greatful for the opportunity to better myself as a person. I am doing well

254

[EXHIBIT H-02]

AROUND OTHERS COPEING WITH SIMILAR PROBLEMS
AND I'M READY TO SUCCEED WHERE I HAVE FAILED
IN THE PAST. I HAVE BEGUN TO REACH OUT TO OTHERS
SO THAT I MAY GROW, AND USE THE SKILLS I
POSSESS FOR SOMETHING OTHER THAN DRUGS AND
THE LIFESTYLE THAT GOES WITH IT, I'M SICK AND
TIRED OF THE HARSH CONSEQUENCES OF MY ADDICTION
AND I'M HONESTLY READY TO CHANGE MY LIFE. I'VE
ALLREADY BEGUN THE LONG PAINFUL PROCESS OF
CHANGE, LIVING AS A CHRISTIAN WITH A PURPOSE.
I HAVE USED THE LAST YEAR IN THE COUNTY JAIL
TO DAILY MAKE THE EFFORTS TO CHANGE. MY GOAL
AND DREAM NOW IS TO LIVE A PRODUCTIVE, HAPPY
LIFE, BOTH FOR MYSELF, AND MY FAMILY, AND I
KNOW I CAN SUCCEED IN SOCIETY WITH A POSITIVE
ATTITUDE. I AM SORRY FOR ALL THE WRONG CHOICES
I'VE MADE IN THE PAST, BUT I HAVE MADE THE PROMISE
TO MYSELF TO MOVE ON TO THE FUTURE, SO THAT I
AM NO LONGER HELD IN BONDAGE. I AM LIVING IN
REPENTANCE AND I AM PROUD OF MYSELF, AND THE
PROGRESS I'VE MADE. THANK-YOU KINDLY AND
SINCERELY FOR READING THESE WORDS

RESPECTFULLY,
ISRAEL MCKENZIE

*Israel McKenzie*

255

1   THAT IS THE FACTS, AND THE COMMITMENT, EITHER COUNTY JAIL OR

2   PRISON, REVIEWED ALL THE PROBATION ALL THAT INFORMATION

3   WHICH I NORMALLY FILE SEPARATE IS CONTAINED WITHIN THE

4   PROBATION REPORT.

5        THERE ARE A COUPLE THINGS I DID WANT TO POINT OUT IN

6   THE PROBATION REPORT AND THE PAPERS FILED BY MISS GALLARDO.

7   FIRST AND FOREMOST THE DEFENDANT'S STATEMENT AT PAGE FOUR OF

8   THE REPORT.  AND AFTER, EVEN AFTER THE TRIAL AND CONVICTION

9   BY THE JURY THE DEFENDANT DOES NOT ADMIT TO THE FACT THAT HE

10  ENTERED THE HOUSE.  ONLY STATES THAT THE DEFENDANT REPORTS

11  HE ENDED UP WITH STOLEN PROPERTY THAT WOULD BE THE, I GUESS,

12  THE PURSE, THE CONTENTS.  I WOULD POINT OUT THAT IN

13  MS. GALLARDO'S MOVING PAPERS AT PAGE FIVE, LINE SIX THROUGH

14  TEN HOWEVER THERE IS A STATEMENT OF FACTS THAT SUGGESTED

15  THAT MR. MCKENZIE DID, IN FACT, WALK THROUGH AN OPEN DOOR

16  INTO A PRIVATE RESIDENCE.  THERE SEEMS TO BE A CONFLICT

17  THERE.  FINALLY, WITH ALL DUE RESPECT TO MS. GALLARDO AT

18  PAGE TEN, LINE THREE HER FIRST SENTENCE OF THE PARAGRAPH MR.

19  MCKENZIE IS NOT A VIOLENT MAN OR A THREAT TO SOCIETY.

20  ALTHOUGH RESIDENTIAL BURGLARY IS NOT DEEMED TO BE A VIOLENT

21  FELONY IT IS A SERIOUS FELONY AND I DISAGREE THAT, I

22  DISAGREE WITH MS. GALLARDO'S BELIEF THAT MR. MCKENZIE IS NOT

23  A THREAT TO SOCIETY IN THE EVENT THAT ALL RESIDENTIAL

24  BURGLARIES ARE SERIOUS FELONIES AND SO MANY UNKNOWNS, SO

25  MANY POSSIBILITIES FOR FURTHER HARM WHEN AN INDIVIDUAL

26  BREAKS INTO THE HOME OF AN INDIVIDUAL.  AND IN THIS CASE A

27  WOMAN IN HER 80'S.  AND I, BASED UPON THOSE COMMENTS, AND

28  THE PROBATION REPORT I WOULD SUBMIT THE MATTER AND THE ASK

"EXHIBIT A-7"
("10 page Romero Motion")

LAW OFFICES OF THE PUBLIC DEFENDER
1  JOSE R. VILLARREAL, #96091
2  IRMA S. GALLARDO, #188931
   County of Santa Clara
3  120 Mission Street
   San Jose, California 95110
4  Telephone: (408) 299-7188

5  Attorneys for Defendant



FILED

MAR 2 3 2005

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
By _____
                Deputy

8  IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  IN AND FOR THE COUNTY OF SANTA CLARA

11 PEOPLE OF THE STATE OF CALIFORNIA,        No. CC448878

12                              Plaintiff,     REQUEST FOR COURT TO
                                               EXERCISE ITS DISCRETION
13              -vs-                            PURSUANT TO PENAL CODE
                                               SECTION 1385 AND STRIKE
14                                             PRIORS
15 ISRAEL MCKENZIE,
                                               Date: 4/1/2005
16                              Defendant.     Time: 9:00 a.m.
                                               Dept.: 92

17 TO THE CLERK OF THE ABOVE-ENTITLED COURT, AND
18 TO THE DISTRICT ATTORNEY FOR SANTA CLARA COUNTY:

19      NOTICE IS HEREBY GIVEN that on the 1st of April, 2005, at 9:00 a.m. in Department

20 92 of the above-entitled court, the above-named defendant will move the court to exercise its

21 discretion and dismiss Defendant's prior "strike" allegation(s) in the interest of justice pursuant

22 to Penal Code section 1385 (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497).

23 Dated: March 22, 2005

24                                      Respectfully submitted,

25                                      JOSE VILLARREAL
                                        Public Defender
26
27                                      _____
                                        IRMA S. GALLARDO
28                                      Deputy Public Defender

                                                            171

REQUEST FOR COURT TO EXERCISE ITS DISCRETION PURSUANT TO
PENAL CODE SECTION 1385 AND STRIKE PRIORS

1                         **DEFENDANT RESPECTFULLY REQUESTS THAT THE COURT**
                      **EXERCISE ITS DISCRETION UNDER PENAL CODE SECTION 1385**

2

3      In *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, the California Supreme

4 Court held that the trial court has the power under Penal Code section 1385(a) to dismiss or strike

5 prior convictions alleged within the meaning of Penal Code section 1170.12 and 667(b)-(i).

6 Striking such convictions does not "wipe out such prior convictions or prevent them from being

7 considered in connection with later convictions. (*People v. Burke* (1956) 47 Cal.2d 45). Rather,

8 it instead recognizes that the trial court has concluded that in the "interests of justice" defendant

9 "should not be required to undergo a statutorily increased penalty" which it would ordinarily be

10 required to impose upon the finding of a prior conviction. (*Id.*, at p. 50; cited with approval in

11 *People v. Superior Court (Romero)*, *supra*, at p.508.)

12      While the Three Strikes law recognized a trial court's broad authority to set aside prior

13 'strikes' for purposes of sentencing – and that this discretion was to be reviewed under the

14 deferential abuse of discretion standard – such power is not absolute. (*Romero*, at p. 530; *People*

15 *v. Orin* (1975) 13 Cal.3d 937, 945.) The authority to strike is limited by the "amorphous concept"

16 that it be "in furtherance of justice." (*Orin*, *supra*, 13 Cal.3d at p. 945) This requires that the

17 court, exercising its discretion under section 1385, give paramount consideration to both the

18 constitutional rights of the defendant as well as the interests of society represented by the People.

19 (*Romero*, *supra*, 13 Cal.4th 497, 530.) Hence, a court may not strike a sentencing allegation due

20 to mere personal antipathy to the three strikes law, judicial convenience, relief of court congestion

21 or as incentive for a plea of guilty are insufficient reasons for the valid exercise of this discretion.

22 (*People v. Romero*, *supra*, 13 Cal.4th, at pp. 530-531, quoting *People v. Kessel* (1976) 61

23 Cal.App.3d 322, 326.) The *Romero* court recognized that proper considerations would be the

24 defendant's background, the nature of the present offense and any other "individualized

25 considerations." (*Romero*, *supra*, quoting *People v. Dent* (1995) 38 Cal.App.4th 1726, 1731.)

26      In *People v. Williams* (1998) 16 Cal.4th 148, the California Supreme Court reviewed

27 whether a judge should exercised its 1385 power to strike a prior conviction. In that case the

28 defendant was charged with one count of driving while under the influence of PCP. The

1   information alleged that Mr. Williams had been separately convicted of two serious or violent
2   felonies in 1982: rape and attempted robbery.

3       The trial judge in Mr. Williams' case indicated during a pre-trial hearing that he believed
4   the case might be one in which it would be appropriate to dismiss some of the charged strike
5   priors. Mr. Williams immediately withdrew his not guilty plea and entered a plea of guilty. The
6   court subsequently struck one of his priors, noting its age. Mr. Williams was sentenced to nine
7   years in prison. The only information before the court appears to have been a pre-plea probation
8   report and Mr. Williams' criminal history. No further evidence was presented.

9       The prosecutor appealed the sentence. In holding that the trial judge had abused his
10  discretion, the California Supreme Court described the nature of the appropriate inquiry. It
11  indicated that the court in question must consider whether, in light of the nature and
12  circumstances of his present felonies and prior serious and/or violent felony convictions, and the
13  particulars of his background, character, and prospects, the defendant may be deemed to be
14  outside the scheme's spirit, in whole or in part, and hence should be treated as though he had
15  presently not committed one or more felonies and/or had not previously been convicted of one
16  or more serious and/or violent felonies. (Id., at p. 161.)

17      The Court found that Mr. Williams did come within the spirit of the three strikes law. In
18  fact, Mr. Williams' abysmal criminal record, filled as it was with crimes of violence, accompanied
19  by the dangerous nature of his current offense, placed him squarely within the sights of the law.

20      Other cases have been published finding no abuse of discretion when courts struck strikes.
21  One such case is *People v. Bishop* (1997) 56 Cal.App.4th 1245, the Court of Appeals found no
22  abuse of discretion when a court struck strikes. Mr. Bishop was convicted of violating Penal
23  Code section 666. He admitted six prison priors and three prior 'strike' convictions. The trial
24  court considered a number of factors in deciding to dismiss two of the prior strikes. These
25  included (1) the age of the strike prior; (2) Mr. Bishop's age (50 years old); (3) the minor nature
26  of his current offense; (4) the hefty nature of his current sentence. The court struck two of the
27  strikes even though Mr. Bishop's current offense was committed just three days after he was
28  released from prison. (*Id.*) The prosecutor appealed the sentence. The Court of Appeal affirmed

173

3

1  indicating that the trial court had properly exercised its discretion by considering the valid

2  mitigating factors of the nature of the current offense and the remoteness of Mr. Bishop's prior

3  convictions.

4       Recently, in *People v. Cluff* (2001) 87 Cal.App.4th 991, the Court of Appeals vacated a

5  trial court's sentence of 25-to-life in a Penal Code Section 290 prosecution.  The Court of

6  Appeals held that the trial court had abused its discretion when it denied Mr. Cluff's *Romero*

7  motion. Cluff was convicted of nine (9) counts of Penal Code Section 288 in the 1980s.  Cluff

8  also had convictions for indecent exposure in his past.  Despite the fact that Cluff made

9  conflicting representations about his whereabouts and that he left California to travel to Utah for

10  four (4) months without notifying the police or his parole agent, the 1st District stated its belief

11  that Cluff should be treated as though he falls outside the spirit of the three strikes law.  The

12  opinion reads as follows:

13       The nature of Cluff's current offense did not demonstrate recidivist tendencies
toward child molestation. While there is no requirement that a third strike be a
14  serious or violent felony, neither the Legislature nor the voters intended the Three
Strikes law to be used as a nuisance statute to rid society forever of persons who
15  fail to meet technical requirements to confirm an accurate registration.  *(Id.* at
1004.)

16       Following the dictates of *Romero, Williams, Bishop,* and *Cluff* this court should consider

17  the nature of the present offense, the defendant's background and character, and any other

18  individualized considerations with the end result being fair consideration of the interests of

19  defendant as well as the interests of society as represented by the People.

20  **CURRENT OFFENSE:**

21       Mr. McKenzie was found guilty after a jury trial on December 14, 2004, to one count of

22  Penal Code section 459/460(a), a felony, and one count of Penal Code section 496(a), a felony.

23  The court also found true that Mr. McKenzie had suffered six priors convictions for burglary and

24  that each of those burglary convictions constituted a strike under the law. The court also found

25  a prison prior and a 5 year prior to be true. Mr. McKenzie's current conviction stems from an

26  incident that occurred on March 2, 2004. In that incident, Mr. McKenzie stole a purse from the

27  dining room table of one of his neighbor's home. Mr. McKenzie then unsuccessfully solicited

28  someone at a bank to cash a check for him. Mr. McKenzie was arrested on March 3, 2004

4       **174**

1    Up until his arrest Mr. McKenzie was working as a landscaper, but only received free room
2  and board. He was not otherwise compensated for his labor and had no source of income. Mr.
3  McKenzie struggles with drug and alcohol addiction, a problem he has tried to overcome. He has
4  also been diagnosed as being bipolar. At the time of his arrest Mr. McKenzie was feeling the
5  effects of withdrawal combined with severe depression and thoughts of suicide

6    Feeling the effects of withdrawal and with no source of income Mr. McKenzie walked
7  through an open door and into a private residence. He took a purse from the table and later
8  attempted to have another person cash a check that he found in the purse. When the man refused
9  to cash the check Mr. McKenzie placed the purse into a mailbox, hoping it would be returned to
10  the owner. Any money obtained was to be used to purchase heroin.

11    There are certain factors mitigating Mr. McKenzie's current offense. First the victim did
12  not suffer a substantial financial loss. The victim testified that the at most she was missing eight
13  to ten dollars taken from her purse. Second, Mr. McKenzie attempted to return the purse to the
14  victim by putting the purse in a local mail box. Third, although this is a burglary, Mr. McKenzie
15  did not threaten anyone, nor were there any acts or attempted acts of violence. Mr. McKenzie did
16  not place anyone in danger nor did he intend to. At the time he was feeling the overwhelming
17  impact of withdrawal and the consuming need for heroin.

18  <u>BACKGROUND, CHARACTER AND PROSPECTS :</u>

19  *Criminal History*

20    While one's criminal history certainly triggers the Three Strikes law, it is not singularly
21  dispositive. It is one factor among many that the court must consider under the *Romero* line of
22  cases. It is true that Mr. McKenzie has eight prior felony convictions, but six of those prior
23  convictions are from one case. Those six prior convictions are the strike priors alleged in the
24  current case for violating Penal Code section 459/460(a) on May 20, 2002. In addition to that,
25  Mr. McKenzie has suffered two felony convictions for possession of a controlled substance and
26  7 misdemeanor convictions involving being under the influence of a controlled substance (3),
27  possession of paraphernalia (1), possession of a hypodermic needle (2), and petty theft (1).

28

**175**

REQUEST FOR COURT TO EXERCISE ITS DISCRETION PURSUANT TO
PENAL CODE SECTION 1385 AND STRIKE PRIORS

1   *Personal History*

2      A court should consider more than simply an offender's record when deciding whether to

3   exercise its 1385 discretion. (*People v. Bishop* (1997) 56 Cal.App.4th 1245.) Other factors

4   which must be considered relate specifically to the defendant and his background. (*People v.*

5   *Superior* Court (*Romero*), supra, at p. 531.) Additionally, the sentence is an appropriate factor

6   for the court to consider: "But a defendant's sentence is also a relevant consideration when

7   deciding whether to strike a prior conviction allegation; in fact, it is the overarching consideration

8   because the underlying purpose of striking prior conviction allegations is the avoidance of unjust

9   sentences." (*People v. Garcia* (1999) 20 Cal.4th 490, 500.)

10      Israel McKenzie has had a turbulent life that began at a young age. He was born on

11   October 4th, 1973, in Baltimore City, Maryland to Michael and Bonnie McKenzie. He is the elder

12   of two sons. In 1977 the McKenzie family moved to California after Michael had been offered

13   a job with United Airlines and settled in the Santa Clara area. However, Israel's parents' marriage

14   collapsed in 1984 when Israel's father discovered that his wife was having an extra-marital affair.

15   The couple went through a bitter divorce and his father moved his sons and himself back to

16   Maryland. In the ensuing years Israel was shuffled back and forth from his father in Baltimore

17   City and his mother in California.

18      Israel admits that his mother Bonnie was wholly unable to provide the support and stability

19   that a child needs in his young years, primarily because she was an alcoholic. In fact, many times

20   young Israel would come home only to find his mother passed out. To create even worse

21   conditions, Israel's mother entered into several abusive relationships adding to the already volatile

22   and unstable home life. This volatility was soon reflected in Israel's school work, where he began

23   failing classes and getting into trouble. To help reinstate some stability in Israel's life, he was sent

24   back to live with his father in Maryland.

25      However, Israel soon developed feelings of anxiety and could not concentrate on school

26   and ultimately dropped out in the eighth grade. At the time Israel had no support structure and

27   because of this he was unable to learn how to relate and socialize with children his age. In fact

28   he struggled to fit in with his peers and was unable to form any real relationships since he was

**176**

6

1  forced to leave his elementary school at a time he was beginning to learn how to form the
2  connections and bonds with his peers. Unfortunately he fell into a group of older kids who
3  introduced him to alcohol and marijuana. In his formative years Israel was denied the basic
4  relationship-building skills needed for a healthy and successful life. By the time Israel was fifteen
5  he was addicted to alcohol and began experimenting with drugs. By sixteen he began
6  experimenting with various drugs including, cocaine, heroin, PCP, and LSD.

7      However in 1995 Israel was determined to change his life and acquired his GED.
8  Subsequently he attended Campbell Community College where he enrolled in several computer
9  programing courses.

10                    Mental Health and Substance Abuse

11      Israel states that he continued to use marijuana and alcohol on a daily basis from the age
12  of thirteen until he was fifteen years old when he became addicted to alcohol and also commenced
13  using a cocktail of different illicit drugs. Israel found that alcohol helped calm him down without
14  which he experienced bouts of overwhelming sadness and anxiety. Israel states that by fifteen
15  years of age he was heavily addicted to alcohol. Later in his younger years he began intravenous
16  use of heroin. He has since battled with alcohol and heroin addiction.

17      Israel supported his addiction by obtaining casual laboring jobs, where he would work for
18  approximately two weeks at a time but once he received his first check he would leave and
19  continue his "chase for the constant high." By the end of 2001, Israel's drug use brought him
20  within the purviews of the law. He was arrested in November 2001 after he was found in
21  possession of a hypodermic needle a small amount of heroin and was also under the influence of
22  heroin and alcohol. Israel was granted Deferred Entry of Judgment. Subsequent arrests for being
23  under the influence of heroin placed Israel on supervised probation. Israel did enter Horizon
24  South on three separate occasions in 2000 and 2001 but each time he would remain in the
25  program for three months before relapsing and resuming his use of heroin, he was also terminated
26  from the program after he failed to tell staff that he was taking pain medication.

27      During this period Israel's also began experiencing severe bouts of depression. He began
28  having suicidal ideations and was mentally unstable. It is unclear how long Israel had suffered

7                                          177

1  from mental illness before he was diagnosed with Bipolar Disorder in 2001. He was prescribed
2  Trazadone, Celexa, Buspar and Ambient. During the same time period Israel was also diagnosed
3  as having Hepatitis C. (See attached records from Santa Clara Valley Medical Center.)

4      Israel continued to take his medications but did not abstain from using drugs or alcohol.
5  He stopped taking his medications when he was sent to prison in 2002. In 2001 Israel made
6  several trips to Emergency Psychiatric Services at Valley Medical Hospital. The medical reports
7  pointed to Israel suffering from depression and feeling suicidal. Israel had no support to help him
8  conquer his mental illness he therefore attempted to mask the symptoms by using alcohol and
9  heroin.

10      Israel's mother, Bonnie stated, as reported in his medical reports, that Israel experienced
11  mood swings that seem to worsen with anti-depressant medication. As is pointed out in the
12  record, Bonnie said that her son had nothing to live for and feels as if he were dying. The
13  depression was so bad at times that Israel became suicidal. However, the same report reveals that
14  Israel had sought help and said that he wished to get better.

15      Unfortunately by 2002 Israel fell back into his addiction and his condition worsened
16  precipitously until he bottomed-out. He turned back to drinking heavily and using heroin as a
17  means to escape the perpetual sadness. Having no means of income to support his addiction, it
18  is when Israel went on a spree of breaking into people's homes, only targeting those houses that
19  were unoccupied at the time. After accepting a plea bargain and pleading no contest to six counts
20  of first-degree burglary, Israel was sentenced to 4 years in prison. While in prison Israel served
21  his entire term in the fire-camp as a model prisoner. He was not taking his psychiatric medication
22  and it was the first period of sobriety since he was a teenager.

23      It was at the fire-camp where Israel found for the first time an inner confidence, and
24  decided with a strong conviction to change and become a better person. The fire-camp for the
25  first time gave Israel the support and positive feedback that he has lacked his entire life and which
26  bolstered his self-esteem. Unfortunately after a month on parole Israel once again fell to the
27  pressure of his addiction and returned to alcohol and heroin as his only recourse to avoid the
28  depression. However, Israel recognized that his life was spiraling out of control and that he

178

1   needed help. Israel decided to reach out to Celebrate Recovery, a twelve-step outpatient program
2   in Santa Cruz. He consistently attended Narcotics Anonymous and joined the Santa Cruz Bible
3   Church.

4       Israel believes that both the twelve-step program and the church gave him positive
5   reenforcement because they allowed him to talk about his addictions and to confront some of his
6   personal reasons that turned him to drugs and alcohol. However, the struggle was a difficult one
7   and in February 2004 Israel was admitted to Emergency Psychiatric Services due to recurring
8   depression and feelings of helplessness. He again was prescribed Celxa and Buspar. (See
9   attached records from Santa Clara Valley Medical Center.)

10      For most of his live Israel has had very little insight into his mental disorder and therefore
11  he has spent the last four years fluctuating between taking his medications to attempting to control
12  the symptoms by using heroin and alcohol. He has in the past and currently expresses a strong
13  desire to enter an intensive drug program. His sponsor, Reed Fulkerson, feels that a dual
14  diagnosis drug program would benefit him in allowing him to address both his drug addiction and
15  allow him to gain an understanding of his mental disorder. He also states "Israel failed in his
16  sobriety because like any newcomer to sobriety he felt he could conquer his addiction by himself,
17  however without constant support and reaffirmation it is a difficult road." Israel is not a violent
18  felon who poses to be a threat to society in fact his strike priors are indicative of a man who went
19  through a manic desire to feed his drug addiction. His mental illness also played a significant role
20  in propelling him to continue his use of heroin. The facts of the current case also do not present
21  him to be a violent felon. We therefore respectfully ask that this court strike the prior strikes and
22  allow Israel to seek the help that he so desperately needs. Israel genuinely desires a life that can
23  be free from drugs and alcohol.

24  **CONCLUSION:**

25      Mr. McKenzie should be treated as though he falls outside the "spirit" of the Three Srikes
26  law. The courts have recognized that automatic imposition of Three Strikes for every offender
27  who at any time triggers the application of the statute is not in "furtherance of justice."
28

9

**179**

1   Individualized considerations must be examined to determine whether or not such defendants fall
2   in "whole or in part" within the spirit of Three Strikes.

3        Mr. McKenzie is not a violent felon or a threat to society. He is a man who has suffered
4   from depression which forced him toward alcohol and heroin. The facts in the current case also
5   do not show Mr. McKenzie to be a violent felon. He has shown a great eagerness to seek help
6   and to overcome his mental and addictive diseases. Mr. McKenzie has suffered and battled a
7   mental disorder and has shown a potential to recover and live a healthy life.

8        Therefore, the defense respectfully requests that the court strike Mr. McKenzie's strike
9   priors and exercise its discretion pursuant to Penal Code Section 1385 in the interest of justice.
10  In the alternative, the court can strike all but one of Mr. McKenzie's strike priors and sentence
11  him as a 2nd striker. Under that sentencing scheme, the court would have the option of imposing
12  the mitigated term of 14 years (mid-term of 4 years x 2 = 8 + 5 years per PC 667(a) + 1 year per
13  PC 667.5(b) = 14 years) or the maximum term of 18 years (max-term 6 x 2 = 12 + 5 years per PC
14  667(a) + 1 year per PC 667.5(b) = 18 years).

15

16  Dated: March 22, 2005

17                              Respectfully submitted,

18                              JOSE VILLARREAL
                                Public Defender
19

20

21                              IRMA S. GALLARDO
                                Deputy Public Defender
22

23

24

25

26

27

28                                                              180

                                        10
            REQUEST FOR COURT TO EXERCISE ITS DISCRETION PURSUANT TO
                  PENAL CODE SECTION 1385 AND STRIKE PRIORS

1      Q.    And was it an actual checkbook or was it checks?

2      A.    It was checks.  They were still in the -- in the

3   holder that you rip them out of.

4      Q.    I have some checks.  Was it like this?

5      A.    Just like that.

6      Q.    Okay.  Just checks without any kind of covering or

7   leather cover or anything like that.

8      A.    Correct.

9      Q.    You didn't see any wallet associated with it.

10     A.    I did not.

11     Q.    Just a book of checks.

12     A.    Right.

13     Q.    Now, were you able to see, when you were having

14   contact with him, any name on the check?

15     A.    I did.

16     Q.    And what name did you see?

17     A.    The name I saw was Evelyn Johnston.

18     Q.    Back on March the 2nd, 2004, did you know an

19   Evelyn Johnston?

20     A.    I did not.

21     Q.    Did he say anything about a grandmother?

22     A.    He did.

23     Q.    What did he say about a grandmother?

24     A.    The reason that he gave to me for me wanting -- me

25   cashing a check for him was that his grandmother was sick

26   and that he had her checks.

27     Q.    How did you feel about being approached by him,

28   seeing this book of checks with a woman's name on it,

1    Q.    Can you see Saratoga Avenue?    [EX. H-9]

2    A.    Yes.

3    Q.    Now, at the corner there can you see what used to

4    be the fire station before it was torn down and rebuilt into

5    a rather large palace?

6    A.    Yes.

7    Q.    And next to it there is a building with a --

8    appears to be a white roof.  Do you know what building that

9    is?

10   A.    Yes, the sheriff and post office.

11   Q.    Is that the post office in Saratoga?

12   A.    Yes.

13   Q.    Is that post office different from the post office

14   in Saratoga on Allendale Avenue?

15   A.    Yes.  This is the branch they call "Village."

16   Q.    The Village post office?

17   A.    Yeah.

18   Q.    Now, was the purse that you found, the black

19   leather purse, found near the Village post office?

20   A.    It was across the street, the other side.

21   Q.    The other side of the street?

22   A.    Yes.

23   Q.    Okay.  What I'd like you to do is I'd like you to

24   go to the diagram -- or go to the aerial photograph with

25   this black Sharpie pen.  What I'd like you to do is find the

26   post box where you found the leather purse.  I'd like you to

27   draw a circle around where that location is and put the

28   letter P inside the circle.  Can you do that for us?

KELLY A. McCARTHY, CSR, RPR, CRR   CERTIFICATE NO. CSR 11651

```
           [H - 10]
1    THERE, SO SHE WALKS OUT TO HER DINING ROOM TABLE AND IT'S
2    GONE.  GONE.

3              NOW, SHE TESTIFIED ABOUT HER HOUSE.  THE DOOR WAS
4    AJAR, EFFECTIVELY OPEN.  SHE DIDN'T HEAR ANYBODY.  SHE
5    TALKED ABOUT HER CARPET.  SHE TALKED ABOUT HOW A FOUR
6    HUNDRED POUND PERSON COULD WALK ACROSS THAT CARPET AND SHE'D
7    NEVER KNOW.  (SHE'S OBVIOUSLY BUSY IN THE KITCHEN, (BLOWER ON)
8    WORKING AWAY, SHE'S NOT PAYING ATTENTION TO WHAT'S GOING ON
9    OUT FRONT.  SHE CAN'T EVEN SEE THE DINING ROOM FROM WHERE
10   SHE IS.  IT'S A PERFECT TIME FOR SOMEONE TO SLIP IN THE DOOR
11   AND TAKE THE PROPERTY.

12             NOW, WE KNOW THE DEFENDANT'S ALREADY BEEN THERE
13   BEFORE, COME BEGGING.  NOW, DOES HE COME BACK AND START
14   LOOKING INTO THE SCREEN?  WE KNOW FROM HER TESTIMONY HE
15   COULD, COULD SEE THE PURSE ON THE TABLE IF YOU STAND OUTSIDE
16   HER DOOR, LOOKING THROUGH THE SCREEN.  IT'S AN OPPORTUNITY,
17   HE GOES IN, TAKES THE PURSE.  GONE.

18             BY THE TIME SHE FIGURES IT OUT - SHE IS THINKING,
19   WELL MAYBE I DIDN'T PUT IT ON THE DINING ROOM TABLE) AND SHE
20   STARTS WALKING AROUND, I THINK SHE TESTIFIED, LOOKING FOR,
21   IT WAS ABOUT TWENTY MINUTES OF LOOKING AND SEARCHING TO MAKE
22   SURE, YOU KNOW, MAYBE I MIGHT HAVE MADE A MISTAKE.  (BUT SHE
23   DIDN'T MAKE A MISTAKE.  SHE LEFT IT ON THE TABLE, BUT SHE
24   WANTED TO BE CERTAIN BEFORE SHE PICKED UP THE PHONE AND
25   CALLED 911.  AND THE CLOCK IS IMPORTANT HERE.  THAT'S WHY
26   THE TIMING IS IMPORTANT.

27             WE KNOW BY WAY OF STIPULATION, THE PARTIES AGREED,
28   THAT HER 911 CALL CAME IN AT 1:55 P.M.  NOW, BEAR IN MIND
```

[I-1]

 1 | DO NOT CONSIDER THIS EVIDENCE FOR ANY PURPOSE
 2 | EXCEPT THE LIMITED PURPOSE FOR WHICH IT WAS ADMITTED.
 3 | NEITHER SIDE IS REQUIRED TO CALL AS WITNESSES ALL
 4 | PERSONS WHO MAY HAVE BEEN PRESENT AT ANY OF THE EVENTS
 5 | DISCLOSED BY THE EVIDENCE OR WHO MAY APPEAR TO HAVE SOME
 6 | KNOWLEDGE OF THESE EVENTS.
 7 | NEITHER SIDE IS REQUIRED TO PRODUCE ALL OBJECTS OR
 8 | DOCUMENTS MENTIONED OR SUGGESTED BY THE EVIDENCE.
 9 | IF YOU FIND THAT THE DEFENDANT WAS IN POSSESSION
10 | OF RECENTLY STOLEN PROPERTY, THE FACT OF THAT POSSESSION IS
11 | NOT BY ITSELF SUFFICIENT TO PERMIT AN INFERENCE THAT THE
12 | DEFENDANT IS GUILTY OF THE CRIME OF RESIDENTIAL BURGLARY.
13 | BEFORE GUILT MAY BE INFERRED, THERE MUST BE CORROBORATING
14 | EVIDENCE TENDING TO PROVE THE DEFENDANT'S GUILT.  HOWEVER,
15 | THIS CORROBORATING EVIDENCE NEED ONLY BE SLIGHT, AND NEED
16 | NOT BY ITSELF BE SUFFICIENT TO WARRANT AN INFERENCE OF
17 | GUILT.
18 | AS CORROBORATION, YOU MAY CONSIDER THE ATTRIBUTES
19 | OF POSSESSION - THAT'S TIME, PLACE, AND MANNER, THAT THE
20 | DEFENDANT HAD AN OPPORTUNITY TO COMMIT THE CRIME CHARGED.
21 | THE DEFENDANT'S CONDUCT AND/OR STATEMENTS MADE BY HIM --
22 | STRIKE THAT.  AND/OR STATEMENTS HE MAY HAVE MADE WITH
23 | REFERENCE TO THE PROPERTY.  A FALSE ACCOUNT OF HOW HE
24 | ACQUIRED POSSESSION OF THE STOLEN PROPERTY.  AND ANY
25 | EVIDENCE WHICH TENDS TO CONNECT THE DEFENDANT WITH THE CRIME
26 | CHARGED.
27 | EVERY PERSON WHO TESTIFIES UNDER OATH IS A
28 | WITNESS.  YOU ARE THE SOLE JUDGES OF THE BELIEVABILITY OF A

[EXHIBIT 1-2]



SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA CLARA
HONORABLE HUGH F. MULLIN III
HALL OF JUSTICE – EAST / DEPT 32

Date: 12/10/04                                                    Case No: CC448878
Deputy Court Clerk: Cathy Vieira
Court Reporter: K. McCarthy                                       Deputy: R. Hammelev

The People of the State of California          Deputy District Attorney: Mark Duffy
                    vs.

ISRAEL NOEL McKENZIE                           Counsel for Defendant: Irma Gallardo

NATURE OF PROCEEDINGS: JURY TRIAL – DAY TWO

9:40 am     Court convenes with all of the above named parties present. All sworn jurors are
            present. Mr. Duffy presents opening statements.

9:49 am     Ms. Gallardo reserves opening statement.

9:50 am     **WITNESS EVELYN JOHNSTON** is sworn and examined on behalf of the People under
            direct.

9:59 am     *PEOPLE'S EXHIBIT 1 – AN ARIAL PHOTO – is marked for identification.*

10:12 am    *PEOPLE'S EXHIBIT 2 – A COPY OF FOUR PHOTOGRAPHS ON ONE PAGE – is
            marked for identification.*

10:25 am    Ms. Gallardo conducts cross examination.

10:44 am    After redirect and re-cross examination, witness Johnston is excused. The jury is
            admonished; court adjourned for mid-morning recess.

11:08 am    Court reconvenes; all parties present as before.

            **WITNESS MASOUD H. MOGHADAM** is sworn and examined on behalf of the People
            under direct.

11:18 am    Ms. Gallardo conducts cross examination.

11:23 am    Witness Moghadam is excused. The Court accepts a stipulation as recited by Mr.
            Duffy.

            **WITNESS ARLIEGH OCHINERO** is sworn and examined on behalf of the People under
            direct.

**CRIMINAL MINUTES – PAGE 1 OF 2**          74

**[EXHIBIT I-5]**



## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA CLARA
## HONORABLE HUGH F. MULLIN III
## HALL OF JUSTICE – EAST / DEPT 32

Date: 12/13/04                                                Case No: CC448878
Deputy Court Clerk: Cathy Vieira
Court Reporter:  AM -M. Caldwell / PM – M. Davis                Deputy: R. Hammelev

The People of the State of California          Deputy District Attorney:  Mark Duffy
                    vs.

ISRAEL NOEL McKENZIE                           Counsel for Defendant:  Irma Gallardo

*NATURE OF PROCEEDINGS: JURY TRIAL – DAY THREE*

**9:24 am**    Court convenes with all of the above named parties present. All sworn jurors are
               present.

               WITNESS S.O.DEPUTY KEVIN MUNCY is sworn and examined on behalf of the
               people under direct.

**9:36 am**    Ms. Gallardo conducts cross examination.

**9:47 am**    After redirect examination, witness Muncy is excused.

               *Mr. Duffy moves for and the Court allows admission of exhibits 1 and 2 into
               evidence.*

               Both sides rest.

**9:48 am**    The jury is admonished; directed to return at 1:30 pm this date and excused.  The
               Court stands in recess.

**9:52 am**    OUT OF THE PRESENCE OF THE JURY: The Court convenes with the defendant
               and counsel present. The Court states, by CALJIC number, those jury instructions
               which will and will not be given to the jury.  Further, the Court indicates if modification
               will be made to the instruction.

**10:27 am**   Jury instruction conference complete; matter is continued to 1:30 pm. Court adjourned.

**2:15 pm**    Court convenes with all of the above named parties present. The sworn jurors are
               present.  The Court reads the jury instructions.

**2:35 pm**    Mr. Duffy presents opening argument.

## CRIMINAL MINUTES – PAGE 1 OF 2          145

1   no footprints on the carpet, although it had rained the day before. However, Ms. Johnston
2   testified that she had a blower going in the kitchen, that the floor was carpeted, and that
    "[a] 400-pound man could walk in the door, and you wouldn't hear him." The gardeners
3   were only there for "part of the time [she] was cooking." The day of the theft was "a
    lovely sunny day," supporting an inference that streets and sidewalks were dry, and "[y]ou
    would not see footprints on my carpet unless you had a really muddy foot."

4
5   Defendant's chief argument is that the evidence was insufficient to establish that the purse
    was in the house when it was taken. This hypothesis appears not to have been raised at
    trial. On the contrary, in argument to the jury defense counsel alluded to the lapse of time
6   "between the time that Ms. Johnston had put her purse down in the dining room" and
    defendant's encounter with witness Ochinero. Later he again referred to "the moment she
7   set the purse on the table." Defendant's belated suggestion that Ms. Johnston "was not
    sure" where she left the purse apparently rests on the fact that when she did not see it on
8   the table, she spent as much as 20 minutes searching the rest of the house. This would no
    doubt have supported an argument to the jury though none was made but it hardly
9   supports defendant's argument that her testimony was speculative. When an item goes
    missing, people often search in places where they do not expect to find it. This may betray
10  uncertainty about where they left it, but it may also reflect the wishful hope that their
    memory, however definite, is wrong. Ms. Johnston's implied acknowledgment of the
11  fallibility of human memory hardly impeaches her own distinct and uncontested
    recollection that she left the purse on the dining room table.
12  The evidence was sufficient to support an inference beyond a reasonable doubt that
    defendant took Ms. Johnston's purse from her home after entering for that purpose.
13
    Respondent's Exh. F at 3-4.
14       Petitioner argues that there was no evidence from which the jury could find beyond a
15  reasonable doubt that he or anyone else entered the house. However, if the jury believed the
16  testimony that the purse was in the house, that the door was unlocked, that someone could enter the
17  house without Mrs. Johnston being aware of it, and that shortly afterwards the purse was in a
18  neighbor's possession, the jury could also reasonably infer that the neighbor entered the house.
19  Thus, the decision of the Court of Appeal was not an unreasonable application of Jackson.

20
21                                      VII.
22  INSTRUCTING THE JURY WITH CALJIC NO. 2.15 DID NOT
    REDUCE THE PEOPLE'S BURDEN OF PROOF
23
24       Petitioner contends that his right to due process was violated by CALJIC No. 2.15, an
25  instruction that states that if the jury finds that the defendant was in possession of stolen property,
26  "the fact of that possession is not by itself sufficient to permit an inference that the defendant is
27  guilty of the crime of residential burglary," and that while corroborating evidence is required, "this
28

1           DO NOT CONSIDER THIS EVIDENCE FOR ANY PURPOSE

2   EXCEPT THE LIMITED PURPOSE FOR WHICH IT WAS ADMITTED.

3           NEITHER SIDE IS REQUIRED TO CALL AS WITNESSES ALL

4   PERSONS WHO MAY HAVE BEEN PRESENT AT ANY OF THE EVENTS

5   DISCLOSED BY THE EVIDENCE OR WHO MAY APPEAR TO HAVE SOME

6   KNOWLEDGE OF THESE EVENTS.

7           NEITHER SIDE IS REQUIRED TO PRODUCE ALL OBJECTS OR

8   DOCUMENTS MENTIONED OR SUGGESTED BY THE EVIDENCE.

9           IF YOU FIND THAT THE DEFENDANT WAS IN POSSESSION

10   OF RECENTLY STOLEN PROPERTY, THE FACT OF THAT POSSESSION IS

11   NOT BY ITSELF SUFFICIENT TO PERMIT AN INFERENCE THAT THE

12   DEFENDANT IS GUILTY OF THE CRIME OF RESIDENTIAL BURGLARY.

13   BEFORE GUILT MAY BE INFERRED, THERE MUST BE CORROBORATING

14   EVIDENCE TENDING TO PROVE THE DEFENDANT'S GUILT.  HOWEVER,

15   THIS CORROBORATING EVIDENCE NEED ONLY BE SLIGHT, AND NEED

16   NOT BY ITSELF BE SUFFICIENT TO WARRANT AN INFERENCE OF

17   GUILT.

18           AS CORROBORATION, YOU MAY CONSIDER THE ATTRIBUTES

19   OF POSSESSION - THAT'S TIME, PLACE, AND MANNER, THAT THE

20   DEFENDANT HAD AN OPPORTUNITY TO COMMIT THE CRIME CHARGED.

21   THE DEFENDANT'S CONDUCT AND/OR STATEMENTS MADE BY HIM --

22   STRIKE THAT.  AND/OR STATEMENTS HE MAY HAVE MADE WITH

23   REFERENCE TO THE PROPERTY.  A FALSE ACCOUNT OF HOW HE

24   ACQUIRED POSSESSION OF THE STOLEN PROPERTY.  AND ANY

25   EVIDENCE WHICH TENDS TO CONNECT THE DEFENDANT WITH THE CRIME

26   CHARGED.

27           EVERY PERSON WHO TESTIFIES UNDER OATH IS A

28   WITNESS.  YOU ARE THE SOLE JUDGES OF THE BELIEVABILITY OF A

(Exhibit 9)

---

INSTRUCTION NO.: _9_

    If you find that a defendant was in ▓▓▓▓▓ possession of recently [stolen] ▓▓▓▓▓ property, the fact of that possession is not by itself sufficient to permit an inference that the defendant ▓▓▓▓▓▓▓▓▓ guilty of the crime of _Residential Burglary_ . Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt.

    As corroboration, you may consider [the attributes of possession--time, place and manner,] [that the defendant had an opportunity to commit the crime charged,] [the defendant's conduct,] [▓▓▓▓▓ or ▓▓▓▓▓▓▓▓▓▓▓,] [and] ▓▓ [other statements [he/▓▓] may have made with reference to the property] [a false account of how [he/▓▓] acquired possession of the stolen property] [any other evidence which tends to connect the defendant with the crime charged].

2.15

[EXHIBIT I-7]

6

1   FIREARM OR AMMUNITION.  TO DO SO IS A NEW FELONY OFFENSE.

2   DO YOU UNDERSTAND THAT?

3             THE DEFENDANT:  YES, I DO.

4             THE COURT:  LET ME GO BACK TO THESE BEING

5   STRIKES.  AS YOU PROBABLY KNOW, IF YOU HAVE TWO STRIKES

6   WHICH NOW YOU'RE GOING TO HAVE SIX; IF YOU HAVE TWO STRIKES

7   AND YOU COMMIT ANY NEW FELONY, THE DISTRICT ATTORNEY CAN

8   USE, CAN ALLEGE THOSE AS PRIOR CONVICTIONS AND YOU COULD

9   FACE A MINIMUM OF 25 YEARS TO LIFE.

10            DO YOU UNDERSTAND THAT?

11            THE DEFENDANT:  YES.

12            THE COURT:   ALSO THESE ARE CALLED SERIOUS

13  FELONIES.  IF THE NEW OFFENSE WOULD BE A SERIOUS FELONY, IN

14  ADDITION TO MAKING YOUR SENTENCE 25 TO LIFE, IT CAN ADD,

15  EACH ONE OF THESE CAN ADD FIVE YEARS SO THAT WOULD BE AN

16  ADDITIONAL 30 YEARS; DO YOU UNDERSTAND THIS?

17            THE DEFENDANT:  YES.

18            THE COURT:  IN PLEADING NO CONTEST, YOU ARE

19  GIVING UP IMPORTANT CONSTITUTIONAL RIGHTS THAT APPLY

20  EQUALLY TO EACH OF THE CHARGES AND MOST OF THEM TO THE

21  VIOLATIONS OF PROBATION.

22            LET ME TALK TO YOU ABOUT THE VIOLATIONS OF

23  PROBATION.  AS TO THE VIOLATIONS OF PROBATIONS, YOU HAVE A

24  RIGHT TO HAVE A HEARING BEFORE A JUDGE SITTING ALONE.  AT

25  THAT HEARING THE BURDEN OF PROOF IS JUST BY A PREPONDERANCE

26  OF THE EVIDENCE.

27            DO YOU UNDERSTAND AND GIVE UP THE RIGHT TO HAVE A

28  HEARING ON YOUR VIOLATIONS OF PROBATION?

[EXHIBIT I-8] 1 of 2

7

1    THE DEFENDANT:  YES.

2         THE COURT:  NOW, AS TO THE NEW CHARGES, YOU

3    HAVE THE RIGHT TO HAVE A PRELIMINARY EXAMINATION.  AND AT

4    THAT HEARING THE DISTRICT ATTORNEY MUST PROVIDE SUFFICIENT

5    EVIDENCE TO SHOW THAT A FELONY HAS BEEN COMMITTED AND YOU

6    ARE THE PERSON GUILTY OF IT.

7         DO YOU UNDERSTAND AND GIVE UP THE RIGHT TO HAVE A

8    PRELIMINARY EXAMINATION IN EACH OF THESE MATTERS?

9         THE DEFENDANT:  YES, I DO.

10        THE COURT:  AFTER THAT, AS TO THE NEW CHARGES,

11   YOU HAVE THE RIGHT TO HAVE A TRIAL EITHER BEFORE A JURY OR

12   A JUDGE AND THAT APPLIES TO EACH OF THE SIX CHARGES.  AT

13   THE TRIAL THE DA MUST PROVE YOUR GUILT BEYOND A REASONABLE

14   DOUBT BEFORE YOU CAN BE CONVICTED OF A CHARGE.

15        DO YOU UNDERSTAND AND GIVE UP THE RIGHT TO HAVE A

16   TRIAL AS TO THESE NEW CHARGES?

17        THE DEFENDANT:  YES.

18        THE COURT:  NOW, AS TO THE VIOLATION OF

19   PROBATION AND THE HEARINGS ASSOCIATED WITH THAT, THE

20   PRELIMINARY EXAMINATION AND THE TRIAL, WHETHER IT'S BEFORE

21   A JUDGE OR JURY; YOU HAVE THE FOLLOWING FOUR CONSTITUTIONAL

22   RIGHTS THAT YOU MAY EXERCISE, BUT YOU GIVE THEM UP TODAY BY

23   WAY OF YOUR PLEA OF GUILTY AND YOUR ADMISSION OF THE

24   VIOLATIONS.

25        THE FIRST IS RIGHT TO CONFRONT AND CROSS-EXAMINE

26   WITNESSES.  THAT MEANS YOU CAN SEE AND HEAR THEM AND

27   THROUGH YOUR ATTORNEY ASK QUESTIONS.  DO YOU UNDERSTAND AND

28   GIVE UP THIS RIGHT?

EXHIBIT 2

```
                                                                4
1              THE DEFENDANT:  YES.

2              THE COURT:   SIR, IN PLEADING GUILTY YOU'LL

3    GIVING UP IMPORTANT CONSTITUTIONAL RIGHTS THAT APPLY

4    EQUALLY TO EACH OF THE CHARGES.

5              FIRST IS THE RIGHT TO A TRIAL BY A JURY OR A

6    JUDGE.  DO YOU UNDERSTAND AND GIVE UP THIS RIGHT?

7              THE DEFENDANT:  YES.

8              THE COURT:   YOU HAVE THE FOLLOWING RIGHTS THAT

9    YOU CAN USE AT THE TRIAL FOR YOUR DEFENSE.  FIRST IS THE

10   RIGHT TO CONFRONT AND CROSS-EXAMINE WITNESSES.  DO YOU

11   UNDERSTAND AND GIVE UP THIS RIGHT?

12             THE DEFENDANT:  YES.

13             THE COURT:   NEXT IS RIGHT TO USE THE SUBPOENA

14   POWER OF THE COURT TO COMPEL THE ATTENDANCE OF WITNESSES

15   AND PRODUCTION OF EVIDENCE.  DO YOU UNDERSTAND AND GIVE UP

16   THIS RIGHT?

17             THE DEFENDANT:  YES.

18             THE COURT:   YOU HAVE THE RIGHT AGAINST SELF

19   INCRIMINATION.  NO ONE CAN FORCE YOU TO TESTIFY AND NO ONE

20   CAN FORCE YOU TO PLEAD GUILTY.  DO YOU UNDERSTAND AND GIVE

21   UP THIS RIGHT?

22             THE DEFENDANT:  YES.

23             THE COURT:   FINALLY YOU HAVE RIGHT TO TESTIFY

24   ON YOUR OWN BEHALF.  DO YOU UNDERSTAND AND GIVE UP THIS

25   RIGHT?

26             THE DEFENDANT:  YES.

27             THE COURT:   FURTHER VOIR DIRE?

28             MR. FLATTERY:   NO.
```

[EXHIBIT I-9] 1 of 2

8

1    THE DEFENDANT:  YES.

2    THE COURT:    YOU HAVE THE RIGHT TO USE THE

3    SUBPOENA POWER OF THE COURT TO COMPEL THE ATTENDANCE OF

4    WITNESSES AND PRODUCTION OF EVIDENCE.  THIS IS AT NO COST

5    TO YOU.  DO YOU UNDERSTAND AND GIVE UP THIS RIGHT?

6    THE DEFENDANT:  YES.

7    THE COURT:    YOU HAVE A RIGHT AGAINST SELF

8    INCRIMINATION ALSO KNOWN AS THE RIGHT TO REMAIN SILENT.  NO

9    ONE CAN FORCE YOU TO PLEAD GUILTY, NO ONE CAN FORCE YOU TO

10   ADMIT YOU VIOLATED YOUR PROBATIONS, AND NO ONE CAN FORCE

11   YOU TO TESTIFY.

12   DO YOU UNDERSTAND AND GIVE UP THE RIGHT AGAINST

13   SELF INCRIMINATION?

14   THE DEFENDANT:  YES.

15   THE COURT:    FINALLY SIR, YOU HAVE RIGHT TO

16   TESTIFY AS PART OF YOUR DEFENSE SHOULD YOU CHOOSE TO DO SO.

17   DO YOU UNDERSTAND AND GIVE UP THIS RIGHT?

18   THE DEFENDANT:  YES.

19   THE COURT:  FURTHER VOIR DIRE MR. FLATTERY?

20   MR. FLATTERY:  NO, YOUR HONOR.

21   THE COURT:    ARE YOU SATISFIED MR. KENNEDY?

22   MR. KENNEDY:  YES.

23   THE COURT:    AND MR. MC KENZIE, DO YOU HAVE ANY

24   QUESTIONS OF YOUR ATTORNEY, THE DA OR MYSELF BEFORE I ASK

25   YOUR PLEAS?

26   THE DEFENDANT:  NO, I DO NOT.

27   THE COURT:    LET ME DO THE NEW CHARGES.  AND

28   REMEMBER EACH OF THESE IS A RESIDENTIAL FIRST DEGREE

EXHIBIT I-9 2 of 2

5

1            THE COURT:  ARE YOU SATISFIED MR. KENNEDY?

2            MR. KENNEDY:  YES.

3            THE COURT:  MR. MC KENZIE, DO YOU HAVE ANY

4 QUESTIONS REGARDING THE NEW PLEA?

5            THE DEFENDANT:  NO, MA'AM.

6            THE COURT:  HOW DO YOU PLEAD TO HEALTH AND

7 SAFETY CODE SECTION 11550(A), USING OR BEING UNDER THE

8 INFLUENCE OF OPIATES; GUILTY OR NOT GUILTY?

9            THE DEFENDANT:  GUILTY.

10            THE COURT:  HOW DO YOU PLEAD TO COUNT 2,

11 POSSESSION OF A HYPODERMIC NEEDLE OR SYRINGE, BUSINESS AND

12 PROFESSIONS CODE SECTION 4140 A MISDEMEANOR?

13            THE DEFENDANT: GUILTY.

14            THE COURT:  COUNSEL, YOU CONCUR WITH YOUR

15 CLIENT'S WAIVERS, PLEAS AND STIPULATE TO A FACTUAL BASIS?

16            MR. KENNEDY:  YES.

17            THE COURT:  AND PEOPLE STIPULATE TO A FACTUAL

18 BASIS?

19            MR. FLATTERY:  YES.

20            THE COURT:  I'LL WAIVE-- EXCUSE ME.  AT THIS

21 TIME I'LL ACCEPT THE WAIVERS, PLEAS, STIPULATION.  I FIND

22 MR. MC KENZIE UNDERSTANDS AND FREELY WAIVES HIS

23 CONSTITUTIONAL RIGHTS.

24       I FIND HE UNDERSTANDS THE NATURE OF THE CRIME

25 CHARGED AND ALL CONSEQUENCES OF THE PLEAS.  THE PLEAS ARE

26 ENTERED FREELY, KNOWINGLY AND VOLUNTARILY AND THERE IS A

27 SUFFICIENT FACTUAL BASIS FOR THEM CONTAINED IN THE POLICE

28 REPORTS IN THE COURT'S FILE.

[EXHIBIT I-10]

## ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE
### [NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]

CR-290

☒ SUPERIOR   COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
☐ MUNICIPAL   BRANCH OR JUDICIAL DISTRICT   HALL OF JUSTICE

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: **ISRAEL NOEL MCKENZIE**    DOB: **10-04-73**    EE220921   -A

AKA:   -B

CIIF:   -C

BOOKING #: **02011418**   ☐ NOT PRESENT

COMMITMENT TO STATE PRISON   ☐ AMENDED   -D
ABSTRACT OF JUDGMENT              ABSTRACT

| DATE OF HEARING | DEPT. NO. | JUDGE |
|---|---|---|
| 06-20-02 | 80 | JEAN HIGH WETENKAMP |

| CLERK | REPORTER | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|
| C. DAVILA | B. GONZALEZ | DANTSUKA |

| COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | |
|---|---|---|
| T. FLATTERY | C. KENNEDY | ☒ APPTD. |

1. Defendant was convicted of the commission of the following felonies:
   ☐ Additional counts are listed on attachment
   ___ (number of pages attached)

| CNT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (MO/DATE/YEAR) | jdr | conv. by court | conv. by jury | plea | TERM (L, M, U) | ENHANCEMENT | CONSECUTIVE 1/3 VIOLENT | CONSECUTIVE 1/3 NON-VIOLENT | CONSECUTIVE FULL TERM | INCOMPLETE SENTENCE enhanced | 654 STAY | PRINCIPAL OR CONSECUTIVE TIME IMPOSED YRS. | MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 459/460(A) | 1ST DEGREE BURGLARY | 2002 | 05-20-02 | | | X | | M | | | | | | | 4 | 0 |
| 2 | PC | 459/460(A) | 1ST DEGREE BURGLARY | 2002 | 05-20-02 | | | X | | M | X | | | | | | (4 | 0) |
| 3 | PC | 459/460(A) | 1ST DEGREE BURGLARY | 2002 | 05-20-02 | | | X | | M | X | | | | | | (4 | 0) |
| 4 | PC | 459/460(A) | 1ST DEGREE BURGLARY | 2002 | 05-20-02 | | | X | | M | X | | | | | | (4 | 0) |
| 5 | PC | 459/460(A) | 1ST DEGREE BURGLARY | 2002 | 05-20-02 | | | X | | M | X | | | | | | (4 | 0) |
| 6 | PC | 459/460(A) | 1ST DEGREE BURGLARY | 2002 | 05-20-02 | | | X | | M | X | | | | | | (4 | 0) |

2. ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| CNT. | ENHANCEMENT | YRS | ENHANCEMENT | YRS | ENHANCEMENT | YRS | ENHANCEMENT | YRS | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

3. ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST enhancements stricken under PC 1385.

| ENHANCEMENT | YRS | ENHANCEMENT | YRS | ENHANCEMENT | YRS | ENHANCEMENT | YRS | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

4. ☐ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).

5. INCOMPLETED SENTENCE(S) CONSECUTIVE

6. ☐ TOTAL TIME ON ATTACHED PAGES:

| COUNTY | CASE NUMBER |
|---|---|
| | |
| | |

7. ☐ Additional indeterminate term (see CR-292).

8. TOTAL TIME: | 4 | 0 |

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.
(Continued on reverse)

Form Adopted by the
Judicial Council of California
CR-290 (Rev. January 1, 1999)

### ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE
### [NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-290 ATTACHED]

Penal Code
§§ 1213, 1213.5

158

EXHIBIT I-11

| PEOPLE OF THE STATE OF CALIFORNIA vs. | | | |
|---|---|---|---|
| DEFENDANT: **ISRAEL NOEL MCKENZIE** | | | |
| EE220921 -A | -B | -C | -D |

9. FINANCIAL OBLIGATIONS (including any applicable penalty assessments):
   a. RESTITUTION FINE of: $4800 per PC 1202.4(b) forthwith per PC 2085.5.
   b. RESTITUTION FINE of: $4800 per PC 1202.45 suspended unless parole is revoked.
   c. RESTITUTION of STBD per PC 1202.4(f) to ☐ victim(s)* ☐ Restitution Fund
      (*List victim name(s) if known and amount breakdown in item 11, below.)
      (1) ☐ Amount to be determined.
      (2) ☐ Interest rate of: ___% (not to exceed 10% per PC 1204.4(f)(3)(F).
   d. ☐ LAB FEE of: $____ for counts: ____ per H&SC 11372.5(a).
   e. ☐ DRUG PROGRAM FEE of $150 per H&SC 11372.7(a).
   f. ☐ FINE of $___ per PC 1202.5.

10. TESTING
    a. ☐ AIDS pursuant to   ☐ PC 1202.1   ☐ other (specify):
    b. ☐ DNA pursuant to   ☐ PC 290.2   ☐ other (specify):

11. Other orders (specify):
RESTITUTION:
$442 - ROBERTA GOODWIN
$488.4 LEO RADLAW THRU DEPT OF REVENUE
→ YIN LIN;
& SANDRA BUTLER
↳ HOLLY VARGANU
& ROBERT SCHRIEBER
$10 PURS PC1202.05; REFERRED TO DEPT OF REVENUE; PROBATION IS DENIED; DEFT ADVISED OF 3 YRS PAROLE.

12. Execution of sentence imposed
    a. ☒ at initial sentencing hearing. ✓
    b. ☐ at resentencing per decision on appeal.
    c. ☐ after revocation of probation.
    d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
    e. ☐ other (specify):

13. CREDIT FOR TIME SERVED

| CASE NUMBER | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | |
|---|---|---|---|---|
| EE220921 -A | 176 | 118 | 58 | ☒ 4019 ☐ 2933.1 |
| -B | | | | ☐ 4019 ☐ 2933.1 |
| -C | | | | ☐ 4019 ☐ 2933.1 |
| -D | | | | ☐ 4019 ☐ 2933.1 |

| DATE SENTENCE PRONOUNCED: | SERVED TIME IN STATE INSTITUTION: | | |
|---|---|---|---|
| 06-20-02 | ☐ DMH | ☐ CDC | ☐ CRC |

14. The defendant is remanded to the custody of the sheriff ☒ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays.

To be delivered to ☒ the reception center designated by the director of the California Department of Corrections.
☒ other (specify): DEFT TO BE TRANSPORTED TO CDC; PRESENTLY SERVING SENTENCE.

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | | |
|---|---|---|
| C.R. HALSTROM | | 06-27-02 |

CR-290 (Rev. January 1, 1999)    ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE

159



c/o Smith  7-22-08

ROBERT HANSON V-63682
C.S.P. CORCORAN 3B03 # 203
P.O. BOX 3466, CORCORAN, CA.
93212-3466

CORCORAN STATE PRISON

UNITED STATES DIST
NORTHERN DISTRICT
CALIFORNIA
450 GOLDEN GATE A
SAN FRANCISCO, CA
94102

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF
CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA.
94102



RECEIVED
☐UNSEALED
☐WITHOUT CONTENTS
☐IN DAMAGED CONDITION
AT _____



PRIORITY
MAIL
UNITED STATES POSTAL SERVICE
www.usps.com

Label 107R, February 2006